UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Orient Plus International Limited; Union Hi-Tech Development Limited; and Golden Genius International Limited,<br><br>                              Plaintiffs,<br><br>vs.<br><br>Baosheng Media Group Holdings Limited; Wenxiu Zhong; Sheng Gong; Yu Zhong; Zuohao Hu; Adam (Xin) He; Yue Jin; Yanjun Hu; Univest Securities, LLC; The Benchmark Company, LLC; WestPark Capital, Inc.; Friedman LLP; and Marcum LLP,<br><br>                              Defendants. | Civil Action No. 1:24-cv-00744-JLR |

**MEMORANDUM OF LAW IN SUPPORT OF UNDERWRITER DEFENDANTS UNIVEST SECURITIES, LLC, THE BENCHMARK COMPANY, LLC, AND WESTPARK CAPITAL, INC.'S MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................................ 1

II. STATEMENT OF FACTS ...................................................................................... 3

    A.  BAOS's IPO ................................................................................................ 3

    B.  Plaintiff Alleges That A Business-Ending Government Investigation
        "Became Clear" To The Underwriters Pre-IPO ...................................... 4

    C.  Contrary to Plaintiffs' Allegations, Plaintiffs' "Insider" Specifically Told
        Them That BAOS Was Not The Target Of Any Investigation Until After
        The IPO .................................................................................................... 5

III. LEGAL STANDARDS ............................................................................................ 8

IV. ARGUMENT ............................................................................................................ 9

    A.  The TAC's Attached Call Transcript Shows That The Alleged
        Government Investigation Did Not Target BAOS Until *After* The IPO—
        Meaning It States No Claim Against The Underwriters Under Any Theory
        Of Falsity .................................................................................................. 9

    B.  The TAC Cannot Survive Rule 9(b) ...................................................... 11

    1.  Rule 9(b) Applies Where Securities Act Claims Sound In Fraud. ...................... 11

    2.  Plaintiffs' Boilerplate Disclaimers Cannot Avoid Rule 9(b)'s Application
        to Their Claims Against The Underwriters ............................................ 12

    3.  The TAC Fails to Satisfy Rule 9(b) As To The Underwriters. ........................... 16

    C.  Even Under A Negligence Theory, The Complaint Fails. .................................. 19

    1.  The Underwriters May, As A Matter of Law, Rely on Expertised Materials
        Such as Audited Financials And Legal Opinions When Conducting
        Reasonable Due Diligence. ...................................................................... 19

    2.  Reasonableness Exists Even If The Disclosures Regarding Governmental
        Investigations Were Not Expertised. ...................................................... 20

V.  CONCLUSION ...................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alcatel Sec. Litig.*,
382 F. Supp. 2d 513 (S.D.N.Y. 2005) ..................................................................15

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*,
794 F. Supp. 1424 (D. Ariz. 1992) .....................................................................20

*In re Ambac Financial Group, Inc. Securities Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010) .................................................................14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..............................................................................................8

*Carroll v. LeBoeuf, Lamp, Greene & MacRae, LLP*,
623 F. Supp. 2d 504 (S.D.N.Y. 2009) .................................................................12

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
616 F. Supp. 3d 192 (E.D.N.Y. 2022) .................................................................14

*In re Countrywide Financial Corp. Sec. Litig.*,
588 F.Supp.2d 1132 (C.D.Cal. 2008) ..................................................................19

*In re Elan Corp.*,
2004 WL 1305845 (S.D.N.Y. May 18, 2004) .....................................................15

*Endo v. Albertine*,
863 F. Supp. 708 (N.D. Ill. 1994) ..................................................................20, 21

*Feit v. Leasco Data Processing Equip. Corp.*,
332 F. Supp. 544 (E.D.N.Y. 1971) .....................................................................20

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) .................................................................16

*Harris v. Amtrust Fin. Servs., Inc.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015) .................................................................17

*In re HEXO Corp. Securities Litigation*,
524 F.Supp.3d 283 (S.D.N.Y. 2021) ...................................................................15

*Johnson v. NYFIX, Inc.*,
399 F. Supp. 2d 105 (D. Conn. 2005) ..................................................................16

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005)........................................................................11, 14, 15

*In re Lululemon Secs. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014)........................................................................11

*Luo v. Sogou, Inc.*,
   465 F. Supp. 3d 393 (S.D.N.Y. 2020)........................................................................10, 12

*McDonald v. City of Troy*,
   542 F. Supp. 3d 161 (N.D.N.Y. 2021)........................................................................15

*In re Meta Materials Inc. Sec. Litig.*,
   2023 WL 6385563 (E.D.N.Y. 2023)........................................................................14

*In re Micro Focus Int'l Plc Sec. Litig.*,
   2020 WL 5817275 (S.D.N.Y. 2020)........................................................................9

*Pani v. Empire Blue Cross Blue Shield*,
   152 F.3d 67 (2d Cir. 1998)........................................................................19

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
   645 F. Supp. 2d 210 (S.D.N.Y. 2009)........................................................................11, 16

*In re Qudian Inc. Sec. Litig.*,
   2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019)........................................................................8

*Reynolds-Sitzer v. Eisai, Inc.*,
   586 F. Supp. 3d 123 (N.D.N.Y. 2022)........................................................................2

*Richman v. Goldman Sachs Grp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012)........................................................................10

*Ross v. Lloyds Banking Group, PLC*,
   2012 WL 4891759 (S.D.N.Y. 2012)........................................................................16, 17, 18

*Schneider v. Traweek*,
   1990 WL 169856 (C.D. Cal. 1990)........................................................................20

*Shuvalova v. Cunningham*,
   2010 WL 5387770 (N.D. Cal. 2010)........................................................................13

*In re Software Toolworks Inc.*,
   50 F.3d 615 (9th Cir. 1994)........................................................................19

*South Cherry St. v. Hennessee Group*,
   573 F.3d 98 (2d Cir. 2009)........................................................................13, 14

*SUN, A Series of E Squared Investment Fund, LLC v. Sundial Growers Inc.*,
  2021 WL 4482276 (S.D.N.Y. 2021)............................................................................9

*Teams. Local 445 v. Dynex Cap*,
  531 F.3d 190 (2d Cir. 2008)....................................................................14, 17, 18

*Teamsters Allied Benefit Funds v. McGraw*,
  2010 WL 882883 (S.D.N.Y. 2010)...........................................................................17

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
  504 F. Supp. 3d 224 (S.D.N.Y. 2020).....................................................................11

**Statutes**

15 U.S.C. § 77k(a), § 77l(a)(2) ................................................................................8

**Other Authorities**

Fed. R. Civ. P 9(b) ............................................................................ *passim*

Defendants Univest Securities, LLC ("**Univest**"), The Benchmark Company, LLC ("**Benchmark**"), and Westpark Capital, Inc.'s ("**Westpark**," collectively, the "**Underwriters**"), respectfully move to dismiss Plaintiff Golden Genius International Limited ("**Golden**")'s Third Amended Complaint (the "**Complaint**" or "**TAC**").[1]

## I.    INTRODUCTION

Boilerplate disclaimers to the contrary, the Third Amended Complaint ("TAC") still accuses the Underwriters of securities fraud in connection with Baosheng Media ("BAOS")'s February 2021 IPO. But although it newly details how Plaintiffs learned of a purported fraud by BAOS, it made ***no*** substantive amendments at all as to the Underwriters.

Specifically, the TAC newly alleges that a BAOS insider told Plaintiffs over the phone in June 2023 that, "one to two months before and continuing through the date of the IPO," ten members of BAOS's management were detained in a government investigation, its CEO went into hiding, and it suspended operations, leaving the insider himself in charge. *Id*. ¶¶ 43-53.

At a glance, this sounds bad. But Plaintiffs appended a transcript of the recorded call. Dkt. 128-1 (TAC Ex. A "Transcript" or "Tr."). Assuming it to be true and correct, Plaintiffs' "insider" states on the transcript that: (i) pre-IPO, the government was investigating a company "several layers of separation" away from BAOS; (ii) BAOS "thought" that the investigation only concerned *that* company, and gave voluntary "cooperation" to supply information about *that* entity; and (iii) it was only "after the listing", that BAOS became a target of the authorities precisely *because* it was "a listed company." Tr. at 42, 47-48. As the insider repeatedly explained: "They don't bother companies that are not listed. They are actually just targeting you

---

[1] The only claims against the Underwriters are Section 11 and 12(a)(2) claims brought by Golden. However, Plaintiffs' main witness Mr. Hu Dong, who recorded the call with the BAOS insider Mr. Yanjun Hu, works for Plaintiff Orient Plus International Limited ("Orient"), who did not bring claims against the Underwriters.

for becoming a listed company." *Id.* In other words, the transcript does not jive with Plaintiffs'
characterizations of what was said.

But even if it did, in particularizing an alleged fraud at BAOS, the TAC continues to
allege in purely conclusorily terms that the same fraud "became clear" to the Underwrites pre-
IPO, who abetted it. TAC ¶¶ 107, 112. How and when these facts "became clear" to them, or
why they would have been motivated to commit this kind of fraud is not explained at all.

Under these facts, the TAC must be dismissed for numerous reasons.

***First***, the Underwriters could not have fraudulently withheld or negligently failed to
discover something that did not happen. Here, Plaintiff's own transcript makes clear that BAOS
was not a government target until *after* it IPO'ed, so the IPO prospectus could not have been
false and misleading by not disclosing facts unknown to anyone at the time.

But even assuming that BAOS was the investigation target pre-IPO. The TAC fails.

***Second***, Plaintiff Golden conclusorily says it is not alleging fraud but negligence. This
cannot circumvent Rule 9(b) because the TAC: (i) continues to plead that severely negative facts
"became clear" to the Underwriters, who hid these facts; (ii) pleads solely this single course of
fraudulent conduct without pleading ***any*** distinct facts to support a negligence theory (which the
law requires); and (iii) continues to disclaim fraud using conclusory boilerplates alone.

Even setting aside the affirmative allegations of fraud, the TACs still does not sound in
negligence because, absent extremely reckless, it is not plausible for any underwriter of a
NASDAQ IPO to overlook an essentially shut down company with detained executives and a
missing CEO. And, to plead extreme recklessness, the TAC must still satisfy Rule 9(b), which
requires "specifying the who, what, when, where, and how … ." *Reynolds-Sitzer v. Eisai, Inc.*,
586 F. Supp. 3d 123, 135 (N.D.N.Y. 2022) (cleaned up).

Here, however, despite dozens of pages of amendments, the TAC adds nothing about the Underwriters. *Cf.* Ex. 1, hereto (Redline between TAC and SAC). Indeed, just like the SAC, all of the TAC's fact allegations about the Underwriters appear in just ten conclusory paragraphs, five of which are copies of the other. *Cf.* TAC ¶¶ 103-107 *with* ¶¶ 108-112. In these, Plaintiffs state that the fraud "became clear" to Underwriters simply because they were in "communication" with BAOS. *Id*. Nothing is said about the "who, what, when, where, and how." As with the SAC, this failure to particularize is fatal.

***Third***, even assuming the claims against the Underwriters sounded in negligence (they do not), *and* assuming BAOS was targeted pre-IPO (it was not), the TAC would still fail.

Pre-IPO, Dentons LLP, BAOS's PRC counsel, gave an opinion letter, attached to the registration statement, confirming without qualification that BAOS's disclosures concerning legal proceedings and its business existence were accurate. Such expertised portions of registration statements can be relied upon by Underwriters to establish a due diligence defense as a matter of law. By the same token, Underwriters holding such an opinion and audited finanicals cannot be expected to question an issuer's very business existence or face negligence claims.

In short, not only does the TAC ***still*** fail to plead at all the who, what, where, and how of the fraud it accuses the Underwriters of, its newly particularized allegations as to BAOS only make the reasons for dismissing the Underwriters much stronger.

## II.    STATEMENT OF FACTS

### A.    BAOS's IPO

BAOS is an online marketing solutions provider. TAC ¶ 5. BAOS filed its first Registration Statement with the SEC on July 10, 2020. *Id*. ¶¶ 29-30 Following amendments, the Registration Statement became effective on February 5, 2021. *Id.* BAOS then completed its IPO and was listed on NASDAQ on February 10, 2021. *Id*.

Univest was the lead underwriter for the IPO, while Benchmark and WestPark were secondary underwriters. *Id*. ¶¶ 103, 108. Golden purchased $3.5 million shares. *Id*. ¶ 41.

BAOS's registration and offering materials disclosed, under "**LEGAL MATTERS**", that "Legal matters as to PRC law will be passed upon for us by Dentons LLP." Ex. 2, at 159. Consistent with this disclosure, Dentons LLP, as "PRC counsel for the Company," issued an Opinion Letter on the subject that accompanied the IPO materials. Ex. 3. As it opined, under an extremely broad definition of "Governmental Authorization" covering "any" kind of "approval, consent, … sanction, certificate, authorization, … permission, endorsement, annual inspection, clearance, qualification, permit or license":

> To the best of our knowledge after due inquiry, none of [BAOS's] PRC Subsidiaries has taken any corporate action, nor have any legal proceedings commenced against it, ... for any adverse suspension, withdrawal, revocation or cancellation of any of its Governmental Authorizations.

*Id.* at 2-3. Separately, the Opinion Letter states:

> <u>Statements in the Prospectus</u>. All statements set forth in the Prospectus under the captions … "***Risk Factors***" … , "***Business***", … ***in each case insofar as such statements describe or summarize PRC legal or regulatory matters, constitute our opinions on such matters in all material aspects, and are fairly disclosed and correctly set forth therein***, and nothing has been omitted from such statements which would make the same misleading in any material aspects.

*Id.* at 4 (bold emphasis added).

Under "Risk Factors" and "Business – Legal Proceedings", the prospectus disclosed one pending and another recently completed civil legal proceeding. TAC ¶ 57; *cf.* Ex. 2 (IPO prospectus), at 25, 108-109.

## B.    Plaintiff Alleges That A Business-Ending Government Investigation "Became Clear" To The Underwriters Pre-IPO

Golden alleges numerous false statements in the Registration Statement and Prospectus, including disclosures about BAOS's legal proceedings, management, growth strategy,

relationship with Sogou, and risk factors. TAC ¶¶ 57-80. All of these alleged misstatements and omissions are based on the same premise—prior to the IPO, BAOS had effectively ceased operations and its management team had been detained or gone into hiding due to an undisclosed Chinese government investigation, which the Underwriters and BAOS "knew" about but chose to withhold from investors. *Id*. ¶¶ 54, 107, 112.

Golden alleges that, with its business "shut down," someone named Yanjun Hu "took actual control" of BAOS in the lead-up to the IPO. *Id.* ¶¶ 43-52. In this undisclosed shadow CEO capacity, Hu purportedly controlled the "statements included within BAOS's Registration Statement and Prospectus" to perpetrate the fraud. TAC ¶¶ 25, 43-52.

Finally, Golden alleges that in the lead up to the IPO, the Underwriters were in constant "communication" and "conversations with" the primary perpetrators of the fraud, through which communications "*it became clear* that BAOS was under investigation." *Id.* ¶¶ 103-112 (emphasis added). Yet they still underwrote the IPO. *Id*.

**C.    Contrary to Plaintiffs' Allegations, Plaintiffs' "Insider" Specifically Told Them That BAOS Was Not The Target Of Any Investigation Until After The IPO**

The TAC newly provides details about how Plaintiffs learned of the fraud. Specifically, Yanjun Hu himself apparently had a call with one of Plaintiff Orient's principals in June 2023, in which he let slip "insider" information. *Id.* ¶¶ 43-45. Although Plaintiffs attempt to cast the call as some kind of smoking gun of pre-IPO fraud, the transcript of the call speaks for itself.

The relevant passage begins on page 40 of the transcript. Mr. Yanjin Hu is "A" and Mr. Hu Dong, Plaintiff Orient's principal, is "B":

First, Mr. Dong asks Mr. Hu about certain disclosed related-party transactions between Mr. Hu's entities and BAOS. Tr. at 40. By way of explaining these, Mr. Hu attempts to recall a "situation… in 2020? Was it 2020 or 2021?", that he "helped [BAOS's CEO] handle", which

situation was that "People were being arrested at Sogou", BAOS's largest customer. Tr. at 40;

Ex. 2 (IPO Prospectus), at 18-19 (identifying "customers [who] contributed to a significant

percentage of our total revenue", including "Sogou".)

Mr. Hu explained that the reason for this was that a Macau-based gambling company

"had a domestic gaming company, which used Sogou to promote" its games, proceeds from

which were "then remitted back to … Macau." *Id.*

As he further elaborated: "In this incident, the game was being promoted by Sogou, and

BAOSHENG was Sogou's biggest agent." *Id.* at 41. Without saying precisely when, Mr. Hu says

that: "So, at the time, ten members of BAOSHENG's senior management were arrested on the

spot. A lot of people were also arrested from Sogou as well. After the arrests, the entire

company's operations were suspended." *Id.*

Alert to the weight of this information, Mr. Dong attempts to lock down the timing of

these arrests—obviously with this lawsuit in mind given he was recording the call:

> Dong: "Was this in 2019?"
> Hu: "The year of 2020. The year of 2021."
> Dong: "The year of 2021."
> Hu: "The year of 2021."
> Dong: "Didn't you just become listed in 2021? Was that before or after you were listed?"
> Hu: "A month or two before the company was listed. They started arresting people. But at that time, I thought it was just a temporary thing."
> Dong: "Oh …"
> Hu: "Because there were several layers of separation here. First, it was the game company, which was in Wuxi. That company was completely controlled and people were arrested."
> Dong: "So it was totally wiped out. OK."
> Hu: "Yes, at the time, we thought that arrests would only happen to that game company, and that they wouldn't... that Sogou would not be affected. So, at the time, we thought we would just have a dozen people over there to cooperate and to tell about the situation."

*Id.* at 41-43. So far, Hu has only stated that there were arrests at a third party, and that BAOS

believed that it and Sogou would be unaffected and sent people to provide information. *Id.*

Next, without saying when exactly, Hu states that "later" these people did not come back "after a week, two weeks, then a month." *Id.* at 43. "At the end, this matter concluded when Sogou, including the agency rights, including those ... they were all gone, all gone, including the collaboration was also terminated completely." *Id.* And, still without saying when precisely, Mr. Hu recalled that at some point, "[BAOS's CEO] came to me, … then of course, a fine was imposed on BAOSHENG, amounting to almost 10 million." *Id.*

Because Mr. Hu was still unclear about when exactly any of this happened, Dong again tries to nail down the timing:

> Dong: "When did you handle this matter? Before the company was listed? Or after listing?"
> Hu: "***after the listing. By the time the company was listed, everything was taken care of at the second half of 2021***."
> […]
> Hu: "At the time, [BAOS' CEO] and I... The first thing was... That's why later, when I dealt with this issue, I took over the company as a matter of course. I had no choice. —I had invested too much, so I had to do it. […] Then, it took two or three months, then I finally got her off the hook on this matter. Then what happened was that a fine was imposed, confiscating the entirety of income from this customer, pre-tax income, as long as it was completely given up as a fine. That's how this thing ended. Otherwise, it would have been a big mess if it was like Sogou at that time. They kept saying, ***your BAOSHENG is also a listed company.***

*Id.* at 46. (emphasis added, non-bracketed ellipses original).

To clarify Mr. Hu's statement that he came into the situation after BAOS became listed, which was in March 2021, and that he handled the matter in the "second half of 2021", Mr. Dong asks point blank: "When they first started arresting people, this company wasn't listed yet, right? It wasn't listed when people started being arrested? Were things still OK back then?" *Id.* at 47.

Mr. Hu responds: "There was cooperation with the investigation." *Id.*

Dong echoes: "***So it was really listed first, and then …***" *Id.* (emphases added, ellipses original).

As Dong trailed off, Hu clarifies his earlier statements even further. As he stated: "It wasn't actually called 'arrest' either. Anyway, at first they called in three people to cooperate with the investigation. At that time, we thought, OK, that's normal. During those years, they were going after people working on data, working on big data, or even working on Bitcoin. They were all just called in to cooperate with the investigation. I think in Jiangsu, the fines of revenues for Bitcoin in 2020 and 2021 was very high." *Id.*

After banter about how much the government can extract in fines, Dong himself summed it up: "Damn! That's how they get their revenue, it's a lot of money. Right now, Yiyang in Hunan Province is just relying on this for revenue. It's so much money, too. Incredible, this." *Id.*

And as Hu concluded: "This is in fact a very simple issue. This is what they are relying on. They see that Sogou is a listed company, ***and they see that BAOSHENG is a listed company. They don't bother companies that are not listed. They are actually just targeting you for becoming a listed company.*** And then, actually, it was OK for me, because I have a friend who works at the Department of Public Security in Jiangsu. At least I knew someone, so I got some leniency on this matter." *Id.* at 48 (emphasis added).

### III.    LEGAL STANDARDS

To survive a Rule 12(b)(6) motion, a plaintiff must plead "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This means "nudg[ing] [the] claims across the line from conceivable to plausible ... ." *In re Qudian Inc. Sec. Litig.,* 2019 WL 4735376, at *4 (S.D.N.Y. Sept. 27, 2019). To assert claims under Sections 11 and 12(a)(2), Plaintiff must plead that a defendant made "an untrue statement of a material fact or omi[ssion]." 15 U.S.C. § 77k(a), § 77l(a)(2).

District courts in this Circuit have consistently held that "the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud." *SUN, A Series of E Squared Investment Fund, LLC v. Sundial Growers Inc.*, 2021 WL 4482276, at *5 (S.D.N.Y. 2021); *see also In re Micro Focus Int'l Plc Sec. Litig.*, 2020 WL 5817275, at *3 (S.D.N.Y. 2020) (same).

## IV.    ARGUMENT

### A.    The TAC's Attached Call Transcript Shows That The Alleged Government Investigation Did Not Target BAOS Until *After* The IPO—Meaning It States No Claim Against The Underwriters Under Any Theory Of Falsity

As set forth above, Plaintiffs' "insider" at BAOS told Plaintiffs there "were several layers of separation here" between BAOS and the government investigation. Tr. at 42. As he explained: "First, it was the game company, which was in Wuxi. That company was completely controlled and people were arrested." *Id.* Next, BAOS, believing that even the next layer, its customer Sougou, also "would not be affected", "thought we would just have a dozen people over there to cooperate and to tell about the situation." *Id.* at 43.

Finally, it was only "later", when the authorities kept the people BAOS sent for longer than expected, that BAOS realized that they must have been detained. And, at Mr. Dong's repeated promptings to explain what "later" meant, the insider Mr. Hu emphasized over and over that BAOS did not become the government's target until "*after the listing*." *Id.* at 46 (also explaining that when the government turned its attention to BAOS, "They kept saying, *your BAOSHENG is also a listed company.*"); *id.* (Dong *himself* acknowledging: "*So it was really listed first, and then ...*") (ellipses original); *id.* at 48 (insider Hu: "*they see that BAOSHENG is a listed company. They don't bother companies that are not listed. They are actually just targeting you for becoming a listed company.*") (emphases added).

In *Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 411 (S.D.N.Y. 2020), Judge Liman dismissed a similar Securities Act claim against Sogou alleging that its IPO prospectus failed to warn of compliance deficiencies, when those supposed deficiencies only materialized through a *post*-IPO government investigation. Here too, the prospectus cannot be expected to disclose a risk that was not believed to exist. Because it is apparent from the call transcript that BAOS did not become a target of any investigation until *after* it went public, there could not have been any investigation to disclose as of the time of the IPO.

Golden theorizes alternatively that BAOS's its prospectus was false and misleading because it failed to specifically anticipate and disclose that it "would" lose Sogou as a customer because of an investigation into the *third party* advertiser, even though BAOS believed "that Sogou would not be affected" by the investigation. Tr. at 43; *cf.* TAC ¶¶ 73, 76. But it is well-settled that "[t]he Securities Act requires candor in disclosures, not clairvoyance." *Luo*, 465 F. Supp. 3d, at 411. And Golden does not explain how requiring a disclosure that is directly contrary to what is contemporaneously believed can be anything but clairvoyance (or more).

Even more aptly, in *In re Lions Gate Entm't Corp. Sec. Litig.*, plaintiffs' falsity theory was based on the failure to disclose a *pending* SEC investigation against *the issuer*, which Judge Koeltl rejected because "the securities laws do not impose an obligation on a company to predict the outcome of investigations." 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016); *see also Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 272 (S.D.N.Y. 2012) ("[a]n investigation on its own is not a 'pending legal proceeding' until it reaches a stage when the agency or prosecutorial authority makes known that it is contemplating filing suit or bringing charges.")

If the law does not require an issuer to speculate about the outcome of investigations, nor to even disclose an ongoing investigation into the issuer until the government "makes known"

that charges would be brought, it is difficult to see how it could require issuers to: (i) disclose

that there was an investigation into a *third* party; (ii) predict that this investigation "would" result

in issuer's loss of *its* customer; even though (iii) the issuer did not contemporaneously expect the

investigation to affect either itself or its customer.

A false registration statement requires contemporaneous falsehoods. *In re Weight

Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 247 (S.D.N.Y. 2020) ("without

contemporaneous falsity, there can be no fraud.") Indeed, securities fraud "cannot occur unless

an alleged material misstatement was false *at the time it was made. ...* A statement believed to be

true when made, but later shown to be false, is insufficient." *In re Lululemon Secs. Litig.*, 14 F.

Supp. 3d 553, 571 (S.D.N.Y. 2014) (emphasis original). There being neither a duty to disclose

nor any contemporaneous falsehoods, the Underwriters could not possibly have signed off on a

false registration statement. This suit must be dismissed on this basis alone.

But even assuming that BAOS *was* the target of an investigation pre-IPO *and* that it knew

this would affect Sogou, the Underwriter claims still fail.

**B.    The TAC Cannot Survive Rule 9(b)**

**1.    Rule 9(b) Applies Where Securities Act Claims Sound In Fraud.**

"[W]here a plaintiff claims to bring a negligence action, a court may apply Rule

9(b) pleading requirements where the wording and imputations of the complaint are classically

associated with fraud." *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d

210, 226 (S.D.N.Y. 2009) (internal citation omitted.) "[T]he wording and imputations of the

complaint are classically associated with fraud when plaintiffs allege that the registration

statement contained 'untrue statements of material facts' and that 'materially false and

misleading' statements were issued." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595,

635 (S.D.N.Y. 2005).

Here, the TAC continues to be replete with hallmarks of fraud. *See e.g.*, TAC ¶ 53 ("BAOS's … did not disclose … making the Registration Statement and Prospectus materially misleading."), ¶ 135 ("The Registration Statement … contained untrue statements of material facts … ."), ¶ 139 (same), ¶ 156 ("The Prospectus … concealed and failed to disclose material facts.") Indeed, the alleged underlying conduct is, at base, that BAOS "knew" about a government investigation, which had negatively impacted it, but chose not to disclose the information to investors. *See* TAC ¶¶ 43-80. This allegedly "became clear" to the Underwriters pre-IPO, who decided to join the fraud. *Id.* ¶¶ 107, 112.

Where a complaint alleges that defendants "knew" and "were aware" of adverse undisclosed facts and hid them, the complaint is "replete with explicit claims of fraud." *Luo*, 465 F. Supp. 3d, at 408 & n.7. This is sufficient to trigger Rule 9(b).

## 2. Plaintiffs' Boilerplate Disclaimers Cannot Avoid Rule 9(b)'s Application to Their Claims Against The Underwriters.

Despite painting a story of fraud, the TAC conclusorily asserts, out of nowhere, that the Underwriters were merely "negligent" in "failing to correct the securities filings." TAC ¶ 102. It then disavows fraud through various boilerplate disclaimers. *Id.* ¶¶ fn.1, 134, 151, 165. These bare assertions do not provide an outlet from Rule 9(b), for several reasons.

***First***, the TAC explicitly chooses fraud by continuing to allege that the Underwriters failed to correct BAOS's IPO materials "when it became clear that BAOS was under investigation." *Id.* ¶¶ 107, 112.

Nonsensically, the TAC alleges that, in failing to disclose bad facts that were "clear," the Underwriters were "at least negligent." *Id.* But fraudulent conduct, by its very nature, cannot be "at least" negligent, since negligence *excludes* scienter, whereas fraud *requires* it. *See Carroll v. LeBoeuf, Lamp, Greene & MacRae, LL*P, 623 F. Supp. 2d 504, 510 (S.D.N.Y. 2009) ("Negligent

misrepresentation 'involves most of the same elements as fraud, with a negligence standard substituted for the scienter requirement.'") (citing cases). As such, not only is negligence not a species of fraud as Golden posits, the two are mutually exclusive. *Shuvalova v. Cunningham*, 2010 WL 5387770, at *6 (N.D. Cal. 2010) ("Since the defendant's knowledge of falsity is an element of fraud, no claim for 'negligent' fraud exists."). Conversely, if Golden was correct, then *all* parties liable for fraud are also automatically liable for negligence, which makes no sense.

In short, in attempting to obtain a negligence standard as "at least" a sub-set of fraud, all while alleging that falsehoods "became clear" to the Underwriters, the TAC reveals that there is only one allegation: fraud.

**Second**, even ignoring the "became clear" allegation and assuming that the Underwriters were not aware of any negative developments at BAOS pre-IPO, there can be no negligence either because no underwriter could have failed to discover that the business they were underwriting was "essentially shut down" unless such an underwriter was the victim of fraud itself, or extremely reckless to the point of being willfully ignorant (*i.e.* scienter).

The Second Circuit has held that, "[b]y reckless disregard for the truth, we mean 'conscious recklessness—*i.e.*, a state of mind *approximating actual intent,* and *not merely a heightened form of negligence*[.]' *South Cherry St. v. Hennessee Group*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis original, internal citation omitted). Thus, "[a]n *egregious* refusal to see the *obvious*, or to *investigate the doubtful*, may in some cases give rise to an inference of … recklessness." *Id.* (emphasis original, citing cases).

Here, the Underwriters are alleged to have been "in direct communication" and "conversations with" BAOS, with a "level of access to and communication with" BAOS's management that was "significantly greater" than available to investors. *Id.* ¶¶ 104-110.

Assuming this to be true, and further assuming that the Underwriters were not knowingly complicit, then that could only mean they failed to discover a "shut down" business with a CEO in hiding despite "significantly greater" access to and ongoing communications with the issuer. In other words, they recklessly refused "to see the obvious". *Id.*

Alleging reckless disregard for the truth also triggers Rule 9(b). *See Teams. Local 445 v. Dynex Cap*, 531 F.3d 190, 194 (2d Cir. 2008) ("In addition to actual intent, the Second Circuit has also concluded that recklessness is a sufficiently culpable mental state in the securities fraud context."); *see also In re JP Morgan Chase Secs. Litig.,* 363 F.Supp.2d 595, 635 (S.D.N.Y.2005) ("[p]laintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of … recklessness.").

*Third*, Plaintiffs may "plead Section 10(b) fraud and Section 11 ... negligence claims as alternatives, as long as the complaint is organized in a way that allows the court to determine which allegations support which claim." *In re Meta Materials Inc. Sec. Litig.*, 2023 WL 6385563 (E.D.N.Y. 2023); *see also In re Chembio Diagnostics, Inc. Sec. Litig.*, 616 F. Supp. 3d 192, 202 (E.D.N.Y. 2022) ("In the Second Circuit, courts accept a securities complaint pleading fraud and negligence theories in the alternative where the plaintiff supports the two theories with ***distinct narratives of the defendants' wrongdoing***."); *see also In re Ambac Financial Group, Inc. Securities Litig.*, 693 F. Supp. 2d 241, 263 (S.D.N.Y. 2010) ("plaintiffs should '***specifically plead*** alternate theories of fraud and negligence' in order to avoid heightened pleading standards for their Securities Act claims.") (emphases added). This makes sense, given that negligence and fraud are mutually exclusive, as set forth above.

Here, Plaintiffs have not attempted to "specifically plead" "distinct narratives" supporting fraud by BAOS and negligence by the Underwriters. Instead, they simply affixed the words "at

least negligent" to the Underwriters' alleged failure to disclose the fraud when "it became clear" to them. TAC ¶¶ 107, 112. Such conclusory window dressing is insufficient to disclaim the allegations' substance: fraud.

*Finally*, Plaintiffs "cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005). As such, courts in this district have consistently held that "boilerplate disclaimers" that the allegations do not sound in fraud are "insufficient to remove those allegations from the requirements of Rule 9(b)." *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 530 (S.D.N.Y. 2005); *see also In re Elan Corp.*, 2004 WL 1305845, at *7 (S.D.N.Y. May 18, 2004) ("Notwithstanding the Plaintiffs' fraud disclaimer, the Section 11 claims in this case are peppered with" language "classically associated with fraud."). Here, Plaintiffs' fraud disclaimers consist of conclusory, one-sentence boilerplates. *Id.* ¶¶ 1 (fn.1), 134, 151, 165.

In sum, neither the explicit allegations of fraud by the Underwriters, nor the magnitude and depth of the hidden facts alleged, leave any possibility of mere negligence. *See McDonald v. City of Troy*, 542 F. Supp. 3d 161 (N.D.N.Y. 2021) ("Although a plaintiff is typically permitted to plead different causes of action in the alternative, … when a plaintiff's factual allegations are only consistent with a theory of intentional conduct, negligence claims must be dismissed.") (citing cases); *see also In re HEXO Corp. Securities Litigation*, 524 F.Supp.3d 283, 299 & fn. 17 (S.D.N.Y. 2021) (dismissing Securities Act claims upon finding that Plaintiffs' claims under the Securities Act and the Exchange Act claims "rest on the same theory – that defendants knew [about the falsity] – such that they are 'almost a mirror image' of one another.").  The Underwriters either knew of the fraud as alleged or were recklessly unaware. Either way, Plaintiffs must satisfy Rule 9(b) as to the Underwriters. As set forth below, they fail to do so.

### 3.    The TAC Fails to Satisfy Rule 9(b) As To The Underwriters.

"[A] party must state with particularity the circumstances constituting fraud or mistake."

Fed. R. Civ. P. 9(b). "As the Section 11 claims are based in fraud, Plaintiffs must allege

[defendants'] fraudulent intent with more specificity." *Police Fire Retirement System v. Safenet*,

645 F. Supp. 2d 210, 241 (S.D.N.Y. 2009). When Plaintiffs "fail to specify any details about

[defendants'] knowing participation in making the alleged fraudulent misrepresentations in the

[issuer's] registration statement," Sections 11 and 12(a)(2) claims fail. *Id*.; *see also Johnson v.*

*NYFIX, Inc.,* 399 F. Supp. 2d 105, 122 (D. Conn. 2005) (plaintiffs must "adequately allege that

the defendants knew or were reckless in not knowing" falsehoods to state a Section 11 claim).

Here, despite the Underwriters having made clear the SAC's failure to particularize, the

TAC *still* pleads no particulars about them. There are no facts suggesting that they had any

motive or intent to defraud, nor any facts about how or when the alleged government

investigation "became clear" to them through their alleged contacts with BAOS, nor any hint as

to how they could have been so reckless as to be unaware.[2]

Rather, the TAC continues to conclusorily allege that the Underwriters knew or should

have known of the fraud due merely to their roles as underwriters. TAC ¶¶ 104-105, 109-110.

Similar attempts to conclusorily allege scienter are regularly rejected. *See Ross v. Lloyds*

*Banking Group, PLC*, 2012 WL 4891759, at *10 (S.D.N.Y. 2012) (rejecting scienter allegations

that "appear premised solely upon the individual defendants' positions within [the Company],

not fact-based allegations of actual knowledge—let alone 'strong circumstantial evidence' of

---

[2] Indeed, Plaintiffs continue to disclaim all allegations of scienter. TAC ¶¶ 134, 151 (averring that Plaintiffs "do not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.") These disavowals are indicative of Plaintiffs' failure to meet Rule 9(b). *See In re Gentiva Sec. Litig.,* 932 F. Supp. 2d 352, 394 (E.D.N.Y. 2013) ("the Plaintiff has failed to comply with Rule 9(b) with regard to the Section 11 claim, because it expressly disclaims all allegations of scienter and recklessness.").

recklessness."); *Teamsters Allied Benefit Funds v. McGraw*, 2010 WL 882883, at \*9 (S.D.N.Y.

2010) ("Courts have routinely rejected the attempt to plead scienter based on allegations that

because of defendants' board membership and/or their executive managerial positions, they had

access to information concerning the company's adverse financial outlook.") (citing cases). If

executives and board members cannot be made liable under Rule 9(b) merely by virtue of their

roles, the Underwriters certainly cannot be.

Indeed, "[w]here plaintiffs contend defendants had access to contrary facts, they must

specifically identify the reports or statements containing this information." *Teams. Local 445*,

531 F.3d 190, 196 (finding failure to plead scienter). Yet Plaintiffs have not "specifically

identified any reports or statements that would have come to light in a reasonable investigation

and that would have demonstrated the falsity of the allegedly misleading statements." *Id.* And the

TAC contains no "allegation that explains how, when and to what extent the [Underwriters]

received information" concerning the purported government investigation. *Ross*, 2012 WL

4891759, at \*10. *see also Harris v. Amtrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155 (S.D.N.Y.

2015) (no scienter without explanation of how contrary information would have come to light).

As the Underwriters previously pointed out, the SAC glaringly "failed to allege what the

purported government investigation of BAOS was even about other than the comically vague

allegation that it was 'due to [BAOS's] involvement with other Chinese entities that were

engaging in activities illegal under the laws of China.'" Dkt. 101 (Underwriters' first MTD), at

14; *cf.* Dkt. 82 (SAC) ¶ 47. The Underwriters even gave Plaintiffs a roadmap to amend, posing

numerous rhetorical questions for Plaintiffs to answer in an amended complaint, for example:

> [W]hat kind of "involvement"? With which "other Chinese entities"? What
> "activities" were these other entities engaged in? Which "laws" were violated?
> Presumably Plaintiffs' deeply embedded insider, when accusing the Company and

its Underwriters, would have explained these details, which any rational listener
would have demanded to believe a fraud of such severity.

Dkt. 101, at 14.

In response, the TAC (partly) answered some of these questions, but more troubling than
before, the answers reveal that Plaintiffs never had the predicate facts to sue the Underwriters in
the *first place*—they had the opposite. Not only was there no investigation of BAOS pre-IPO
(only an investigation into a third company that was not even BAOS's customer Sogou),
Plaintiffs' own insider repeatedly stated to Plaintiff Orient that pre-IPO, BAOS did not believe
either it or Sogou was a target.

The fact that their own call transcript contradicts scienter is why the SAC's allegations
were so vague. Despite revealing this, Golden newly makes *two* superficial tweaks to the TAC
concerning the Underwriters: (i) adding the afterthought allegation that the Underwriters
"should" have been in direct communications with BAOS's executives in preparing for the IPO.
TAC ¶¶ 104, 109; (ii) adding the assertion that their "level of access to and communication with
BAOS's directors and senior executives was significantly greater than the access and
communication available to Plaintiffs." *Id*. ¶¶ 105, 110.

Neither changes the fact that BAOS was under no investigation pre-IPO. Even assuming
it was, merely accusing the Underwriters of having generic "access to contrary facts" through
contact with issuer executives does not amount to "specifically identif[ying] any reports or
statements that would have come to light in a reasonable investigation." *Teams. Local 445*, 531
F.3d 190, 196. Nor does it "explain[] how, when and to what extent the [Underwriters] received
information" containing facts contrary to what they disclosed. *Ross*, 2012 WL 4891759, at *10.
In short, even assuming there was an investigation of BAOS pre-IPO (which there was not), the

TAC's hopelessly shallow Underwriter-specific amendments, which fail to add *any* particularly, underscores the sheer flimsiness of Plaintiffs' case against them.

But even ignoring all of the above, and assuming negligence claims alone *and* that there was an investigation of BAOS pre-IPO, the Underwriter claims *still* fail.

**C.    Even Under A Negligence Theory, The Complaint Fails.**

"Underwriters may absolve themselves from liability under sections 11 and 12(a)(2) by establishing a 'due diligence' defense." *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir. 1994). An underwriter's due diligence is subject to "the standard of reasonableness[, which] shall be that required of a prudent man in the management of his own property." *Id*. (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208, 96 S.Ct. 1375, 1388, 47 L.Ed.2d 668 (1975) (cleaned up). Although it is usually a question of fact, "reasonableness becomes a question of law and loses its triable character if the undisputed facts leave no room for a reasonable difference of opinion." *Id*. at 621-622 (internal citation omitted); *see also Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint.")

Here, it is evident from the face of the TAC that the Underwriters met the reasonableness standard and can therefore rely on the due diligence defense as a matter of law.

**1.    The Underwriters May, As A Matter of Law, Rely on Expertised Materials Such as Audited Financials And Legal Opinions When Conducting Reasonable Due Diligence.**

"An underwriter need not conduct due diligence into the 'expertised' parts of a prospectus, such as certified financial statements." *In re Software Toolworks Inc.*, 50 F.3d 615, at 623; *see also In re Countrywide Financial Corp. Sec. Litig.*, 588 F.Supp.2d 1132, 1175 (C.D.Cal. 2008) (granting motion to dismiss and holding that "Underwriter Defendants have a due

diligence defense on the face of the [complaint] as a matter of law ... because underwriters may reasonably rely on audited financial statements ... .").

Just as auditors are experts with respect to financial statements on which they opine, counsel are experts on legal proceedings, and certainly "expert" as to the existence of legal proceedings against their clients. *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1453 (D. Ariz. 1992) ("The court holds that an attorney who provides a legal opinion used in connection with an SEC registration statement is an expert within the meaning of Section 11."); *Schneider v. Traweek*, 1990 WL 169856 (C.D. Cal. 1990) ("An attorney who expressly consents to the inclusion of, or reference to his opinion in a registration statement can be considered an 'expert' within the meaning of [Section 11].")

Here, PRC counsel issued an unequivocal opinion letter stating that the portions of the registration materials disclosing legal and regulatory proceedings were accurate. *Supra*, at 4. The Underwriters are entitled to rely on PRC counsel's expertise as a matter of law.

> ### 2.    Reasonableness Exists Even If The Disclosures Regarding Governmental Investigations Were Not Expertised.

Underwriters "cannot, of course, be expected to possess the intimate knowledge of corporate affairs of inside directors, and their duty to investigate should be considered in light of their more limited access." *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 582 (E.D.N.Y. 1971); *see also Endo v. Albertine*, 863 F. Supp. 708, 732 (N.D. Ill. 1994) (same).

Here, assuming there was an investigation of BAOS pre-IPO, the existence of the Dentons Opinion Letter means that BAOS would have necessarily been deceiving both the Underwriters *and* BAOS's own counsel about the fact that its business was "shut down" by such an investigation. *Id.* ¶ 58. But if that were the case, the Underwriters, with their more limited access than counsel, cannot reasonably be expected to suspect that: (i) BAOS's counsel was

being defrauded; and (ii) BAOS's representations about its very business existence were fraudulent. Were that the standard for reasonableness, it would in essence require underwriters to assume total fraud on the part of issuers, and not rely on *anything* issuers tell them. "Underwriters cannot be expected, however, to ferret out everything that management knows about the company." *Endo*, 863 F. Supp. 708, 732 (internal citation omitted).

In sum, a "reasonable", non-reckless underwriter can, as a matter of law, rely on issuer counsel's expertised opinion as to the existence of material legal proceedings. By the same token, it cannot, as a matter of law, be required to suspect the issuer to the point of questioning the very existence of its business, particularly in light of a counsel opinion confirming the business was in good standing, as well as audited financials.

But in all events, the negligence theory is simply implausible. It is implausible because in the absence of participation in a fraud or extreme recklessness, no underwriter could possibly fail to discover by the exercise of reasonable due diligence that an issuer's "executives and managers were taken into custody by Chinese authorities, that one executive went into hiding, [that it had] suspended its operations, and [a shareholder] took control of the Company." TAC ¶ 44. That negligence is not possible in such a situation is precisely why Plaintiffs were at least required to, but did not, allege the Rule 9(b) particulars for how the Underwriters could have been so reckless. *Supra*, at 11-15.

## V.    <u>CONCLUSION</u>

For these reasons, the Court should dismiss the TAC as to the Underwriters with prejudice.

//

//

//

Respectfully Submitted,

Dated: December 20, 2024     **MORROW NI LLP**

By: _____

Angus F. Ni
41 Madison Ave, 31st Floor,
New York, NY 10010
(646) 453-7294
angus@moni.law

*Attorneys for Underwriters*

## <u>CERTIFICATE OF FORMATTING COMPLIANCE</u>

The undersigned certifies that this brief complies with the Court's formatting and word limit rules, requiring all text to be double spaced. The brief contains 6,781 words.

Dated: December 20, 2024                      **MORROW NI LLP**

                                              By: _____

                                              Angus F. Ni
                                              41 Madison Ave, 31st Floor,
                                              New York, NY 10010
                                              (646) 453-7294
                                              angus@moni.law

                                              *Attorneys for Underwriters*