UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Orient Plus International Limited; Union Hi-Tech Development Limited; and Golden Genius International Limited, | Civil File No. 1:24-cv-00744-JLR |
| Plaintiffs, | |
| vs. | **Oral Argument Requested** |
| Baosheng Media Group Holdings Limited; Wenxiu Zhong; Sheng Gong; Yu Zhong; Zuohao Hu; Adam (Xin) He; Yue Jin; Yanjun Hu; Univest Securities, LLC; The Benchmark Company, LLC; WestPark Capital, Inc.; Friedman LLP; and Marcum LLP, | |
| Defendants. | |

## PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE THIRD AMENDED COMPLAINT

### TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND ....................................................................................2

ARGUMENT ..............................................................................................................6

I.     Rule 8's Notice Pleading Standard Governs Golden's Securities Act Claims ..................7

     A.     Rule 8—*Not* Rule 9(b)—Applies to the TAC........................................7

     B.     Golden's Complaint Satisfies Rule 9(b) Standard Regardless ..............12

II.     The Court Has Personal Jurisdiction Over Defendants ....................................16

     A.     The Court Has Personal Jurisdiction over Adam (Xin) He ..................17

     B.     The Court Has Personal Jurisdiction over the Remaining Audit Committee Directors........................................................................................17

     C.     The Court has Personal Jurisdiction over Yanjun Hu............................21

III.     Golden's Claims Were Brought Within the Statute of Limitations.................22

IV.     Golden States a Section 11 and Section 12(a)(2) Claim.................................26

     A.     Golden Adequately Pleads Falsity........................................................28

     B.     The Company Had a Duty to Disclose ..................................................32

         1.     BAOS Had a Duty to Disclose Under Item 303 ........................33

         2.     BAOS Had a Duty to Disclose Because it Spoke About Topics Implicated by the Omitted Information ......................................35

     C.     The Misrepresentations and Omissions Were Material .........................37

     D.     The Company's Identified Risk Factors Did Not Adequately Warn of the Underlying Risks ................................................................................39

     E.     Defendants Have Not Established their Negative Causation Affirmative Defense ..................................................................................................41

V.     Golden States a Section 15 Claim Against the Individual Defendants and Yanjun Hu...........................................................................................................................43

     A.     Golden Adequately Pleads the Audit Committee Directors Are Control Persons ..................................................................................................43

B.      Golden Adequately Pleads that Yanjun Hu Is a Control Person .........................45

VI.    The Underwriters' Affirmative Defense Does Not Support Dismissal ............................47

A.      Golden Alleges the Underwriters Failed to Exercise Reasonable Care in
        Conducting Due Diligence......................................................................................48

B.      The Underwriters' Claimed Reliance on the Dentons Letter Is Improper
        and Unsupported ...................................................................................................48

VII.   The Auditors' Motion To Dismiss Should Be Denied.......................................................51

A.      Golden States A Claim Against The Auditors......................................................51

        1.      The Auditor's Consent Is Materially Misleading and Not Subject
                to the *Omnicare* Framework ....................................................................52

        2.      The Audit Opinions And Consent Are Materially Misleading
                Under *Omnicare*........................................................................................54

        3.      There Is No Requirement to Allege an Error in The Company's
                Financial Statements to State a Section 11 Claim Against an
                Auditor ......................................................................................................62

B.      Golden's Claim Against Friedman Should Not Be Dismissed on Statute Of
        Repose Grounds .....................................................................................................63

        1.      The Requirements For Relation Back Under Federal Rule of Civil
                Procedure 15(c) Are Satisfied ...................................................................65

        2.      Friedman's Position that Relation Back Cannot Apply When a
                Statute Of Repose Has Run Is Incorrect ...................................................67

        3.      In Any Event, the Section 11 Claim Should Proceed Against
                Marcum ......................................................................................................70

VIII.  Union And Orient State a Viable Contract Claim Against BAOS ...................................71

A.      Union and Orient Plead that BAOS Breached Section 3.1(*l*) By Failing to
        Disclose the Investigation ......................................................................................71

B.      Union and Orient Plead that BAOS Breached Sections 3.1(i) and (j) by
        Failing to Disclose The Investigation and its Material Impact..............................73

C.      Union and Orient Plead that BAOS Breached Section 3.1(x) by Failing to
        Disclose Significant Material Events......................................................................74

CONCLUSION................................................................................................................75

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acierno v. New Castle Cnty.*,
  2000 WL 718346 (D. Del. May 23, 2000) .............................................................. 69

*Akerman v. Oryx Commc'ns, Inc.*,
  810 F.2d 336 (2d Cir. 1987) ................................................................................... 41

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 514 (S.D.N.Y. 2005) .................................................................... 12

*In re. Alibaba Grp. Holding Ltd. Sec. Litig.*,
  2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023) .................................................... 21, 22

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 346 (S.D.N.Y. 2005) ................................................................ 16, 17

*In re Ambac Fin. Grp., Inc.*,
  693 F. Supp. 2d 241 (S.D.N.Y. 2010) .................................................................... 12

*In re AmTrust Financial Services, Inc. Securities Litigation*,
  2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ......................................................... 61

*In re AOL Time Warner Sec. & "ERISA" Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) .................................................................... 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................... 6, 57

*Balestra v. ATBCOIN LLC*,
  380 F. Supp. 3d 340 (S.D.N.Y. 2019) ................................................................ 17, 19

*Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017) .................................................................... 21

*Barilli v. Sky Solar Holdings, Ltd.*,
  389 F. Supp. 3d 232 (S.D.N.Y. 2019) .................................................................... 70

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................. 6

*Bensinger Denbury Res. Inc.*,
  31 F. Supp. 3d 503 (E.D.N.Y. 2014) ...................................................................... 70

iv

*Bishop v. St. Jude Med. S.C., Inc.*,
    2020 WL 4352682 (D. Minn. July 29, 2020) ........................................................67

*In re Braskem S.A. Sec. Litig.*,
    246 F. Supp. 3d 731 (S.D.N.Y. 2017)..............................................................21, 22

*United States ex rel. Carter v. Halliburton Co.*,
    315 F.R.D. 56 (E.D. Va. 2016) ........................................................................ 69

*Caterpillar, Inc. v. Scott*,
    2005 WL 8162859 (D.S.C. July 7, 2005) ...........................................................24

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*,
    850 F.3d 58 (2d Cir. 2017)..............................................................................22

*Chapman v. Mueller Water Products, Inc.*,
    466 F. Supp. 3d 382 (S.D.N.Y. 2020)................................................................15

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
    616 F. Supp. 3d 192 (E.D.N.Y. 2022) ................................................................9

*Chen v. X Fin.*,
    2021 WL 7449851 (S.D.N.Y. Dec. 9, 2021) .......................................................26

*In re China Valves Tech. Sec. Litig.*,
    979 F. Supp. 2d 395 (S.D.N.Y. 2013)............................................................62, 63

*City of Omaha Police & Fire Ret. Sys. v. Eoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020)............................................................45, 47

*City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011)............................................................................24

*City of Warwick Retirement System v. Carvana Co.*,
    CV 2022-013054, slip op. (Ariz. Sup. Ct. Oct. 26, 2023) ....................................61

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
    928 F. Supp. 2d 705 (S.D.N.Y. 2013)........................................................33, 34, 35

*Coalition for Competitive Electricity v. Zibelman*,
    906 F.3d 41 (2d Cir. 2018)..........................................................................28, 47

*Cross v. 21 Century Holding Co.*,
    2011 WL 34808272 (S.D.N.Y. Aug. 6, 2001)......................................................26

*Danjanovich v. Robbins*,
    2006 U.S. Dist. LEXIS 52508 (D. Utah July 28, 2006) .......................................38

*Deephaven Priv. Placement Trading, Ltd. v. Grant Thornton & Co.*,
    454 F.3d 1168 (10th Cir. 2006) ........................................................51

*In re Didi Glob. Inc. Sec. Litig.*,
    2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024) .......................................27

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013) ...............................................................7

*In re Elan Corp.*,
    2004 WL 1305845 (S.D.N.Y. May 18, 2004) .......................................12

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013) ..................................................39

*Fed. Deposit Ins. Corp. for Colonial Bank v. First Horizon Asset Sec. Inc.*,
    291 F. Supp. 3d 364 (S.D.N.Y. 2018) ..................................................70

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017) ...................................................24, 25, 41

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ...............................................................41

*Flynn v. Sientra, Inc.*,
    2016 WL 3360676 (C.D. Cal. June 9, 2016) .......................................37

*Forsberg v. Always Consulting, Inc.*,
    2008 WL 5449003 (S.D.N.Y. Dec. 31, 2008) .......................................12

*Freeland v. Iridium World Commc'ns, Ltd.*,
    233 F.R.D. 40 (D.D.C. 2006) ............................................................41

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..................................................40

*In re Friedman's, Inc. Sec. Litig.*,
    385 F. Supp. 2d 1345 (N.D. Ga. 2005) ................................................47

*In re Fuwei Films Sec. Litig.*,
    634 F. Supp. 2d 419 (S.D.N.Y. 2009) ..................................................36

*Gerszberg v. Iconix Brand Grp., Inc.*,
    2018 WL 2108239 (S.D.N.Y. May 7, 2018) .......................................72

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    643 F. Supp. 2d 562 (S.D.N.Y. 2009) ..................................................41

*Goldman v. Belden*,
   754 F.2d 1059 (2d Cir. 1985).................................................................37

*Gucci Am. v. Bank of China*,
   768 F.3d 122 (2d Cir. 2014)..................................................................17

*H.A.B. Assocs. v. Hines*,
   1990 WL 170514 (S.D.N.Y. Oct. 26, 1990) ..........................................13

*Handal v. Tenet Fintech Grp. Inc.*,
   2023 WL 6214109 (E.D.N.Y. Sept. 25, 2023) .......................................14

*Harris v. Amtrust Fin. Servs., Inc.*,
   135 F. Supp. 3d 155 (S.D.N.Y. 2015).....................................................16

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
   422 F. Supp. 3d 821 (S.D.N.Y. 2019).................................................28, 29

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)...........................................................................27, 53

*Hogan v. Pilgrim's Pride Corp.*,
   73 F.4th 1150 (10th Cir. 2023) .............................................................69

*Hoi Ming Michael Ho v. Duoyuan Glob. Water, Inc.*,
   887 F. Supp. 2d 547 (S.D.N.Y. 2012)...........................................24, 26, 47

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
   309 F. Supp. 3d 100 (S.D.N.Y. 2018).....................................................71

*Hunt v. Bloom Energy Corp.*,
   2021 WL 4461171 (N.D. Cal. Sept. 29, 2021) ...................................61, 62

*Hurst v. Enphase Energy, Inc.*,
   2021 WL 3633837 (N.D. Cal. Aug. 17, 2021) ...................................63, 64

*Indiana Public Retirement System v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)................................................................33, 34

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)....................................................59

*Itoba Ltd. v. LEP Grp. PLC*,
   930 F. Supp. 36 (D. Conn. 1996)..........................................................19

*In the Matter of Jason Jianxun Tang, Cpa, Respondent*,
   2022 WL 17080793 (Nov. 17, 2022)......................................................64

*Jiajia Lou v. Sogou, Inc.*,
    465 F. Supp. 3d 393 (S.D.N.Y. 2020)....................................................................36

*JP Morgan Chase Bank v. Winnick*,
    350 F. Supp. 2d 393 (S.D.N.Y. 2004)....................................................................24

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)....................................................................9

*Kessev Tov, LLC v. Doe(s)*,
    2022 WL 2356626 (N.D. Ill. June 30, 2022) ........................................................ 69

*Kline v. First Western Government Securities*,
    24 F.3d 480 (3d Cir. 1994)....................................................................................36

*Krupski v. Costa Crociere S.p.A.*,
    560 U.S. 538 (2010)...............................................................................................67

*Landry v. Price Waterhouse Chartered Accountants*,
    715 F. Supp. 98 (S.D.N.Y. 1989)..........................................................................22

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006)....................................................................23

*Leasco Data Processing Equipment Corp. v. Maxwell*,
    468 F.2d 1326 (2d Cir. 1972).................................................................................17

*LeMatta v. Casper Sleep, Inc.*,
    2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022) ......................................................38

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)...................................................................................42

*Lewis v. YRC Worldwide Inc.*,
    2020 WL 1493915 (N.D.N.Y. Mar. 27, 2020) ......................................................35

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)....................................................................................7

*Lindsay v. Morgan Stanley (In re Morgan Stanley Info. Fund Sec. Litig.)*,
    592 F.3d 347 (2d Cir. 2010)........................................................................27, 35, 48

*In re Lions Gate Entm't*,
    165 F. Supp. 3d  1 (S.D.N.Y. 2016)..................................................................35, 36

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)..........................................................................8, 9, 58

*In re Measurement Specialties, Inc.*,
    2003 WL 27398420 (D.N.J. Sept. 29, 2003) ............................................................48

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
    2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ........................................................28

*Merck & Co. v. Reynolds*,
    130 S. Ct 1784 (2010).............................................................................................23

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Rajcher*,
    609 F. Supp. 291 (S.D.N.Y. 1985).........................................................................17

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014).............................................................35, 36, 38, 40

*In re Miniso Grp. Holding Ltd.. Sec. Litig.*,
    2024 WL 759246 (S.D.N.Y. Feb. 23, 2024)..........................................................42

*Mitchell v. CFC Fin. LLC*,
    230 F.R.D. 548 (E.D. Wis. 2005) ..........................................................................67

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    2011 WL 2020260 (S.D.N.Y. Apr. 28, 2011)..................................................23, 24

*Navarra v. Marlborough Gallery, Inc.*,
    2013 WL 1234937 (S.D.N.Y. Mar. 26, 2013) .......................................................66

*Nayani v. Lifestance Health Grp., Inc.*,
    2023 WL 3260260 (S.D.N.Y. May 4, 2023) .........................................................10

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
    122 F.4th 28 (2d Cir. 2023) ....................................................................56, 61, 62

*Ning Yu v. State Street Corp. (In re State Street Bank & Trust Co. Fixed Income Funds Invs. Litig.)*,
    774 F. Supp. 2d 584 (S.D.N.Y. 2011)...................................................................42

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..................................................................................28

*NYKCool A.B. v. Pac. Int'l Servs.*,
    2013 WL 1274561 (S.D.N.Y. Mar. 29, 2013) .......................................................71

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)..........................................................................................54, 61

*In re Orion Sec. Litig.*,
    2009 WL 2601952 (S.D.N.Y. Aug. 20, 2009).......................................................11

*Pappas v. Qutoutiao Inc.*,
2024 WL 4588491 (2d Cir. Oct. 28, 2024)............................................................7, 8, 11, 12

*In re Pareteum Sec. Litig.*,
2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) .........................................................................52

*Peifa Xu v. Gridsum Holding Inc.*,
2021 WL 773002 (S.D.N.Y. Feb. 23, 2021) ...........................................................................70

*Police & Fire Ret. Sys. Of Detroit v. SafeNet, Inc.*,
645 F. Supp. 2d 210 (S.D.N.Y. 2009).......................................................................................9

*Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*,
721 F.3d 95 (2d Cir. 2013)...............................................................................................67, 68

*Powers v. Newell Brands, Inc.*,
2019 WL 2491896 (W.D.N.Y. June 14, 2019) .......................................................................67

*Prime Mover v. Elixir Gaming Technologies, Inc.*,
793 F. Supp. 2d 651 (S.D.N.Y. 2011) .....................................................................................72

*Purdue Pharma L.P. v. Kentucky*,
704 F.3d 208 (2d Cir. 2013).....................................................................................................9

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007)...............................................................10, 12, 43, 44

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)...............................................................................................8, 13

*Ross v. Lloyds Banking Grp., PLC*,
2012 WL 4891759 (S.D.N.Y. Oct. 16, 2012) ........................................................................16

*Rubinstein v. Credit Suisse Group AG*,
457 F. Supp. 3d 289 (S.D.N.Y. 2020).....................................................................................34

*Rudman v. CHC Grp. Ltd.*,
217 F. Supp. 3d 718 (S.D.N.Y. 2016).....................................................................................23

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015)........................................................................................13

*In re Satyam Computer Servs. Ltd. Sec. Litig.*,
915 F. Supp.2d 450 (S.D.N.Y. 2013).......................................................................................45

*Se. Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
2015 WL 3833849 (M.D. Pa. June 22, 2015) .........................................................................61

*SEC v. e-Smart Techs., Inc.*,
  926 F. Supp. 2d 231 (D.D.C. 2013) ...............................................................17

*SEC v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996)........................................................................43

*SEC v. Nielson*,
  2020 WL 9439395 (D.D.C. Feb. 13, 2020) ...................................................37

*SEC v. Poirier*,
  140 F. Supp. 2d 1033 (D. Ariz. 2001) ..........................................................38

*SEPTA v. Orrstown Fin. Servs. Inc.*,
  12 F.4th 337 (3d Cir. 2021) ....................................................................68, 69

*Set Capital LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021)......................................................................40, 54

*Sharma v. Rent the Runway*,
  2024 WL 4287229 (E.D.N.Y. Sept. 25, 2024) ................................................9

*Sherman v. Town of Chester*,
  752 F.3d 554 (2d Cir. 2014)............................................................................7

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
  248 F. Supp. 3d 428 (S.D.N.Y. 2017)...........................................................70

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
  645 F. App'x 72 (2d Cir. 2016) .....................................................................60

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
  243 F. Supp. 3d 1109 (E.D. Cal. 2017)....................................................56, 57

*Strougo v. Barclays PLC*,
  317 F. Supp. 3d 815 (S.D.N.Y. 2018)...........................................................46

*In re SunEdison, Inc. Sec. Litig.*,
  300 F. Supp. 3d 444 (S.D.N.Y. 2018)..............................................60, 61, 63

*In re Synchrony Fin. Sec. Litig.*,
  988 F.3d 157 (2d Cir. 2021)..........................................................................13

*Teachers' Ret. Sys. of Okla. v. GE (In re GE Sec. Litig.)*,
  844 F. App'x 385 (2d Cir. 2021) ...................................................................32

*Teamsters Allied Benefit Funds v. McGraw*,
  2010 WL 882883 (S.D.N.Y. Mar. 11, 2010) .................................................16

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.,*
    531 F.3d 190 (2d Cir. 2008)................................................................16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
    551 U.S. 308 (2007)...........................................................................59

*In re Terrorist Attacks on Sept. 11, 2001,*
    714 F.3d 659 (2d Cir. 2013)................................................................16

*Thomas v. Citigroup Glob. Markets Holdings Inc.,*
    2022 WL 1051158 (S.D.N.Y. Mar. 1, 2022) ....................................26

*In re Tronox, Inc. Sec. Litig.,*
    769 F. Supp. 2d 202 (S.D.N.Y. 2011)...............................................43

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976).....................................................................37, 38

*United States v. Arthur Young & Co.,*
    465 U.S. 805 (1984)...........................................................................51

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC,*
    127 F. Supp. 3d 156 (S.D.N.Y. 2015)..........................................69, 70

*Winter v. Stronghold Digit. Mining, Inc.,*
    686 F. Supp. 3d 295 (S.D.N.Y. 2023).....................................6, 42, 53

*Xiang v. Inovalon Holdings, Inc.,*
    268 F. Supp. 3d 515 (S.D.N.Y. 2017)...............................................23

*Yi Xiang v. Inovalon Holdings, Inc.,*
    254 F. Supp. 3d 635 (S.D.N.Y. 2017)...............................................43

*In re Zenith Labs. Sec. Litig.,*
    1993 WL 260683 (D.N.J. Feb. 11, 1993) .........................................46

*Zhang v. Wen Mei, Inc.,*
    2017 WL 8813132 (E.D.N.Y. Dec. 28, 2017) ..................................67

*Zuckerman v. Smart Choice Auto. Grp., Inc.,*
    2000 WL 33996254 (M.D. Fla. Aug. 29, 2000) ...............................38

**Statutes**

15 U.S.C. § 77g(a)(1)...............................................................................51

15 U.S.C. § 77k(a) .......................................................................10, 53, 62

15 U.S.C. § 77k(b) .............................................................................48, 53

15 U.S.C. § 77m...............................................................................................23

15 U.S.C. § 77v(a)............................................................................................17

28 U.S.C. 2072(b)............................................................................................69

**Other Authorities**

17 C.F.R. § 210.3-01(a).....................................................................................51

17 C.F.R. § 210.3-02(a).....................................................................................51

17 C.F.R. § 229.303....................................................................................32, 33

17 C.F.R. § 240.12b-2..................................................................................43, 46

Black's Law Dictionary (12th ed. 2024).........................................................64, 67

Restatement (Second) of Conflict of Laws § 37................................................17

## INTRODUCTION

In June 2023, Defendant Yanjun Hu admitted that in the months preceding Defendant Baosheng Media Group Limited's[1] initial public offering, Chinese law enforcement arrested ten of the Defendant-issuer's most senior executives, while its CEO went into hiding to avoid arrest. The Company's operations stopped abruptly, while non-director and non-officer Yanjun Hu took control as, in the Underwriter Defendants' own words, an "undisclosed shadow CEO." (Underwriters' Br. at 5.) None of this was disclosed to investors and none of the Company's gatekeepers—not its underwriters, auditors, or independent directors—executed reasonable care or diligence. As the Underwriters' brief admits, it "sounds bad." (*Id.* at 1.)

That these factual allegations "sound bad" is, if anything, an understatement and they provide more than enough to survive the five motions to dismiss brought by the thirteen Defendants. Their principal argument asks the Court to recharacterize and reinterpret Yanjun Hu's own words. Defendants cobble together a stack of inferences they say shows that Yanjun Hu said something else entirely. But, of course, a Rule 12 motion is no place for Defendants to demand the Court grant inferences in *their* favor. To the contrary, on a Rule 12 motion dismiss all inferences must be granted in the Plaintiffs' favor. And in any event, there is little doubt about Yanjun Hu's admission; he said "a month or two before the company was listed. They started arresting people." (Third Amended Complaint ECF No. 128 ("TAC") ¶ 49; Tr. at 13:28.)[2]

---

[1] Hereinafter, "BAOS" or the "Company" refers to Baosheng Media Group Limited; "Audit Committee Directors" refers to Yu Zhong, Zuohao Hu, and Adam (Xin) He; "Signatories" refers to Wenxiu Zhong, Sheng Gong, and Yue Jin; "Individual Defendants" refers collectively to the Audit Committee Directors, the Signatories, and Yanjun Hu; "Auditors" refers to Friedman LLP ("Friedman") and Marcum LLP ("Marcum"); "Underwriters" refers Univest Securities, LLC ("Univest"), The Benchmark Company, LLC ("Benchmark"), and WestPark Capital, Inc. ("Westpark").

[2] The transcript (hereinafter, "Tr.") of the call between Yanjun Hu and Dong Hu was appended to the TAC as Exhibit A (ECF No. 128-1.)

Defendants' hodgepodge of other legal arguments fares no better. The TAC is not subject to a heightened pleading standard under Rule 9(b), and even if it were, the TAC more than meets it by identifying the omissions and misrepresentations and quoting extensively from Defendant Yanjun Hu's admissions. Similarly, this Court has personal jurisdiction over the Audit Committee Directors and Yanjun Hu because, at a minimum, their actions caused a foreseeable effect in the United States. Plaintiffs brought this suit within both the statute of limitations and statute of repose, and it undeniably states Securities Act claims under Sections 11, 12, and 15. Meanwhile, the Underwriters' affirmative defense is premature, and in any event, baseless. The Auditors' argument fails because *Omnicare* does not apply to the alleged misleading statements prepared by the auditors, and, even if it did, the statements of opinion are actionable. Finally, Union and Orient have stated a contract claim against BAOS based on similar omissions and misrepresentations in the Sale and Purchase Agreement. In short, the Court should deny Defendants' motions.

## **FACTUAL BACKGROUND**

BAOS is a China-based online marketing solution provider that advises advertisers on online marketing strategies, offers advertising optimization services, and facilitates the development of online ads. (TAC ¶ 5.) In 2020 and 2021, BAOS sought to raise money as a foreign private issuer, and to that end, it filed an initial registration statement with the SEC on July 10, 2020 (*id.* ¶ 29), and after a handful of amendments, it became effective on February 5, 2021 (*id.* ¶ 30; *see generally* Declaration of Ian Blodger ("Blodger Decl.") Ex. 4 (the "Registration Statement").) On February 8, 2021, its shares began trading on the NASDAQ exchange, having raised $31.2 million. (TAC ¶¶ 30, 39; *see generally*, Declaration of Angus Ni ("Ni Decl.") Ex. 2, ECF No. 139-3 (the "Prospectus").) BAOS filed its final Prospectus on February 9, 2012. (TAC ¶ 39.)

Individual Defendants Wenxiu Zhong (CEO and Chairperson of the Board), Yue Jin (CFO), and Sheng Gong (Director) signed the Registration Statement (*id.* ¶ 31), while Defendants Yu Zhong, Zuohao Hu, and Adam (Xin) He served on the Company's Audit Committee (*id.* ¶ 33.) Defendant Friedman audited BAOS (Friedman later represented that it had merged into Defendant Marcum) (*id.* ¶¶ 9–10),[3] and Univest, Benchmark, and WestPark, underwrote the IPO (*id.* ¶¶ 6–8).

The $31.2 million BAOS raised in its IPO included a $3.5 million investment from Plaintiff Golden Genius International Limited ("Golden"). (*Id.* ¶ 41.) Just over two weeks later, Plaintiffs Orient Plus International Limited ("Orient") and Union Hi-Tech Development Limited ("Union") bought $10 million in shares directly from BAOS. (*Id.* ¶ 42.)

Left unsaid in BAOS's Registration Statement—or any other public filing for that matter—was the mass arrests Chinese law enforcement executed on the Company's executive team in the months preceding the IPO. (*Id.* ¶ 128.) Plaintiffs learned about this series of arrests from Defendant Yanjun Hu during a June 2023 phone call with Dong Hu, a principal of Plaintiff Orient. (*Id.* ¶¶ 43–44.) During this call, Yanjun Hu explained to Dong Hu that due to an investigation into an illegal gambling scheme, "ten members of Baosheng's senior management were arrested on the spot," and less than thirty seconds later in the same conversation, he confirmed those arrests occurred "a month or two before the company was listed." (*Id.* ¶¶ 48–49; Tr. at 12:58, 13:28.) Yanjun Hu later explained that not only was BAOS's executive team

---

[3] On May 3, 2022, Marcum issued a press release announcing that "Friedman will merge into Marcum." (*Id.* ¶ 115.) Similar statements were posted to Friedman's Twitter and LinkedIn pages (*id.* ¶ 117), while the Company, presumably with Marcum's consent, filed a Registration Statement on August 8, 2023, in which it announced that Friedman LLP was merged with Marcum LLP" and that Friedman had "filed its application to withdraw the PCAOB registration on December 3, 2022" (*id.* ¶¶ 118–19).

arrested, but that BAOS's CEO, Wenxiu Zhong,[4] "hid away" from Chinese authorities because "she was too scared." (TAC ¶ 51; Tr. at 16:16.)

These arrests lasted for a significant time period. As Yanjun Hu notes, "we thought we would just have a dozen people over there to cooperate and to tell them about the situation . . . but they didn't come back after a week, two weeks, then a month." (Tr. at 14:03.) Due to the absence of its executive team, "the entire company's operations were suspended." (TAC ¶ 48; Tr. at 12:58.) In the absence of any executive management team, Yanjun Hu admitted he "took over the company as a matter of course." (TAC ¶ 51; Tr. at 16:16.)

After discussing the arrests and the CEO's going into hiding, Yanjun Hu then explained the "matter concluded when Sogou, including the agency rights . . . they were all gone, all gone, including the collaboration was also terminated completely." (Tr. at 14:12.) As BAOS's public filings show, this termination occurred in March 2021, just weeks after BAOS's February 8, IPO. (Declaration of Sasha Mi ("Mi Decl."), Ex. J (ECF No. 143-9) at 3.) This termination "largely impacted" BAOS, because Sogou accounted for 82.3% of its revenue in the year prior to the IPO. (TAC ¶ 52(f).) Not only did BAOS lose its agency agreement because of the arrests, investigation, and suspension of its corporate activities, but BAOS also faced a fine of 10 million RMB. (*Id.* ¶ 52(e); Tr. at 14:29.)

Aside from the mere fact that Sogou had been lost as a client, none of this was disclosed in any public filing—not the arrests, not the CEO going into hiding, not Yanjun Hu taking control over the Company, and not the causal link between management's arrests and BAOS losing 82% of its revenue. (TAC ¶¶ 52–53.) Instead, the Registration Statement and Prospectus painted a far rosier picture. For example, BAOS trumpeted "management's extensive industry

---

[4] Yanjun Hu refers to Wenxiu Zhong as "Youyou" during the call. (*See* Tr. at 6:35–6:39.)

experience, deep industry insights and well-establish network of media resources (*id.* ¶ 59), while those skilled managers were sitting in a Chinese jail cell (*id.* ¶ 52(b)). The public filings boasted that Defendant and CEO Wenxiu Zhong brought "valuable market insights and well-balanced connections and access to business resources on both the media side and the advertiser side" (*id.* ¶ 61) but failed to disclose she was in hiding (*id.* ¶ 52(b)). The Registration Statement and Prospectus also touted the Company's growth plans and its relationship with its biggest customer, Sogou. (*Id.* ¶¶ 64–73.) For example, the Company's growth strategy depended on expanding its advertising base, increasing the amount of advertising spend from its advertisers, and broadening its media resources with authorized agency relationships (*id.* ¶ 67), but as Yanjun Hu disclosed, the Company suspended operations while its executives sat in jail or disappeared into hiding. The same is true about the Company's representations about the strength of its Sogou relationship. (*Id.* ¶¶ 69–73.) The Company said nothing about this investigation in its discussion of pending legal proceedings (*id.* ¶¶ 57–58) and its risk factors repeatedly failed to recognize the risks warned of had already materialized (*id.* ¶ 74–80).

The Company's gatekeepers—its auditors, underwriters, and directors—were no help either. Friedman audited the Company's financial statements, and later consented to their inclusion in the Registration Statement and Prospectus. (*Id.* ¶ 82.) To provide that consent, Friedman had to comply with applicable professional standards requiring, among other things, extending their procedures with respect to subsequent events from the date of its audit report to the effective date of the Registration Statement. (*Id.* ¶¶ 85–89.) Because the Company's management team was in jail or hiding, and because inquiries of and representations from management are central to the required procedures, Friedman could not have complied with these professional standards. (*Id.* ¶¶ 90–92.) The Underwriters' work was no better. As the lead

underwriter, Univest had significant access to and communication with BAOS directors and senior executives and it should have known BAOS was under investigation due to the disruptions of having most of its officers in jail or in hiding. (*Id.* ¶ 104–07.) The other two underwriters' work (Benchmark and WestPark) was also inadequate because they each failed to perform the necessary diligence to ensure the Registration Statement and Prospectus were accurate. (*Id.* ¶¶ 108–12.)

To right Defendants' wrong, Plaintiffs filed suit on February 1, 2024, just seven months after Defendant Yanjun Hu disclosed that Chinese authorities had arrested the Company's senior executives. (*Id.* ¶ 127.) Plaintiff Golden brought Securities Act claims under Sections 11, 12, and 15 against Defendants while Plaintiffs Orient and Union brought a contact claim against BAOS for its breach of the stock purchase agreement ("SPA"). Hoping to avoid discovery into these material omissions and misrepresentations, the thirteen Defendants filed five motions to dismiss spanning more than 40,000 words. For the reasons explained further below, the Court should deny all five motions.

## ARGUMENT

To prevail in opposition to a motion to dismiss, Plaintiff's complaint need contain only "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Winter v. Stronghold Digit. Mining, Inc*., 686 F. Supp. 3d 295, 303 (S.D.N.Y. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In assessing whether the plaintiff has stated a plausible claim, courts "draw[] all reasonable inferences in favor of the nonmoving party." *Sherman v. Town of Chester*, 752 F.3d 554, 560 (2d Cir. 2014). Courts assess motions to dismiss under Rule 12(b)(2), like those brought by certain Individual Defendants

6

here, by using a similar standard—whether "a plaintiff [has made] a prima facie showing that

jurisdiction exists." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d

Cir. 2013). In deciding whether the plaintiff has met its burden, a court must view the "pleadings

and affidavits in the light most favorable to the plaintiff, resolving all doubts in their favor."

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (citation omitted).

Defendants cannot meet either burden. Accordingly, the Court should deny Defendants'

Motions in full.

## I.    RULE 8'S NOTICE PLEADING STANDARD GOVERNS GOLDEN'S SECURITIES ACT CLAIMS

BAOS and the Underwriters implore this Court to analyze Golden's Section 11 and

12(a)(2) claims under Rule 9(b)'s heightened pleading standard.[5] (BAOS Br. at 21–22;

Underwriters' Br. at 11–19.) That rule does not apply, and even if it did, the TAC's allegations

meet it.

### A.    Rule 8—*Not* Rule 9(b)—Applies to the TAC

Golden accuses BAOS and the Underwriters of negligently violating Sections 11 and 12

of the Securities Act. (TAC ¶¶ 133–62.) Because Section 11 and 12 claims sound in strict

liability or negligence, such claims are presumed to be subject to the Rule 8 notice pleading

standard. Indeed, Rule 8 applies where the "plaintiff alleges negligent preparation of the

registration statement and prospectus, rather than fraudulent preparation," *Pappas v. Qutoutiao*

*Inc.,* 2024 WL 4588491, at *2 (2d Cir. Oct. 28, 2024) (unpublished), or where the complaint

"explicitly does not allege fraud," *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir.

2011).

---

[5] The Auditors, Signatories, Yanjun Hu, and Audit Committee Directors do not join this
argument.

As recently as three months ago, the Second Circuit confirmed this basic principle, stating, "[a] plaintiff may retain the application of the Rule 8 notice pleading standard by expressly pleading negligence, disclaiming fraud, eschewing language in its Section 11 or Section 12(a)(2) claims implying fraud or the elements thereof, and separating allegations supporting fraud claims from allegations supporting negligence claims." *Pappas*, 2024 WL 4588491, at *2 (unpublished). Only complaints relying on averments of fraud are subject to Rule 9(b). *See id.* at *1. *Pappas* is instructive. There, the Plaintiff brought Sections 11, 12(a)(2) and 15 claims against an issuer, its officers and directors, and its underwriters based on alleged misstatements and omissions in connection with the company's IPO and secondary public offering. *Id.* at *1. The Second Circuit reversed the district court's order dismissing the complaint on the ground that it had not complied with Rule 9(b). *Id.* In so reversing, the Second Circuit held that the plaintiff's complaint was subject to only the notice pleading requirement of Rule 8 because the plaintiff framed the securities law claims in the "classic language of negligence and strict liability" and by disclaiming any fraud-related theory. *Id.* at *2. The same is true of Golden's claims.

Ignoring the Second Circuit's most recent decision on this issue, BAOS and the Underwriters instead focus on a series of older cases standing for the unremarkable proposition that Section 11 and 12 claims can be subjected to Rule 9(b) "insofar as the claims are premised on allegations of fraud," *see Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). (Underwriters' Br. at 12–14; BAOS Br. at 21.) But their cases all share one important detail that neither the Underwriters nor BAOS explore. Plaintiffs in *all* those cited cases brought Exchange Act *and* Securities Act claims. *See, e.g.*, *Police & Fire Ret. Sys. Of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 217–18 (S.D.N.Y. 2009); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d

595, 616 (S.D.N.Y. 2005). Such pleading in the alternative (*i.e.*, bringing both a negligence claim under Section 11 of the Securities Act and a fraud claim under Section 10(b) of the Exchange Act) is permitted so long as the plaintiff presents "two theories with distinct narratives." *In re Chembio Diagnostics, Inc. Sec. Litig.*, 616 F. Supp. 3d 192, 202 (E.D.N.Y. 2022). These courts apply Rule 9(b) when plaintiffs do not present two theories with distinct narratives. Again, this is not controversial, but also not at issue in the TAC.

Courts need not look for two theories when a plaintiff pleads only a negligence theory, as Golden has done here. In *Litwin*, for example, the Second Circuit considered a complaint with only Securities Act claims. 634 F.3d at 708. There, and although the defendants did not challenge it, the court observed that the "plaintiffs' complaint explicitly [did] not allege fraud"; that is, there was *no* Section 10(b) claim. *Id.* at 715. The court in *Sharma v. Rent the Runway* reached the same conclusion. 2024 WL 4287229, at *8 (E.D.N.Y. Sept. 25, 2024) ("[W]hile plaintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness, here it is crucial that Plaintiffs do not bring claims under Section 10(b)(5) of Securities Exchange Act, which would require satisfying the heightened pleading under Rule (9)(b).") (quotation and citation omitted). Like in *Litwin* and *Sharma*, the TAC here explicitly does not allege fraud. (TAC ¶¶ 133–66.) That a plaintiff is the master of her complaint surely means that she can choose to pursue a negligence theory, fraud theory, or both. *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 216 n.7 (2d Cir. 2013). And where only a negligence theory is at issue in the operative pleading, the court need not go hunting for distinct liability theories supporting both a negligence and fraud claim.

Even if this Court were required to parse negligence and fraud allegations, the TAC adequately alleges negligence, thus necessitating application of Rule 8. BAOS's and the

Underwriters' briefs begin by insisting that Rule 9(b) applies because the TAC is "replete with hallmarks of fraud." (Underwriters' Br. at 12; BAOS Br. at 21.) As evidence, they claim the TAC uses phrases like "materially misleading," "untrue statements of material facts," and "failed to disclose material facts." (*Id.*) But these phrases are just references to or direct quotes from Section 11's text. 15 U.S.C. § 77k(a) (creating liability where registration statements contain "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ."). The TAC's anodyne descriptions of BAOS's materially inaccurate registration statement do not sound in fraud, rather, they plead necessary elements—namely, falsity and materiality—to establish Section 11 and 12 liability. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 631–32 (S.D.N.Y. 2007) ("Fraud, of course, implies more than falsity, and the mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does not make it fraudulent."); *Nayani v. Lifestance Health Grp., Inc.*, 2023 WL 3260260, at *2 (S.D.N.Y. May 4, 2023) ("[T]he allegations in the FAC simply track the elements of Section 11, and a plaintiff cannot be held to allege fraud whenever he tracks those elements.").

Next, the Underwriters cherry-pick a two-word phrase—"became clear" from Paragraphs 107 and 112 of the TAC—as supposed evidence that Golden alleges fraudulent intent. (Underwriters' Br. at 12–13.) Citing a single word in a single paragraph from the TAC, BAOS does the same thing. (BAOS Br. at 21 (citing TAC ¶ 54).)[6] Both arguments contort the TAC beyond recognition. Even if these paragraphs could be read as pleading that BAOS or the Underwriters knew of the arrests, "that a fact was known and not disclosed does not mean, as a

---

[6] Paragraph 54 pertains specifically to Union's and Orient's contract claim, *not* Golden's Section 11 or 12 claims. (TAC ¶ 54 (alleging, "At the time BAOS entered into the SPA with Orient and Union . . . .").)

matter of law, that the circumstances of the resulting omission sound in fraud." *Pappas*, 2024 WL 4588491, at *2 (quoting *In re Orion Sec. Litig.*, 2009 WL 2601952, at *1 (S.D.N.Y. Aug. 20, 2009)). In other words, a party may know something, and negligently fail to correct a registration statement or prospectus to accurately reflect that knowledge, which is precisely what Golden alleges here.

Besides the repeated disclaimers that Golden is not pursuing a fraud-based claim (*see, e.g.*, TAC ¶¶ 1 n.1, 134, 151, 165) and the absence of a Section 10(b) claim, the rest of the TAC affirms the premise of those disclaimers. For example, in the Section 11 claim, Golden alleges that "BAOS is strictly liable for the materially inaccurate statements contained in the Registration Statement and Prospectus and the failure of the Registration Statement and the Prospectus to be complete and accurate." (*Id.* ¶ 137.) For the Individual Defendants, Golden alleges they are liable under Section 11 "[b]y virtue of their failure to exercise reasonable care . . . ." (*Id.* ¶ 138.) For the Underwriters, Golden alleges they "fail[ed] to exercise reasonable care" to ensure the Registration Statement was accurate and not misleading. (*Id.* ¶ 139.) Golden's Section 12 claim similarly uses negligence-type language, alleging, "[n]one of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were accurate and complete in all material respects." (*Id.* ¶ 160.) Courts in this District have analyzed similar negligence-based allegations under Rule 8. *See In re Refco*, 503 F. Supp. 2d at 632 (rejecting defendants' Rule 9(b) argument by finding plaintiffs' allegations about the officers' and auditors' failure to conduct "a reasonable investigation" to state a claim for negligence); *Pappas*, 2024 WL 4588491, at *2. The Underwriters' *own* authority rejected application of Rule 9(b) as to the underwriters and auditors

when the complaint faulted both for failing to conduct a reasonable investigation. *In re Ambac Fin. Grp., Inc.*, 693 F. Supp. 2d 241, 275 (S.D.N.Y. 2010).[7]

The Underwriters also argue that the TAC contains so-called "boilerplate disclaimers" and they then rely on *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 514, 530 (S.D.N.Y. 2005), and *In re Elan Corp.*, 2004 WL 1305845, at *7 (S.D.N.Y. May 18, 2004), to claim such disclaimers are not enough to avoid Rule 9(b). (Underwriters' Br. at 15.) This grossly mischaracterizes the TAC's negligence theory and ignores the repeated allegations that Defendants failed to exercise reasonable case. (TAC ¶¶ 90, 138, 139, 160.) It also fails to appreciate that *Alcatel* and *Elan* both arose when those plaintiffs pled alternative theories without differentiating between the two. *Alcaltel*, 382 F. Supp. 2d at 530; *Elan*, 2004 WL 1305845, at *22. The TAC, on the other hand, pleads pure negligence and has disclaimed any fraud theory.

### B.    Golden's Complaint Satisfies Rule 9(b) Standard Regardless

After erecting a heightened pleading burden that does not exist, BAOS and the Underwriters claim Golden cannot meet it. Not so. Rule 9(b) requires that a plaintiff "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and

---

[7] BAOS includes an oblique reference to a proceeding brought against it in the Cayman Islands, claiming "[t]he gravamen of the Cayman Petition also makes the [sic] Golden's coy disclaimer of scienter particularly meaningless." (BAOS Br. at 21 n.9.) There is no fraud claim at issue in the Cayman proceeding. Rather, Golden seeks the winding-up of BAOS for, among other reasons, improper related party transactions, the management of the company following the IPO, and the inaccuracy of the statements BAOS made prior to the IPO. (*See* ECF No. 143-11 ¶ 72.) Even if the Cayman petition sought relief for fraud, which it does not, the relief a party seeks in a separate lawsuit has no bearing on the allegations made in the suit before this Court. *See Forsberg v. Always Consulting, Inc.*, 2008 WL 5449003, at *10 (S.D.N.Y. Dec. 31, 2008) (noting that a court "may only consider the information contained in the four corners of a complaint" on a motion to dismiss); *cf. Pappas*, 2024 WL 4588491, at *2 ("However, a Securities Act claim sounding in negligence or strict liability will not be subjected to the heightened standard of Rule 9(b) merely because of the complaint's other claims.").

other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To satisfy

Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

the statements were fraudulent." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir.

2021). Rule 9(b) is not "an insurmountable hurdle for plaintiffs to overcome . . . ." *H.A.B.*

*Assocs. v. Hines*, 1990 WL 170514, at *2 (S.D.N.Y. Oct. 26, 1990).[8]

Golden's Securities Act claims meet that standard. There is no serious dispute that

Golden identifies the misrepresentations and omissions at issue as the TAC pleads seven

categories of misrepresentations and omissions. (*See, e.g.*, TAC ¶ 52 (failure to disclose the

arrests of its executives and related disruptions); *id.* ¶¶ 57–58 (failure to disclose legal

proceedings); *id.* ¶¶ 59–63 (misleading statements about the Company's reliance on

management); *id.* ¶¶ 64–73 (misleading statements about growth and its Sogou relationship); *id.*

¶¶ 74–80 (misleading statements about risks that had already materialized); *id.* ¶¶ 81–94

(misleading statements from the Auditors); *id.* ¶¶ 95–98 (failure to make required disclosures).

Nor is there any legitimate dispute about who made the statements or when they were made (in

the case of a misrepresentation)—the Company made the statements in its Registration Statement

and Prospectus, while the Auditors prepared or certified parts of the Registration Statement. The

TAC specifically identifies the "what," "where," and "when" and further explains "how" those

---

[8] The Underwriters repeatedly criticize Golden for failing to plead scienter
(Underwriters' Br. at 16, 18), which is not an element of Section 11 or 12 claims. Though
"[c]laims that sound in fraud must satisfy the heightened pleading requirements of Rule
9(b), [] that Rule does not add substantive elements such as scienter to any claim." *In re
Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 n.8 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v.
Sanofi*, 816 F.3d 199 (2d Cir. 2016); *see also Rombach*, 355 F.3d at 171 ("[A] plaintiff
need allege no more than negligence to proceed under Section 11 and Section 12(a)(2)"
even when subject to Rule 9(b)).

statements were misleading. This is enough to survive Rule 9(b). *See In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 216 (S.D.N.Y. 2004); *Handal v. Tenet Fintech Grp. Inc.*, 2023 WL 6214109, at *9 (E.D.N.Y. Sept. 25, 2023).

BAOS, nevertheless, mischaracterizes Golden's Securities Act claims as a failure to "point to any regulatory enforcement action or findings of wrongdoing based on Baosheng's conduct." (BAOS Br. at 21.) BAOS misunderstands the TAC. Golden's Securities Act claims focus on the arrests and the abrupt disruption to the business while a shadow CEO, Yanjun Hu, took control. (TAC ¶ 52.) Although it's true that BAOS should have disclosed that as a legal proceeding (*id.* ¶¶ 57–58), it is also true that those omissions infected virtually every other component of BAOS's Registration Statement and Prospectus. For example, BAOS trumpeted the experience of its management team, (*id.* ¶¶ 59–63) but failed to disclose those skilled managers were sitting in a Chinese jail cell (*id.* ¶ 52(b)). BAOS boasted about Defendant CEO Wenxiu Zhong's "valuable market insights and well-balanced connections and access to business resources on both the media side and the advertiser side" (*id.* ¶ 61) while she was in hiding (*id.* ¶ 52(b)). The Registration Statement and Prospectus emphasized the Company's growth plans and its relationship with its biggest customer, Sogou (*id.* ¶¶ 64–73) all while its operations had been suspended. Meanwhile, its risk factors repeatedly failed to recognize that certain risks had already materialized. (*Id.* ¶¶ 74–80.) BAOS all but ignores these well-pled allegations.[9]

---

[9] Citing *Chapman v. Mueller Water Products, Inc.*, 466 F. Supp. 3d 382, 399 (S.D.N.Y. 2020), BAOS also characterizes Yanjun Hu's recorded comments as mere "rumor." (BAOS Br. at 22.) Yanjun Hu's statements are far different than what was at issue in *Chapman*, which involved *confidential* witnesses that overheard information or made assumptions about the state of the company without holding a position that would have made them knowledgeable. *See Chapman*, 466 F. Supp. 3d at 399. Golden does not rely on an anonymous source, but rather it identified the source and pled how he had direct knowledge given *he* took control of the Company when the executive team was detained

The Underwriters take a different tact by arguing that Golden does not plead intent with sufficient particularity (Underwriters' Br. at 16–18) never mind that Rule 9(b) permits pleading "knowledge[] and other conditions of a person's mind . . . generally." Of course, Golden affirmatively declined to plead a fraud-based claim against the Underwriters, but the Underwriters' own brief posits a recklessness theory in failing to correct the misleading Registration Statement and Prospectus. (Underwriters' Br. at 13.) The TAC alleges the Underwriters "would or should have been in direct communication with BAOS's directors and senior executives in preparing for the IPO." (TAC ¶¶ 104, 109.) And that level of access and communication should have alerted the Underwriters to the investigation, arrests, and disruption. (*Id.* ¶¶ 106, 111.) As the Underwriters further claim, their failure to discover "a 'shut down' business with a CEO in hiding" could mean only that they "recklessly refused 'to see the obvious.'" (Underwriters' Br. at 14.) And in arguing for the application of a heightened burden, the Underwriters contend "neither the explicit allegations of fraud by the Underwriters, nor the magnitude and depth of the hidden facts alleged, leave any possibility of mere negligence." (*Id.* at 15.)

The Underwriters also argue that Golden has not identified "any reports or statements" that would have come to light had they performed a reasonable investigation. (Underwriters' Br. at 17.)[10] Again, not so. The undisclosed information at issue—the executives' arrests, the CEO's

---

or hiding. (TAC ¶¶ 44–46.) Yanjun Hu even helped secure the release of some members of the executive team. (Tr. at 16:01; *see* Section IV(a), *infra*.)

[10] On this point, the Underwriters cite several inapposite cases, none of which apply Rule 9(b) to an underwriter. (Underwriters' Br. at 16–17 (citing *Ross v. Lloyds Banking Grp., PLC*, 2012 WL 4891759, at *10 (S.D.N.Y. Oct. 16, 2012); *Teamsters Allied Benefit Funds v. McGraw*, 2010 WL 882883, at *9 (S.D.N.Y. Mar. 11, 2010); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 196 (2d Cir. 2008); *Harris v. Amtrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155 (S.D.N.Y. 2015)).)

retreat to a hiding place, and Defendant Yanjun Hu's control—is the critical information at issue. Assuming Rule 9(b) applies, there are just two possible inferences for the Underwriters: either they knew of the arrests and did nothing (fraud), or they did not discover the arrests, missing executives, or "shadow CEO", but should have (recklessness or negligence). Either way, and even under the false construct of applying Rule 9(b), Golden sufficiently pleads intent.[11]

## II.    THE COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS

Four Individual Defendants, including the three Audit Committee Directors, and Yanjun Hu, challenge the Court's personal jurisdiction. Each is mistaken because their actions caused a foreseeable effect in the United States.

To establish personal jurisdiction, "due process requires a plaintiff to allege (1) that a defendant has certain minimum contacts with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). "The Securities and Exchange Acts allow for personal jurisdiction over foreigners not present in the United States to the extent that the Due Process Clause of the Fifth Amendment permits." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 346, 398 (S.D.N.Y. 2005) (citing *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir. 1972). The Securities Act authorizes nationwide service of process, meaning courts may consider "contacts with the United States as a whole" when determining whether they may exercise jurisdiction over defendants. 15 U.S.C. § 77v(a); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 349–50 (S.D.N.Y. 2019); *see also Gucci Am. v. Bank of China*, 768 F.3d 122, 142 n.21 (2d Cir. 2014). For foreign defendants, courts have personal jurisdiction over defendants

---

[11] If the Court holds that Plaintiffs have not satisfied the appropriate pleading standard, Plaintiffs respectfully request an opportunity to replead with greater specificity.

who caused effects in the United States where "the effect occurs as a direct and foreseeable result of the conduct outside the territory." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d at 398 (citing Restatement (Second) of Conflict of Laws § 37). The TAC alleges the specific actions of the Audit Committee Directors and Yanjun Hu that had effects in the United States, that those effects were foreseeable, and that all four Defendants had good reason to know their conduct would produce those effects.

A.    **The Court Has Personal Jurisdiction over Adam (Xin) He**

Adam (Xin) He is subject to the Court's jurisdiction because he lives in the United States. (Declaration of Adam (Xin) He, ECF No. 114-1 at ¶ 3 (stating, "I currently live and work in Chicago, Illinois").) Standing alone, this is enough. When considering challenges to a court's personal jurisdiction under the Securities Act, courts have concluded that living within the territorial borders of the United States is sufficient minimum contact to establish personal jurisdiction consistent with due process. *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Rajcher*, 609 F. Supp. 291 (S.D.N.Y. 1985) (holding that the court had personal jurisdiction in an action under the Securities Exchange Act, where the defendant lived within the territorial boundaries of the United States); *SEC v. e-Smart Techs., Inc.*, 926 F. Supp. 2d 231, 236 (D.D.C. 2013) ("[The Defendant] never denies his contacts with the United States as a whole; indeed, he would have difficulty so doing since he lives in California. His argument on personal jurisdiction thus cannot prevail.").

B.    **The Court Has Personal Jurisdiction over the Remaining Audit Committee Directors**

The TAC further alleges the Audit Committee Directors responsibility over the contents of BAOS's filings, including the Registration Statement, and that filing a registration statement with false information in the United States would have a foreseeable effect in the United States.

17

The Registration Statement itself confirms these foundational facts. According to BAOS, the Audit Committee Directors were charged with

> reviewing with the independent auditors any audit problems or difficulties and management's response; discussing the annual audited financial statement with management and the independent auditors; . . . meeting separately and periodically with management and the independent auditors; and monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of [BAOS's] procedures to ensure proper compliance.

(TAC ¶ 34; Registration Statement at 122.) The Audit Committee Directors were no passive actors. They met with management and the auditors, supposedly monitored compliance with company policies, and discussed the Company's financial statements with management and the auditors. (TAC ¶ 34.) By virtue of their roles as Audit Committee Directors, the TAC also alleges that they "had control over the contents of BAOS's public filings, knew those documents would be filed in the United States with the SEC, and directed those filings toward United States investors." (*Id.* ¶ 24.) The TAC further alleges that the Audit Committee Directors "each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement," (*id.* ¶ 138), as established by the job description provided for in the Registration Statement.

These allegations are sufficient to establish personal jurisdiction over the Audit Committee Directors because they allege that the Audit Committee Directors took actions— wrongly approving a Registration Statement that contained false and misleading statements and supposedly meeting with management about financial statements and other matters—that had a direct and foreseeable effect in the United States by misleading investors about a stock listed on an American exchange. Courts in this Circuit have found personal jurisdiction over foreign defendants in similar circumstances. In *Itoba Ltd. v. LEP Group PLC*, for example, the court

found it had personal jurisdiction over a defendant where he knew or should have known a form "he approved would be filed with the SEC and be relied on by potential investors." 930 F. Supp. 36, 41 (D. Conn. 1996).[12]

The Audit Committee Directors claim that "they do not have sufficient contacts with New York, did not conduct any act within New York, and did not direct any actions into New York," (Audit Committee Directors' Br. at 9), with each Audit Director submitting an affidavit disclaiming any contact with New York (Declaration of Yu Zhong ECF No. 147-3 Decl. ¶ 3; Declaration of Zuohao Hu, ECF No. 147-2 ¶ 3; Declaration of Adam (Xin) He ECF No. 147-1 ¶ 3). Their framing is too narrow. In cases brought under Section 11, courts consider a defendant's "contacts with the United States as a whole" when determining whether they have personal jurisdiction over the defendant. *Balestra*, 380 F. Supp. 3d at 349–50. Here, the Audit Committee Directors were responsible for approving the Registration Statement they knew would be filed in the United States for securities traded on the NASDAQ, a New York exchange. (TAC ¶ 22.) This is sufficient contact with this forum.

The Audit Committee Directors also argue the "mere fact of their status as independent directors also does not establish personal jurisdiction." (Audit Committee Directors' Br. at 10.) That may be true, but it is irrelevant. This Court does not have jurisdiction over the Audit Committee Directors because they were independent directors; this Court has jurisdiction over the Audit Committee Directors because they took actions directed at the United States.

---

[12] The Audit Committee Directors make much of their failure to sign the Registration Statement or Prospectus. (Audit Committee Directors' Br. at 9.) That is irrelevant. This Court can exercise personal jurisdiction so long as they took actions—approving the Registration Statement—that had a foreseeable effect in the United States. *See Itoba,* 930 F. Supp. at 41.

Finally, the Audit Committee Directors minimize the numerous specific allegations against each of them by claiming those allegations are impermissible group pleading. Though the TAC uses the shorthand "members of the audit committee," it also specifies that it is referring to "Adam (Xin) He, Yu Zhong, and Zuohao Hu," when it uses that collective term. (TAC ¶ 33.) And the TAC includes specific, concrete allegations against "members of the audit committee" by citing to their duties as identified in the Registration Statement. (*Id.* ¶ 34.) The TAC also alleges the Audit Committee Directors "had control over the contents of BAOS's public filings," (*Id.* ¶ 24), and "each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement." (*Id.* ¶ 138.) Given the Audit Committee Directors each had the same duties and responsibilities for approving BAOS's statements, it is perfectly appropriate to refer to them collectively.

The cases cited by the Audit Committee Directors involve fundamentally different allegations. In *Alibaba*, the only allegations were that the "[defendant] was responsible for appointing [the company's] Board Members, (2) several Board Members were indebted to him, and (3) [the defendant] was able to "seize licenses" to retain "substantial holdup leverage over [the company][.]" *In re. Alibaba Grp. Holding Ltd. Sec. Litig.*, 2023 WL 2601472, at *6 (S.D.N.Y. Mar. 22, 2023). Similarly, the only allegations in *Braskem* were that the defendant controlled most of the shares, had the power to appoint directors, veto corporate actions, and approve business plans. *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 766–71 (S.D.N.Y. 2017). Unlike the TAC's allegations against the Audit Committee Directors, the complaints in *Alibaba* and *Braskem* did not allege the defendants had formal responsibilities to investigate the truth and accuracy of a company's statements and approve those statements. In other words,

20

*Alibaba* and *Braskem* concerned allegations that a director *could* have control, where here Golden pleads the Audit Committee Directors had that control.

### C.    The Court Has Personal Jurisdiction over Yanjun Hu

Yanjun Hu admitted that he "took over the company as a matter of course" and that he "had no choice." (Tr. at 16:16; *see also* TAC ¶¶ 24, 44, 51, 52(d), 63, 68.) He now asks the court to ignore his own words. (Signatories/Hu Br. at 15.) The Court should not do so because Yanjun Hu took actions that had foreseeable effects in the United States by misleading investors about a stock listed on an American stock exchange.

Courts in this Circuit routinely find personal jurisdiction over similarly situated defendants that had control over false statements in securities filings. In *Banco Bradesco S.A. Sec. Litig.*, for example, the court held it had personal jurisdiction over a defendant who approved a statement "with knowledge that it would be filed with the SEC and be given to prospective American purchases and sellers." 277 F. Supp. 3d 600, 644 (S.D.N.Y. 2017). By virtue of his position controlling the company, Yanjun Hu knew that the Registration Statement and Prospectus would to be filed with the SEC and would be relied upon by investors in the United States. In *Landry v. Price Waterhouse Chartered Accountants*, the court found personal jurisdiction over a defendant who "was a behind the scenes player in the . . . management of" the company that made allegedly fraudulent statements. 715 F. Supp. 98, 102 (S.D.N.Y. 1989). Here, although Yanjun Hu was never publicly identified as being in control of BAOS, the TAC adequately alleges that he controlled BAOS behind the scenes when it filed false statements in the United States.

Yanjun Hu, like the Audit Committee Directors, argues that he does not have sufficient contacts with New York. (Signatories/Hu Br. at 9.) This is the wrong inquiry in securities cases

(Section II.B, *supra*.). Like the Audit Committee Directors, Yanjun Hu took actions—controlling the Registration Statement and Prospectus—that had an effect in the United States as a whole.

Yanjun Hu cites the same cases as the Audit Committee Directors, but *Alibaba* and *Braskem* are equally as inapposite as applied to him. (Signatories/Hu Br. at 10 (citing *Alibaba*, 2023 WL 2601472, at \*6; *Braskem*, 246 F. Supp. 3d 731 at 766–71.) Again, those cases did not involve allegations that the defendants had any control over the allegedly false statements at issue. Here, the TAC specifically and repeatedly alleges that Yanjun Hu controlled the statements in BAOS's Registration Statement and Prospectus because he controlled BAOS at the time it filed those statements in the United States.[13] These concrete, specific allegations are sufficient to establish personal jurisdiction over Yanjun Hu.

## III.    GOLDEN'S CLAIMS WERE BROUGHT WITHIN THE STATUTE OF LIMITATIONS

All Defendants, except the Underwriters, claim Golden's Securities Act claims are time barred. Not so. Golden did not discover and could not have discovered the facts necessary to plead those claims until after June 2023 when Defendant Yanjun Hu finally disclosed the arrests and his having become the "shadow CEO." (TAC ¶¶ 43–46.)

The parties agree that under Section 13, any Securities Act claims must be "brought "within one year after the discovery of the untrue statement or the omission, or after such

---

[13] Yanjun Hu argues that the transcript submitted by Plaintiffs shows that he did not have control over BAOS when it filed the Registration Statement. Yanjun Hu's own statements contradict this argument. He stated, "the company suspended operations" and that because of that he "took over the company as a matter of course." (Tr. at 12:58, 16:16.) Even if these comments were somehow ambiguous, such ambiguity is construed in favor of Plaintiffs. *See CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 77 (2d Cir. 2017).

discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m.[14]
No Defendant argues that Golden failed to bring its Securities Act claims within one year of
actual discovery. Nor could they as Golden adequately alleges it discovered the misstatements
and omissions in June 2023 following Defendant Yanjun Hu's admissions. (TAC ¶ 127.) Instead,
certain Defendants claim Golden did not exercise reasonable diligence in pursuing its claim.
These Defendants misunderstand the law and facts.

The one-year period begins to run when "'a reasonably diligent plaintiff would have
discovered the facts constituting the violation.'" *N.J. Carpenters Health Fund v. Residential
Capital, LLC*, 2011 WL 2020260, at *4 (S.D.N.Y. Apr. 28, 2011) (quoting *Merck & Co. v.
Reynolds*, 130 S. Ct 1784, 1798 (2010)).[15] Importantly, a fact is not deemed "discovered" until a
"plaintiff would have sufficient information about that fact to adequately plead it in a complaint .
. . with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *N.J.
Carpenters Health Fund*, 2011 WL 2020260, at *4 (quoting *City of Pontiac Gen. Emps. Ret. Sys.
v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)). In other words, "the limitations period begins
to run only when, in the course of that investigation, the reasonable plaintiff would have

---

[14] BAOS also agrees that a statute-of-limitation defense is disfavored on a motion to
dismiss. (BAOS Br. at 20 (noting the likelihood of fact issues)); *see also Lapin v.
Goldman Sachs Grp., Inc.,* 506 F. Supp. 2d 221, 234 (S.D.N.Y. 2006) ("[O]on a motion
to dismiss, 'unless Defendants can produce uncontroverted evidence that irrefutably
demonstrates when plaintiff discovered or should have discovered the fraudulent scheme,
they cannot satisfy the heavy burden of establishing inquiry notice as a matter of law.'"
(citation omitted)).

[15] Most courts in this District apply *Merck*'s conception of "discovery" to Securities Act
claims. *Rudman v. CHC Grp. Ltd.*, 217 F. Supp. 3d 718, 724 (S.D.N.Y. 2016); *Xiang v.
Inovalon Holdings, Inc.*, 268 F. Supp. 3d 515, 522 (S.D.N.Y. 2017). BAOS's brief cites
approvingly to *Merck* and the Individual Defendants otherwise cite authority adopting
*Merck*. (*See* BAOS Br. at 19; *see, e.g.*, Signatories/Hu Br. at 11 (citing *Hoi Ming Michael
Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547 (S.D.N.Y. 2012)).) Defendants
have waived any argument to the contrary.

discovered sufficient information to plead a securities-law violation adequately." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017) (citation omitted).

These Defendants make four short, undeveloped arguments in support of their claim that the statute of limitations has run. None are availing. *First*, BAOS and the Individual Defendants claim Golden's investigation was inadequate, and that it should have made a so-called books-and-records request to assess the viability of its claims. (*See* BAOS Br. at 20; Signatories/Hu Br. at 12.) These Defendants cite no authority, and Golden is aware of none, that requires inspection before relying on the discovery rule provided by the Securities Act. Just the opposite is true in similar circumstances. *See Caterpillar, Inc. v. Scott*, 2005 WL 8162859, at *3–4 (D.S.C. July 7, 2005) (denying motion to dismiss where plaintiff "could not have discovered the [misconduct] through due diligence because it did not have actual access to the corporations' books and records"); *cf. JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 410 (S.D.N.Y. 2004) (finding a plaintiff *with* an inspection right still did not have "the duty to inquire"). Even if inspection were required, BAOS prohibited it. Under the heading "Inspection of Books and Records" in both the Prospectus and Registration Statement, BAOS said, "[h]olders of our Ordinary Shares will have no general right under the Cayman Companies Act to inspect or obtain copies of our register of members or our corporate records." (Registration Statement at 128; Prospectus at 133.)

*Second*, all these Defendants claim the loss of Sogou's business in 2021 and accompanying loss of revenue should have caused a reasonable investor to investigate further. (BAOS Br. at 20; Audit Committee Directors' Br. at 11; Signatories/Hu Br. at 11.) These Defendants point to BAOS's September 2021 filing in which BAOS disclosed the loss of Sogou's business:

> Our top publisher, Sogou, has been acquired by Tencent and its business is currently under restructuring. We have been trying to secure the authorized agency status of Sogou for the year ending December 31, 2022. However, there is uncertainty as to whether and when we can successfully secure an authorized agency status with Sogou. . . .
>
> For the year ended December 31, 2021, our decrease in gross billing and revenues as compared with those of the year ended December 31, 2020 was mainly caused by the decrease in gross billing and revenue from Sogou. . . . [O]ur annual authorized agency agreement with Sogou expired in March 2021, which was not renewed subsequently.

(Mi Decl., Ex. J at 7, 10.) This bland disclosure, standing alone, would not—and did not—provide an ordinary investor with any indication of a securities violation, let alone a *probable* violation as required by *Nomura*, 873 F.3d at 122. Glaringly absent from these disclosures is any reference to the arrests, the CEO's hiding, BAOS's suspended operations, or Yanjun Hu's control. (*See* TAC ¶ 52.) That is the gravamen of Golden's allegations. Fundamental to a potential shareholder's investment decision is the identity of who is running the Company. Nothing about the loss of Sogou—especially when the Company misrepresented the cause of Sogou's departure[16]—accurately discloses who ran BAOS. Without that information, Golden did not yet have viable Securities Act claims.[17]

---

[16] BAOS characterized the loss of Sougou as the result of the agreement "expir[ing]." (*See* Mi Decl., Ex. J. at 10.) This was false.

[17] The Individual Defendants cite three inapposite cases in support of their argument. *Thomas v. Citigroup Glob. Markets Holdings Inc.*, 2022 WL 1051158 (S.D.N.Y. Mar. 1, 2022), involves a *pro se* plaintiff who admitted the alleged wrongdoing "was discernable by using 'simple math,'" and in any event, his damages were fixed at the time his shares were redeemed. 2022 WL 1051158, at *12. *Cross v. 21 Century Holding Co.*, 2011 WL 34808272, at *6 (S.D.N.Y. Aug. 6, 2001), addressed a restatement that disclosed the very misrepresentations at issue in the litigation. And *Chen v. X Fin.*, 2021 WL 7449851, at *6–10 (S.D.N.Y. Dec. 9, 2021), was an actual discovery case, not a constructive discovery case.

*Third*, nothing in BAOS's forward-looking statements or disclaimers in the Registration Statements and Prospectus about the possibility of losing Sogou provide any basis for a reasonable investor to conduct additional investigation. Those disclosures never identify the risk of losing Sogou following the arrests of management. And the Individual Defendants' own cited authority establish that such disclosures are not enough as they provide only "general statements of past, current, and future problems that the company faced, and they do not clearly warn Plaintiff[] of [any] misstatements." *Hoi Ming Michael Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 565 (S.D.N.Y. 2012).

*Fourth*, the Individual Defendants argue allegations in the Cayman proceeding support their position that a reasonable investor could have determined the Registration Statement and Prospectus contained materially misleading statements in 2021 and 2022. (*See* Signatories/Hu Br. at 11–12; Audit Committee Directors' Br. at 11–12.) This argument is meritless. The Cayman proceeding was filed *after* Golden filed its Securities Act claims, and in any event, it is based, in part, upon the same June 2023 call with Yanjun Hu. (*See* Mi Decl. ¶¶ 42–46 (describing the contents of the call *and* noting the existence of this lawsuit).) How or why the April 2024 Cayman filing establishes that Golden should have discovered BAOS's fraud earlier, the Individual Defendants never explain. To the extent the Cayman proceeding is relevant at all, it further establishes the importance of the June 2023 call in providing information to investors about the accuracy of the Registration Statement and Prospectus.

## IV.    GOLDEN STATES A SECTION 11 AND SECTION 12(A)(2) CLAIM

Golden pleads a viable Section 11 claim against all Defendants and a viable Section 12(a)(2) claim against BAOS and Univest. To do so, a plaintiff must allege that:

> (1) [the plaintiff] purchased a registered security, either directly
> from the issuer or in the aftermarket following the offering; (2) the

> defendant participated in the offering in a manner sufficient to give
> rise to liability under section 11; and (3) the registration statement
> contained an untrue statement of a material fact or omitted to state a
> material fact required to be stated therein or necessary to make the
> statements therein not misleading.

*Lindsay v. Morgan Stanley (In re Morgan Stanley Info. Fund Sec. Litig.)*, 592 F.3d 347, 358–59 (2d Cir. 2010). Section 12(a)(2) imposes liability in "similar circumstances" where a person offers or sells a security using a "prospectus or oral communication." *In re Didi Glob. Inc. Sec. Litig.*, 2024 WL 1119483, at *4 (S.D.N.Y. Mar. 14, 2024). Issuers are subject to "virtually absolute" liability under Section 11, while the remaining potential defendants under Sections 11 and 12(a)(2) are liable for mere negligence. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359. As the Supreme Court has said, "Section 11 places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983). Courts generally consider Sections 11 and 12(a)(2) claims together because of their similarities. *See, e.g.*, *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 358–59.

No Defendant disputes that Golden adequately pleads it purchased a registered security, or that Golden's purchase was based upon statements made in a registration statement or prospectus. (*See* BAOS Br. at 9; Audit Committee Directors' Br. at 13–22; Signatories/Hu Br. at 13–22; Underwriters' Br. at 4.) Rather, various Defendants challenge Golden's allegations regarding falsity, duty, and materiality. (Audit Committee Directors' Br. at 13–21; Signatories/Hu Br. at 13–21; BAOS Br. at 10–18.) Certain Defendants then claim BAOS adequately disclosed the underlying risks (BAOS Br. at 17–18) and the Individual Defendants assert a negative causation affirmative defense (Audit Committee Directors' Br. at 21; Signatories/Hu Br. at 21). Golden adequately pleads each element.

A.      **Golden Adequately Pleads Falsity**

All five motions recast and reinterpret the Yanjun Hu recording. (BAOS Br. at 6; Audit Committee Directors' Br. at 3–7; Signatories/Hu Br. at 3–7; Underwriters' Br. at 5–10; Auditors' Br. at 4–5.) According to Defendants, Yanjun Hu supposedly did not admit that "ten members of Baosheng's senior management were arrested on the spot" and that this happened "[a] month or two before the company was listed." But of course, that is precisely what Yanjun Hu said. (Tr. at 13:28.) Although each Defendant reimagines this conversation in their so-called Statement of Facts, only the Underwriters and Auditors tie their reinterpretation to the falsity element of a Section 11 claim. (Underwriters' Br. at 9–11; Auditors' Br. at 19–21.) Yet even if all Defendants affirmatively made this argument, it fails. Aside from the accuracy of Golden's allegations, Defendants are in no position, on a Rule 12 motion, to demand the Court draw inferences in their favor. *See Coalition for Competitive Electricity v. Zibelman*, 906 F.3d 41, 48–49 (2d Cir. 2018).

Defendants initially ask the Court to simply ignore the call transcript because they view it as a "generic allegation" from so-called secondhand source. (BAOS Br. at 11 (citing *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *11 (S.D.N.Y. Mar. 30, 2021)).) Golden may rely on "second-hand sources" or even confidential witnesses so long as allegations in the complaint are sufficient to "'provide an adequate basis for believing that the defendants' statements were false.'" *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 850–51 (S.D.N.Y. 2019) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)). More fundamentally, Yanjun Hu is not a "secondhand" source. Golden pleads details showing the basis for Yanjun Hu's intimate knowledge of the company. During the June 2023 phone call, for example, Yanjun Hu described his direct personal knowledge of the investigation and arrest of BAOS's executive team. (Tr. at 13:28, 16:16.) He noted that he helped release various executive team members that had been

28

detained and provided guidance on how the executive could evade arrest. (*See* Tr. at 16:01 ("I

even went to Wuxi to bail people out."); 16:16 ("YOUYOU even hid away, she was too

scared. . . . Back then, I asked her to turn off her mobile phone, and I told her I would take care

of this matter.").) Finally, Yanjun Hu's admissions are specific, listing dates, names of

individuals, and locations, suggesting familiarity with the topic. In similar circumstances, courts

have credited confidential witness testimony when assessing the plausibility of a complaint. *See,

e.g.*, *Haw. Structural Ironworkers Pension Tr. Fund*, 422 F. Supp. 3d at 851 (holding two

confidential witness statements provided support for the complaint's allegations where those

witnesses had direct knowledge of events about which they gave statements).[18]

> When properly considering the transcript itself, it demonstrates Golden's interpretation is

not only reasonable, but correct. During the call, Yanjun Hu and Dong Hu had the following

exchange:

> > [YH] 12:58: So at the time, ten members of BAOSHENG's senior
> > management were arrested on the spot. A lot of people were also
> > arrested from Sogou as well. After the arrests the entire company's
> > operations were suspended.
> >
> > [DH] 13:12: Was this in 2019?
> >
> > [YH] 13:15: The year of 2020. The year of 2021.
> >
> > [DH] 13:17: Oh!
> >
> > [DH] 13:21: The year of 2021.
> >
> > [YH] 13:21: The year of 2021.
> >
> > [DH] 13:22: Didn't you just become listed in 2021? Was that before
> > or after you were listed?

---

[18] Yanjun Hu is also a significant shareholder of BAOS. (TAC ¶ 17.) In a Schedule 13
filing, Yanjun Hu admitted to owning 6.84% of BAOS shares while various entities over
which he has control own an additional 20% of BAOS. (Blodger Decl. Exs. 1, 3.)

[YH] 13:28: A month or two before the company was listed. They
started arresting people. . . .

(Tr. at 41–43.) Just thirty seconds passes between when Yanjun Hu mentions the arrests of ten

BAOS executives, and when those arrests occurred—"a month or two before the company was

listed." (*Id.*)

Defendants' reimagining requires splicing together disparate pieces of a more than

twenty-minute telephone call. Rather than looking at the thirty-seconds of conversation

discussing the timing of the arrests relative to BAOS's IPO, Defendants ignore that exchange

and instead rely heavily on a statement Yanjun Hu makes five-minutes later. At minute 18:30 of

the transcript, Yanjun Hu states, "they see that BAOSHENG is a listed company," and "[t]hey

don't bother companies that are not listed," which in Defendants' view, proves the investigation

and arrests must have occurred after BAOS's IPO. (*See* BAOS Br. at 6; Audit Committee

Directors' Br. at 5; Signatories/Hu Br. at 5; Auditors' Br. at 20; Underwriters' Br. at 8 (all citing

Tr. at 18:30).) Defendants also point to Yanjun Hu's statement from minute 15:44 that he

"handled this matter . . . after the listing." (*See* Tr. at 15:44; BAOS Br. at 6; Audit Committee

Directors' Br. at 5; Signatories/Hu Br. at 5; Auditors' Br. at 20; Underwriters' Br. at 8.)

Defendants claim the only possible interpretation of these statements—none of which are

temporally related to one another—is the investigation and arrest happened after BAOS's IPO,

interpreting "bother companies" to mean "investigate companies" and "handle" to mean "take

control of the company and help release arrested executive team members."

A better interpretation of these two excerpts that accounts for the context of the

conversation is that when Yanjun Hu said, "bother companies," he meant, "impose fines on

companies." And when Yanjun Hu said he "handle[d]" the matter, he meant "to fully resolve the

investigation (*i.e.* pay the fine)." The flow of the conversation makes this the only reasonable

interpretation. Just before noting that Chinese authorities do not "bother" unlisted companies, Yanjun Hu discussed fines levied by Chinese authorities and provided an example of a situation where a local authority "imposed a fine, and . . . got over 3 billion US dollars from Bitcoin." (Tr. at 18:04.) Yanjun Hu and Dong Hu continue discussing how fines allow local authorities to "get their revenue" and Yanjun Hu only then responds, "[t]hey don't bother companies that are not listed." (*Id.* at 18:21–18:30.) It is also possible that Yanjun Hu's reference to the Company being "listed" simply means that the Company has started the process of being listed publicly. (*Id.* at 18:30.) This part of the discussion has nothing to do with the arrests or the investigation.

Similarly, Yanjun Hu said he "handled" the investigation into BAOS immediately after they discussed Sogou's 1.4 billion fine. He then notes that BAOS was fined ten million RMB. (*Id.* at 14:29–15:07.) When Dong Hu asks, "When did you handle this matter? Before the company was listed? Or after listing?" Dong Hu is asking whether BAOS paid the fine before or after the IPO, and Yanjun Hu responds "after the listing" clarifying "everything was *taken care of* at the second half of 2021." (*Id.* at 15:39–15:44 (emphasis added).) Yanjun Hu's use of the phrase "taken care of" is distinct from the statement Defendants' claim he made—that everything related to the investigation "*occurred*" in the second half of 2021. Yanjun Hu's statements make clear that he and BAOS handled the fine and fallout from the investigation in the second half of 2021. Though Plaintiffs have the far better interpretations of the transcript, on a motion to dismiss, that does not matter because all reasonable inferences must be drawn in favor of Plaintiffs. *See Teachers' Ret. Sys. of Okla. v. GE (In re GE Sec. Litig.)*, 844 F. App'x 385, 387 (2d Cir. 2021).

Other than challenging the meaning of the Yanjun Hu recording, the Defendants, other than the Auditors (*see* Section VII.A, *infra*) do not otherwise challenge the alleged

31

misrepresentations and omissions identified in the TAC of which there are seven categories. (*See, e.g.*, TAC ¶ 52 (failure to disclose the arrests of its executives operational disruptions); *id.* ¶¶ 57–58 (failure to disclose legal proceedings); *id.* ¶¶ 59–63 (misleading statements about the Company's reliance on management); *id.* ¶¶ 64–73 (misleading statements about growth and its Sogou relationship); *id.* ¶¶ 74–80 (misleading statements about risks that had already materialized); *id.* ¶¶ 95–98 (failure to make required disclosures).) Without a disclosure that at a minimum identified the arrests, "shadow CEO," or disruptions, the Company's affirmative statements are otherwise misleading.

### B.    The Company Had a Duty to Disclose

BAOS and the Individual Defendants claim BOAS had no duty to disclose the investigation itself. (*See* BAOS Br. at 12–15; Signatories/Hu Br. at 16–19; Audit Committee Directors' Br. at 16–19.) BAOS adds that it "was not required to accuse itself of speculative wrongdoing." (BAOS Br. at 10.) These arguments misunderstand the misrepresentations and omissions at issue. Golden alleges the investigation and arrests materially disrupted the Company and the failure to disclose made statements in the Company's public filings inaccurate or misleading. BAOS was required to disclose this information under both Item 303 of Regulation S-K, 17 CFR § 229.303, and because BAOS affirmatively chose to speak on the topic.[19]

---

[19] Without reference to any case law, BAOS and the Individual Defendants claim that Form 20-F Item 8 does not require disclosure of the investigation. (BAOS Br. at 12; Audit Committee Defendants' Br. at 17; Signatories/Hu Br. at 17.) Form 20-F Item 8(7) requires disclosure of legal proceedings, including proceedings "involving any third party, which may have, or have had in the recent past, significant effects on the Company's financial position or profitability" and specifically includes "government proceedings pending or known to be contemplated." An investigation conducted by a government agency into unlawful conduct is a legal proceeding under 20-F Item 8(7).

### 1.    BAOS Had a Duty to Disclose Under Item 303

Under Item 303 of Regulation S-K, 17 CFR § 229.303, BAOS had an obligation to disclose that its executive team had been detained, its CEO went into hiding, the company suspended operations, that Yanjun Hu took control of BAOS, and the impending loss of its relationship with Sogou. Item 303 requires companies to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" and "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 CFR § 229.303

The information BAOS omitted required disclosure under Item 303. In *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 718 (S.D.N.Y. 2013), for example, the court held that a defendant had a duty to disclose state investigations under Item 303 where the complaint alleged the defendants "reasonably should have expected that the state investigations would cause MetLife to alter its IBNR reserves" and possibly face fines. Similarly, in *Indiana Public Retirement System v. SAIC, Inc.*, the Second Circuit reversed a district court's decision denying a motion to amend to allege violations of Item 303 where the proposed allegations noted the defendant was aware that its relationships with entities that accounted for a significant portion of its revenues were in jeopardy. 818 F.3d 85, 95 (2d Cir. 2016). The circumstances in this case are like both *City of Westland* and *Indiana Public Retirement System*. Golden specifically alleges BAOS's management knew of the arrests, the suspension of operations, Yanjun Hu taking control, and the impending loss of Sogou as a client—each of which were material events that would have a material unfavorable impact on

33

BAOS's revenue. (TAC ¶ 96.) Accordingly, BAOS had an obligation to disclose this information under Item 303.

BAOS argues it was not obligated to make such a disclosure because it claims it did not have actual knowledge of a material impact to its business at the time of the IPO. (BAOS Br. at 13–15.) The Individual Defendants contend that disclosure is not required by Item 303 because, in their view, companies are not generally required to disclose investigations. (Audit Committee Defendants' Br. at 17–19; Signatories/Hu Br. at 17–19.)

Golden's allegations establish that BAOS and its management had actual knowledge of the investigation, its likely outcome, and its effect on the company's relationship with Sogou at the time of the IPO. (TAC ¶¶ 54; 96.) Golden alleges that BAOS and its management knew of the investigation and its ongoing materially detrimental effects on BAOS's operations and the fact that the investigation jeopardized its relationship with Sogou. (TAC ¶¶ 44, 47–48, 54, 63.) Unlike the allegations at issue in the cases to which BAOS cites, these allegations are not conclusory. *See Rubinstein v. Credit Suisse Group AG*, 457 F. Supp. 3d 289, 300–1 (S.D.N.Y. 2020) (rejecting a claim that alleged the defendants could be "presumed to have known" of the risks). Golden cites to evidence from Yanjun Hu explaining how BAOS's executive team was detained, how the company suspended operations, and how these events put BAOS's agreement with Sogou in jeopardy all in the months leading up to the IPO. (TAC ¶¶ 44, 47–48, 54, 63.) These allegations are sufficient to establish knowledge of a material event at the time of its IPO under Item 303. *See Indiana Public Retirement System*, 818 F.3d at 95; *City of Westland*, 928 F. Supp. 2d at 718.

The Individual Defendants are incorrect that an Item 303 does not require disclosure of investigations. *See City of Westland*, 928 F. Supp. 2d at 718 (requiring disclosure of an

investigation under Item 303). The Individual Defendants reliance on *In re Lions Gate Entertainment Corp. Securities Litigation*, for this proposition is misplaced. That case did not hold that Item 303 never requires a company to disclose an investigation; rather it held that the investigation at issue could not be characterized as a "known trend" or "uncertainty" and then determined it could not have had a material effect on the defendant's business anyway. 165 F. Supp. 3d 1, 20 (S.D.N.Y. 2016). Similarly, in *Lewis v. YRC Worldwide Inc.*, the court concluded the specific investigation at issue was not required to be disclosed because it had lasted for nine years, and there was no indication the investigation would result in any outcome. 2020 WL 1493915, at *10 (N.D.N.Y. Mar. 27, 2020). Here, in contrast, the investigation *already* had a materially negative effect on BAOS, including suspending its operations and jeopardizing its relationship with Sogou. Under those circumstances Item 303 requires disclosure. *See City of Westland*, 928 F. Supp. 2d at 718.

### 2. BAOS Had a Duty to Disclose Because it Spoke About Topics Implicated by the Omitted Information

Not only did BAOS have a duty to disclose under Item 303, but it also imposed upon itself a duty to make disclosures by speaking on the topics at issue. "[W]hen an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366 (quotations and citation omitted); *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

In its Registration Statement and Prospectus, BAOS chose to speak about its operations, the involvement of its management team, its compliance with Chinese laws, and its relationship with Sogou. (*See* TAC ¶¶ 52(b), 61, 64–73). In choosing to speak, BAOS was required to make a

complete and accurate disclosure, including disclosing the investigation, suspension of activities, its shadow CEO, and the imminent loss of Sogou as a client. *See In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 440 (S.D.N.Y. 2009) (denying a motion to dismiss based on defendants' failure to disclose an ongoing investigation).

BAOS's and the Individual Defendants' authority does not change the analysis because all of it arises where the company had not previously spoken about a particular topic, or when the investigation itself was immaterial. For example, in *Jiajia Lou v. Sogou, Inc.*, the court determined the defendant had no obligation to disclose regulatory violations that occurred after the registration statement was filed, and contrasted the circumstances of that case with others where such a disclosure would be required, including where the company described compliance measures but was simultaneously experiencing ongoing violations. 465 F. Supp. 3d 393, 410 (S.D.N.Y. 2020) (citing *JinkoSolar Holdings Co.*, 761 F.3d at 251). BAOS again cites *Lions Gate Entertainment* for the proposition that a company is not required to disclose an ongoing investigation. (*See* BAOS Br. at 12 (citing *In re Lions Gate Entm't*, 165 F. Supp. 3d at 12).) BAOS omits, however, the caveat recognized by *Lions Gate Entertainment*, which requires disclosure when "the investigation itself was material." 165 F. Supp. 3d at 12. Applying this same principle, in *Kline v. First Western Government Securities*, the Third Circuit determined that a legal opinion letter about the tax consequences of a company's trading program was materially misleading by failing to disclose the existence of an SEC investigation and an IRS audit, because the existence of those investigations called into question the accuracy of the tax opinion. 24 F.3d 480, 491 (3d Cir. 1994). Golden's claim is similar to *Kline* because although the investigation itself might be insufficient to mandate disclosure, the effect of that investigation calls into question the accuracy of the Company's disclosures.

### C.    The Misrepresentations and Omissions Were Material

BAOS and the Individual Defendants also boldly claim the mass arrests of BAOS's

executives and the abrupt disruption to the business while a "shadow CEO" took control is

somehow immaterial. (BAOS Br. at 16–17; Audit Committee Directors' Br. at 13;

Signatories/Hu Br. at 13.) These Defendants apparently misunderstand the importance of such

basic information, including, for example, (i) who is running the Company; (ii) are those

executives presently incarcerated; or (iii) whether the investigation is connected directly to a

customer who accounts for 82.3% of its revenue. Plainly, such misrepresentations and omissions

are material.

Materiality is a fact-specific inquiry that is typically inappropriate on a Rule 12 motion

unless the allegations in the complaint "are so obviously unimportant to a reasonable investor

that reasonable minds could not differ on the question of their importance." *Goldman v. Belden*,

754 F.2d 1059, 1067 (2d Cir. 1985). A statement or omission is material if "there is a substantial

likelihood that a reasonable shareholder would consider it important in deciding how to [act]."

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). For the misstatement to be

material, "there must be a substantial likelihood that the disclosure of the omitted fact would

have been viewed by the reasonable investor as having significantly altered the 'total mix' of

information made available." *Id.*

Courts have concluded that operational-based misrepresentations and omissions of far

less consequence are material. *See, e.g.*, *SEC v. Nielson*, 2020 WL 9439395, at *14 (D.D.C. Feb.

13, 2020) (finding a material misstatement and omission where defendant's company "ceased

operations in Columbus in September 2012, thereby leaving it with no operations anywhere in

the world."); *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *11 (C.D. Cal. June 9, 2016) (finding

material misstatement and omission where prospectus warned of interruptions to operations but

did not disclose that a government authority had already "issued a ninety day suspension of" the company's operations); *Zuckerman v. Smart Choice Auto. Grp., Inc.*, 2000 WL 33996254, at *5 (M.D. Fla. Aug. 29, 2000) (finding material misstatement and omission where defendant's "Form 10-Q for the third quarter of fiscal year 1998 . . . did not report that DIS has ceased operations"); *Cf. JinkoSolar*, 761 F.3d at 251 (finding misstatement where a company was "failing to prevent substantial violations of the Chinese regulations" when "the relevant authorities may at their own discretion close or suspend the operation of any facility that fails to comply"); *LeMatta v. Casper Sleep, Inc.*, 2022 WL 4637795, at *10 (E.D.N.Y. Sept. 30, 2022) (denying motion to dismiss where plaintiffs allege "Defendants [sic] statements served to mislead investors about the true status of [defendant's] operations").[20]

Besides the disruption, the detention of BAOS's executive team or its CEO secreting into hiding are obviously material. A foundational disclosure of any public company is the identity of who is running the Company. *See* Form 20-F, Part I, Item 1 (requiring disclosure of the identities of a company's directors and senior management); *Danjanovich v. Robbins*, 2006 U.S. Dist. LEXIS 52508, at *39 (D. Utah July 28, 2006)[21] ("These misrepresentations were material. They related to basic information about TEK, including its management . . . ."); *SEC v. Poirier*, 140 F. Supp. 2d 1033, 1043 (D. Ariz. 2001) ("By failing to disclose their control of [the company], [defendants] made a material omission in connection with the offer of securities."). Here, BAOS

---

[20] The Individual Defendants argue the investigation does not satisfy Item 103's "distinct materiality test" because the fine resulting from the investigation was not more than 10 percent of BAOS's assets. (Audit Committee Directors' Br. at 14; Signatories/Hu Br. at 14.) Item 103, however, is not the only basis for a misstatement or omission to be considered "material." *See TSC Indus.*, 426 U.S. at 449. Moreover, the investigation was material because it resulted in the suspension of the Company's operations and made clear that BAOS would lose its most significant client that accounted for more than 80% of its revenue. (TAC ¶¶ 73–75.)

[21] *Danjanovich* is attached as Exhibit 5 to the Blodger Declaration.

and the Individual Defendants failed to identify its executives' detention in the Registration Statement and Prospectus, (TAC ¶ 128), leaving Golden and other investors to guess whether its undisclosed shadow CEO was competent or experienced. These Defendants' omission was all the more material because the Registration Statement and Prospectus trumpeted the talent and experience of the management team. (*Id.* ¶¶ 61–63.)

The Individual Defendants also argue BAOS could not have known to disclose the investigation or its effects because "Baosheng had no reason to believe it was the subject of the Investigation." (Audit Committee Directors' Br. at 15; Signatories/Hu Br. at 15.) BAOS never explains how it would be possible for the Company to fail to notice the arrest of its executive team or the fact that the Company suspended operations. This misunderstands the TAC, which specifically alleges that "Chinese authorities investigated BAOS because of its relationship with Sogou . . . ." (TAC ¶ 47.) The TAC further alleges that because the investigation caused BAOS to suspend operations, BAOS's executive team knew or should have known that Sogou, which accounted for over 80% of BAOS's revenue, would not renew its agency agreement with BAOS. (*Id.* ¶¶ 73–75.)

### D.    The Company's Identified Risk Factors did Not Adequately Warn of the Underlying Risks

BAOS and the Individual Defendants contend they cannot be liable for the failure to disclose the imminent loss of BAOS's relationship with Sogou because the Registration Statement and Prospectus generically disclosed the importance of Sogou. (BAOS Br. at 17–19; Audit Committee Directors' Br. at 19–21; Signatories/Hu Br. at 19–21.) These risk disclosures are not only insufficient, but themselves constitute a material misstatement of fact. "Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized."

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013). Put differently, "cautionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized in the past and is virtually certain to materialize again." *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021); *see also JinkoSolar*, 761 F.3d at 251 ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."). As the Second Circuit explained in *JinkoSolar*, "[o]ne cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors." 761 F.3d at 251.

BAOS's Registration Statement and Prospectus states, "*[i]f* we fail to maintain our relationships with business stakeholders, mainly advertisers and media, our business, results of operations, and financial condition and business prospects *could* be materially and adversely affected." (*See* TAC ¶ 75; Registration Statement at 15; Prospectus at 15 (emphasis added).) These disclosures, however, do not disclose that the risks had already materialized at the time they were made because BAOS and its directors and officers knew or should have known that Sogou would not renew its business relationship with BAOS based on the nature of the investigation into BAOS's conduct, but also based on the suspension of BAOS's operations following the detention of its executive team. (*See* TAC ¶¶ 73–75.) These misstatements and omissions were material, thus requiring disclosure. *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 181 (S.D.N.Y. 2010) ("Material facts include . . . facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities.").

E.     **Defendants Have Not Established Their Negative Causation Affirmative Defense**

The Individual Defendants claim they are entitled to the negative causation affirmative defense. (Audit Committee Directors' Br. at 21; Signatories/Hu Br. at 21.) Their argument is both premature and wrong.

Loss causation is not an element of a claim under either Section 11 or 12. *See, e.g.*, *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009). Instead, "[t]he absence of loss causation is an affirmative defense . . . ." *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 46 (D.D.C. 2006). Defendants bear the burden of demonstrating that something other than the alleged omissions or misstatements at issue caused plaintiffs' loss. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009). "This defense 'allocate[s] the risk of uncertainty to the defendants' and imposes upon them a 'heavy burden.'" *Nomura*, 68 F. Supp. 3d at 492 (quoting *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987)). Given that "heavy burden" and its fact-intensive nature, courts in this Circuit disfavor granting 12(b)(6) motions based on this affirmative defense. *See Giant*, 643 F. Supp. 2d at 572 ("[T]he affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion.").

Even if the Individual Defendants properly raised negative causation, their argument still misses the mark. They emphasize, for example, that the BAOS/Sogou agency agreement ended after the Registration Statement became effective, and thus, the misleading Registration Statement could not have caused damages related to the end of the Sogou relationship. (Audit Committee Directors' Br. at 21; Signatories/Hu Br. at 21.) This misunderstands Golden's theory. Golden alleges BAOS misrepresented it had lost or was certain to lose its relationship with Sogou, which accounted for 82.3% of BAOS's revenue in the year prior to its IPO, because

41

BAOS's leadership had been detained by Chinese authorities for providing services *to* Sogou (TAC ¶¶ 50, 54, 73, 75–76), and because its operations abruptly stopped during that detention (*id.* ¶ 52(c)). It does not matter precisely when BAOS formally lost Sogou as a customer and whether it was before or after the Registration Statement became effective. If it was before, Defendants misrepresented the fact that they had already lost Sogou; if it was after, Defendants misrepresented the fact they were certain to lose Sogou because of the arrests. Either way, the Registration Statement was materially misleading because it represented the loss of Sogou's business as merely a risk, despite that it had either already occurred or was imminent. This is sufficient to "raise a plausible inference that 'the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'" *Winter*, 686 F. Supp. 3d at 311 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).

With little explanation, Defendants cite two inapposite cases. *State Street*, for example arose in the context of a mutual fund and rested on principles only applicable in that context, namely the possibility of misrepresentations affecting a mutual fund's net asset value. *Ning Yu v. State Street Corp. (In re State Street Bank & Trust Co. Fixed Income Funds Invs. Litig.)*, 774 F. Supp. 2d 584, 596 (S.D.N.Y. 2011). In *Miniso Group*, the plaintiff's primary allegation was that it suffered a loss after publicly available information was publicized by a short seller. *In re Miniso Grp. Holding Ltd.. Sec. Litig.*, 2024 WL 759246, *20 (S.D.N.Y. Feb. 23, 2024). The court also found that plaintiff had sold its shares prior to the publication of the short seller's report. *Id.* Neither of these facts are present in this case.

Because the absence of loss causation is not apparent on the face of the TAC, Defendants' argument fails. *Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 645 (S.D.N.Y. 2017) ("Because of Defendants' failure to meet their burden of proof for a negative

causation defense, and the fact-intensive nature of the inquiry at issue, the Court is persuaded that dismissal of the Consolidated Complaint based on negative causation would be premature.").

## V.    GOLDEN STATES A SECTION 15 CLAIM AGAINST THE INDIVIDUAL DEFENDANTS AND YANJUN HU

Though Golden asserts a Section 15 claim against each of the Individual Defendants, only Yanjun Hu and the Audit Committee Directors challenge the basis for this claim.[22] Their challenges fail because Golden pleads sufficient facts to establish their control over BAOS. To state a claim for "control person liability" under Section 15, a plaintiff must allege "(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 637. Control for purposes of Section 15(a) is defined as "the power to direct or cause the direction of the management and policies of the primary violators, whether through the ownership of voting securities, by contract, or otherwise." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2). If the control person has this authority, he or she is not required to exercise this power to fall within the statute's requirements. *See In re Refco*, 503 F. Supp. 2d at 638. An individual's status as a control person "is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011).

### A.    Golden Adequately Pleads the Audit Committee Directors Are Control Persons

The Audit Committee Directors each had control over BAOS sufficient to direct or cause the direction of its management and policies by virtue of their positions as directors and service on the Audit Committee (including Defendant Adam (Xin) He serving as Chairperson of that

---

[22] The Signatories contest liability under Section 15, but do not contest the element of control. (*See* Signatories/Hu Br. at 22.)

committee). (TAC ¶ 33.) Besides their service on the audit committee, Golden alleges these

Defendants were responsible for:

- reviewing with the independent auditors any audit problems or difficulties and management's response;

- discussing the annual audited financial statements with management and the independent auditors;

- reviewing the adequacy and effectiveness of our accounting and internal control policies and procedures and any steps taken to monitor and control major financial risk exposures;

  . . .

- meeting separately and periodically with management and the independent auditors; and

- monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance.

(TAC ¶ 34; Prospectus at 122.)

This is enough to plead control-person liability under Section 15. In *In re Refco*, the court

denied a motion to dismiss brought by audit committee members because the complaint

adequately alleged control by virtue of their responsibility "for overseeing Refco's financial

reporting, accounting, and internal controls, and coordinating outside audits." *In re Refco, Inc.*

*Sec. Litig.*, 503 F. Supp. 2d at 640. The same is true here. Not only are the Audit Committee

Directors members of the board and audit committee, but they likewise hold responsibility for

meeting with management, coordinating with outside audits, overseeing BAOS's financial

reporting, and implementing and managing controls for the company. (TAC ¶ 34.) By virtue of

their role on the audit committee, the Audit Committee Directors were required to interact with

management, to resolve issues with management responses to auditor inquiries, and to ensure

compliance with BAOS's code of ethics and conduct. (*Id.*)

44

Cases cited by the Audit Committee Directors are distinguishable. They cite several cases standing for the proposition that "mere membership on an audit committee, standing alone, is [in]sufficient to demonstrate actual control. . . ." (Audit Committee Directors' Br. at 23 (citing *In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp.2d 450, 482 (S.D.N.Y. 2013).)) But in *In re Satyam*, the court *denied* a motion to dismiss, concluding that the complaint's allegations regarding the audit committee defendants' responsibility to oversee the company's financial reporting, accounting, and internal controls evidenced sufficient involvement in the company's operation to establish control under Section 20 of the Exchange Act. *Id.* at 482. Like the TAC (TAC ¶ 34), the complaint in *In re Satyam* detailed the audit committee's responsibilities, including overseeing the company's financial reporting; reviewing financials with management; reviewing the company's audit process; engaging and working with independent auditors; and reviewing performance of the company's internal controls. *Id.* at 465.[23]

### B.    Golden Adequately Pleads that Yanjun Hu Is a Control Person

Yanjun Hu separately argues that the TAC fails to allege that he qualifies as a control person. But this Court need not look beyond Yanjun Hu's own words. As he admitted during the June 2023 phone call excerpted in the Complaint, he "took over the company as a matter of course" after its executive team was detained and the company suspended operations. (*See* TAC ¶¶ 44, 51, 68, 73; Tr. at 12:58; 16:16.

---

[23] The Audit Committee Directors' contention that the allegations are speculative and conclusory are inaccurate. (Audit Committee Directors' Br. at 24 (citing *City of Omaha Police & Fire Ret. Sys. v. Eoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 429 (S.D.N.Y. 2020)).) Rather than speculating about the role of the audit committee within BAOS's organization, the TAC identifies their role based on BAOS's own public filings. (TAC ¶ 34; Prospectus at 122.).

These allegations are more than enough to establish Yanjun Hu's control. For example, Golden alleges that Yanjun Hu had a significant ownership stake in BAOS, but also that he was in actual control over the Company's operations at or around the time of the IPO. (TAC ¶¶ 17, 129; Tr. at 16:16; Blodger Decl., Exs. 1, 3.) Control person liability does not depend on formalities. *See In re Zenith Labs. Sec. Litig.*, 1993 WL 260683, at *11 (D.N.J. Feb. 11, 1993) ("[T]hat the defendant [is a controlling person[] is not a matter of formal definition, but rather one of practical reality."); 17 C.F.R. § 240.12b-2 (defining control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, *or otherwise*.") (emphasis added). "The issue of control is a complex factual question that necessitates a close examination of the parties' relationship. Indeed, whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Strougo v. Barclays PLC*, 317 F. Supp. 3d 815, 820 (S.D.N.Y. 2018) (quotation omitted).

Yanjun Hu claims these allegations are insufficient because they are "incorrect and uncorroborated" and "conclusory." (Signatories/Hu Br. at 23–24.)But the truth of Golden's allegations is presumed for purposes of a motion to dismiss. *See Coalition for Competitive Elec.*, 906 F.3d at 48–49. Moreover, Golden's allegations are far from conclusory. Yanjun Hu admitted to taking control of BAOS in the months preceding the IPO because the executive team had been detained or was in hiding. (*See* TAC ¶ 25). With Yanjun Hu assuming control over the Company during the leadup to the IPO, he must have been involved with preparing the Registration Statement and Prospectus, as alleged in the Complaint. (*See* TAC ¶ 25.)

Yanjun Hu's authority is distinguishable. For example, the allegations found to be conclusory in *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, were simply that the executives, by virtue of their status as executives, controlled the "contents of the [c]ompany's SEC filings." 450 F. Supp. 3d 379, 429 (S.D.N.Y. 2020). *See also Duoyuan Glob. Water*, 887 F. Supp. 2d at 578 (holding that a complaint failed to allege control person liability where the allegation of "control" was based solely on the defendant's role in the company). In contrast, Golden's allegations are not that Yanjun Hu had a formal role within the company (he did not); rather, Yanjun Hu stepped into the role of shadow CEO while the executives were detained and BAOS's business had been suspended. (*See, e.g.*, TAC ¶ 25.) This much more specific allegation supports a determination that Golden adequately pleads control person liability under Section 15 against Yanjun Hu.

## VI.    THE UNDERWRITERS' AFFIRMATIVE DEFENSE DOES NOT SUPPORT DISMISSAL

The Underwriters seek dismissal based on a fact-intensive affirmative defense that they engaged in reasonable due diligence. This affirmative defense is improperly raised on a motion to dismiss, and even if it were proper, is premised upon a misreading of the TAC that draws inferences in their favor. *In re Friedman's, Inc. Sec. Litig.,* 385 F. Supp. 2d 1345, 1369 (N.D. Ga. 2005) (quotation omitted). Although Section 11 provides due diligence defenses to non-issuer defendants, 15 U.S.C. § 77k(b), "defendants bear the burden of demonstrating the applicability of each of these defenses, which are therefore unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6)." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 360 n.7. The Underwriters cannot overcome that burden.

### A.   Golden Alleges the Underwriters Failed to Exercise Reasonable Care in Conducting Due Diligence

Contrary to the Underwriters' claims (Underwriters' Br. at 19–21), the TAC alleges the Underwriters failed to exercise reasonable care in conducting due diligence. In particular, the Underwriters, due to their role helping the Company prepare for its IPO, would have had significant contact with BAOS, its directors, and its managers. (TAC ¶¶ 104, 109.) When BAOS's executives were arrested or went into hiding, the Underwriters would have known that BAOS was under investigation, given the significant disruption the arrests caused. Based on these facts, and others detailed in the TAC, Golden alleges that the Underwriters "fail[ed] to exercise reasonable care . . . to make reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement." (*Id.* ¶ 139.) The TAC also alleges that "[the Underwriters were] at least negligent in failing to conduct adequate diligence or investigation into the accuracy of the Registration Statement and Prospectus . . . ." (*Id.* ¶¶ 107, 112.) These allegations plainly contradict the Underwriters' claims that they conducted adequate due diligence and foreclose the Underwriters' due diligence defense at the motion to dismiss stage. *See, e.g.*, *In re Measurement Specialties, Inc.*, 2003 WL 27398420, at *34 (D.N.J. Sept. 29, 2003) (denying an underwriter's motion to dismiss based on a due diligence affirmative defense, noting that such defenses, including allegations that the underwriter relied on "expertised" portions of a securities filing, are properly addressed after discovery).

### B.   The Underwriters' Claimed Reliance on the Dentons Letter is Improper and Unsupported

Despite these specific averments that they failed to conduct adequate due diligence, the Underwriters assert their due diligence defense should prevail because they were entitled to rely on "expertised" sections of the securities filings, and because they were otherwise clearly deceived by BAOS's misstatements and omissions. The Underwriters, however, have pointed to

48

no allegations in the TAC that the Underwriters relied on those "expertised" portions of the securities filings, or that doing so would be "reasonable" under Section 11(b).

The only basis for the Underwriters' claim of reasonable reliance is language from the Prospectus that states "[l]egal matters as to PRC law will be passed upon for us by Dentons LLP," which the Underwriters believe should be interpreted to indicate they relied on this opinion and that doing so was reasonable. (*See* Underwriters' Br. at 4 (citing Prospectus at 179).) Read in context, however, this phrase does *not* indicate the Underwriters relied on Dentons or that doing so would be reasonable. As the Prospectus makes clear, when using the terms "we" or "us" it means BAOS, not its Underwriters. (*See, e.g.*, Prospectus at 172 (distinguishing between "us" and the Underwriters.) Thus, the phrase in the Prospectus does not indicate that the Underwriters received the legal advice and relied on it—only that Dentons provided the opinion to the Company. The TAC and the securities filings are also devoid of any basis to believe that it would be reasonable for the Underwriters to rely on Denton's January 22, 2021, opinion letter. This is particularly true in light of Plaintiffs' allegations that Univest had significant ongoing contact with BAOS and, if it had conducted reasonable diligence, would have discovered the company's executive team had been detained, the company had suspended operations, and that Yanjun Hu had taken over operations of the company. (TAC ¶¶ 102–12.)

Even if the Court were to look past the absence of any allegation that the Underwriters relied on the letter prepared by Dentons, such reliance would not be reasonable or relevant to the claims at issue. The Underwriters point to two specific statements in the Dentons letter they claim establish Dentons issued an opinion as to the detention of BAOS's executive team:

First, the Underwriters cite to:

> To the best of our knowledge after due inquiry, none of the PRC Subsidiaries has taken any corporate action, nor have any legal

> proceedings commenced against it, for its liquidation, winding up, dissolution, or bankruptcy, for the appointment of a liquidation committee, team of receivers or similar officers in respect of its assets or for any adverse suspension, withdrawal, revocation or cancellation of any of its Governmental Authorizations.

(Underwriters' Br. at 4 (citing ECF No. 139-4 ("Opinion Letter") at 4 ).) This statement, however, does not bear on whether the executive team was detained or the Company suspended operations. Rather, the section indicates there are no current legal proceedings seeking BAOS's "liquidation, winding up, dissolution, or bankruptcy" or other similar remedies. (*Id.*) This statement is irrelevant to Golden's claims.

Second, the Underwriters cite:

> <u>Statements in the Prospectus</u>. All statements set forth in the Prospectus under the captions "Prospectus Summary", "Risk Factors", "Dividend Policy", "Business", "Regulations", and "Taxation", in each case insofar as such statements describe or summarize PRC legal or regulatory matters, constitute our opinions on such matters in all material aspects, and are fairly disclosed and correctly set forth therein, and nothing has been omitted from such statements which would make the same misleading in any material aspects.

(Underwriters' Br. at 4 (citing Opinion Letter at 4).) This section is also narrow—relating only to the statements in the Prospectus, not the Registration Statement. Further, Dentons's letter clarifies that it certifies as accurate the listed sections, only "insofar as such statements describe or summarize PRC legal or regulatory matters," thereby limiting its opinion to general details regarding Chinese laws and regulations. (*Id.*) Golden's allegations are also much broader than legal or regulatory matters, including that the senior executives and directors were arrested, that the operations of the company were halted, and that a third-party took over. Read in the light most favorable to Plaintiffs, this letter does not support the Underwriters' affirmative defense.

## VII.   THE AUDITORS' MOTION TO DISMISS SHOULD BE DENIED

### A.    Golden States a Claim Against the Auditors

As noted in the Auditors' own authority, "an accountant who audits a public company's financial statements has what the Supreme Court has emphasized is a special public responsibility." *Deephaven Priv. Placement Trading, Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1174 (10th Cir. 2006) (quotation omitted) (cited in Auditor Br. at 12). Auditors, who must exercise due professional care and professional skepticism in all their work (TAC ¶ 84), perform a "'public watchdog' function" that "requires complete fidelity to the public trust." *United States v. Arthur Young & Co.*, 465 U.S. 805, 817–18 (1984). That is particularly true at the time of a company's IPO. To go public, the issuer must include audited financial statements, and the related audit reports, in its registration statement. *See* 17 C.F.R. § 210.3-01(a) (requirement to file "audited balance sheets"); 17 CFR § 210.3-02(a) (requirement to file "audited statements of comprehensive income and cash flows"); Form 20-F, Items 8.A.1, 8.A.3. Except in "rare circumstances," the auditor is required to consent to the inclusion of its audit reports. SEC Financial Reporting Manual, 4810.1, .05 ("Registrants must file a copy of the auditor's consent to the use of its audit report or an acknowledgement letter regarding the use of its review report in any filing under the 1933 Act as an exhibit."); *see also* 15 U.S.C. § 77g(a)(1) ("If any accountant … is named as having prepared or certified any part of the registration statement, or is named as having prepared or certified a report or valuation for use in connection with the registration statement, the written consent of such person shall be filed with the registration statement.").

The auditor cannot give that consent blindly. The Securities Act and professional auditing standards require that the auditor extend its procedures with respect to subsequent events from the date of its audit reports to the effective date of the registration statement, or as close thereto

as is reasonable and practicable under the circumstances. (TAC ¶¶ 85–86 (discussing AS 4101).

"Because a registration statement under the Securities Act of 1933 speaks as of its effective date,

the independent accountant whose report is included in such a registration statement has a

statutory responsibility that is determined in the light of the circumstances on that date." AS

4101.05;[24] *see also In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *22 (S.D.N.Y. Aug. 11,

2021) ("An accountant may not allow a previous opinion to be used in connection with a later

securities offering unless intervening material events are disclosed.") (citing AS 4101).

      The auditor's consent procedures cannot be completed without management. Professional

standards require the engagement team to make multiple, distinct inquiries of management.

(TAC ¶¶ 85–86.) And professional standards require the engagement team obtain written

representations from management. (*Id.*) Here, viewing the facts alleged in the light most

favorable to Plaintiffs, the Auditors could not have completed those procedures in compliance

with professional standards because BAOS's management team was detained, its CEO was

hiding, and an undisclosed shadow CEO had taken control of the Company. (TAC ¶ 44.) That is

sufficient to state a Section 11 claim.

### 1.    The Auditor's Consent Is Materially Misleading and Not Subject to the *Omnicare* Framework

      Under Section 11, the Auditors are liable for materially false or misleading statements in

any part of the registration statement they "prepared or certified." *Herman*, 459 U.S. at 381 n.11

(citing 15 U.S.C. § 77k(a)(4)). That extends not just to the Audit Reports themselves, which

include statements of opinion, but also to the Auditor's Consent, which does not.[25] The Consent

---

[24] *Available at* https://pcaobus.org/oversight/standards/auditing-standards/details/AS4101.

[25] Because the Consent is not a statement of opinion subject to *Omnicare*, the Auditors' inquiry or knowledge is irrelevant to whether the Consent is adequately alleged to be

here, which appears on company letterhead, is written in the first person, is signed by the audit

firm, and was clearly prepared by the Auditors:



Exhibit 23.1

**FRIEDMAN LLP®**

ACCOUNTANTS AND ADVISORS

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in the Registration Statement on Form F-1 filed pursuant to Rule 462(b) under the Securities Act of 1933, as amended, of our report dated May 6, 2020, except for note 15, as to which the date is July 10, 2020, with respect to the consolidated balance sheets of Baosheng Media Group Holdings Limited and subsidiaries as of December 31, 2019 and 2018, and consolidated statements of income and comprehensive income, cash flows and changes in shareholders' equity for each of the years in the two-year period ended December 31, 2019, appearing in the Prospectus included in this Registration Statement on Form F-1 (No. 333-239800). We also consent to the reference to our firm under the heading "Experts" in the Prospectus.

/s/ Friedman LLP

New York, New York

February 8, 2021

(Declaration of Karim Basaria ("Basaria Decl."), Ex. D (ECF No. 142-4) (quoted in TAC ¶ 82)).

And that Consent was materially misleading by omission.

As the Supreme Court has explained, "Section 11's omissions clause, as applied to

statements of . . . fact, necessarily brings the reasonable person into the analysis, and asks what

she would naturally understand a statement to convey *beyond its literal meaning*." *Omnicare,*

*Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 193–94 (2015)

(emphasis added). To be sure, the Consent is short and formulaic. But the facts omitted here are

so basic, so fundamental to the affairs of the Company, as to render them materially misleading.

In light of the centrality of management to the required consent procedures, the consent would

---

false or misleading at the pleading phase. Under Section 11, a lack of knowledge after reasonable inquiry is an affirmative defense—often referred to as a due diligence defense—and thus does not provide a basis for dismissal. 15 U.S.C. § 77k(b)(3); *Winter*, 686 F. Supp. 3d at 307.

have conveyed to a reasonable investor that, at a minimum, the management team was at liberty—not detained or in hiding—and running of the company. Here, as already discussed, that was not the case at the time of BAOS's IPO. Thus, although the Consent was "literally true," it created "a materially misleading impression" regarding the status of the Company and its management team that is actionable under the securities laws. *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021).[26]

### 2.    The Audit Opinions and Consent Are Materially Misleading Under *Omnicare*

Separately, the Audit Reports and Consent are actionable under *Omnicare*'s omissions prong. In particular, the Auditors omitted their failure to conduct the inquiry required by professional standards in consenting to the inclusion of their Audit Reports in the Registration Statement. (TAC ¶¶ 83–94.) According to the Auditors, the TAC "does not and cannot allege that Friedman omitted any 'particular,' much less 'material,' facts about Friedman's inquiry or knowledge related to its Audit Report or to its Consent allowing Baosheng to include the Audit Report in the IPO materials." (Auditor Br. at 3; *see also id.* at 15–21.) But the TAC pleads particular facts showing that the Auditors did not—because they could not—comply with professional standards in performing consent procedures, which they indisputably failed to disclose.

As alleged in the TAC, and already discussed in detail above, BAOS's management team was not running the Company in the period leading up to the IPO. Beginning a month or two before the IPO, Chinese authorities detained ten members of BAOS's management team and its

---

[26] Unlike other Defendants, the Auditors do not contend that Rule 9(b)'s pleading standard applies here. Even if it did, the TAC's allegations suffice.

CEO went into hiding. (TAC ¶¶ 44, 52, 63.) As a result, an undisclosed shadow CEO took control of the Company. (*Id.*)

Without the management team in place, the Auditors could not have completed the required consent procedures. (TAC ¶¶ 90–92.) Indeed, the applicable professional standards place management at the heart of those procedures. The auditor must obtain written representations from management. (TAC ¶ 86.b.) And the auditor must make multiple different inquiries of management, *e.g.*, regarding subsequent events, changes to related parties, significant, new related party transactions, and any other matter necessary and appropriate that arose from carrying out the consent procedures. (*Id.*) If the Auditors did not learn the Company's management team was absent—detained as part of a government investigation or in hiding—that underscores the severity of their negligence, including failures to exercise due care and professional skepticism. (TAC ¶ 91.) If they did gain such knowledge during consent procedures, as outlined in the TAC and not disputed in the Auditor's brief, that would trigger other professional standards that likewise require inquiries of management, and thus could not have been completed. (TAC ¶¶ 88–90.) This is not just, as the Auditors assert in their brief, mere "regurgitation" of auditing standards combined with "conclusory surmisals" regarding their work. (Auditor Br. at 1–2.) These factual allegations show it would have been impossible for Friedman to have done the work consistent with professional standards. While the Auditors attempt to downplay the consent procedures, *e.g.*, calling them "very limited," (Auditor Br. at 19), they do not and cannot contend those procedures can be completed without the management team in place.

This fact about the Auditor's inquiry—*i.e.*, that the consent procedures were not completed in accordance with professional standards—was not disclosed. That is an "omission

that a reasonable investor would have considered significant in making investment decisions." *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 53 (2d Cir. 2023) (holding auditor's certification that it had complied with professional actionable under *Omnicare* in analyzing Section 10(b) claim because "[t]he absence of [the auditor's] certification would have been significant, for without it, [the auditor] could not have issued an unqualified opinion, which then would have alerted investors to potential problems in the company's financial reports") (citation omitted); *see also Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1120–22 (E.D. Cal. 2017) (denying auditor's motion to dismiss Section 11 claim based on allegations that it had failed to perform procedures in compliance with professional standards, including under *Omnicare*'s omissions prong). The absence of the Auditor's consent would have, at a minimum, alerted investors to potential problems with the Company and, likely, scuttled the IPO. (*See* Section VII.A, *supra*.)

Faced with these allegations, the Auditors advance a series of arguments for dismissal. These arguments fail. The Auditors' primary argument rests on disputing the TAC's factual allegations. Throughout their brief, in bolded italics, the Auditors claim that central events took place after the IPO, and thus after their consent procedures would have been completed. (*See, e.g.*, Auditor Br. at 2, 4, 5, 9, 20.) These arguments, however, fail for the reasons already explained above. (*See* Section IV.A, *supra*); *see also Marrone Bio*, 243 F. Supp. 3d at 1120 (denying auditor's motion to dismiss Section 11 claim, noting "[a]gain, it is inappropriate to address the truth or falsity of Plaintiffs' allegations at this stage of the litigation).

The Auditors also take issue with the particularly of the TAC's factual allegations, pointing out what they claim to be omissions and ambiguities therein. These arguments not only fail on their own terms, but also contravene the applicable pleading standard. For example, the

Auditors assert "the TAC says nothing about the nature, length, severity, or timing" of the detention of BAOS's management team and what authority of the Chinese government was involved. (Auditor Br. at 19–20; *see also id.* at 2, 4, 5, 18, 23 (referring to the TAC's allegations variably as "scant," "vague," "speculative," "conclusory," "threadbare," and "boilerplate").) That is false. The TAC alleges, among other things, that:

- The investigation involved China's Ministry of Public Security, its national police force;

- That beginning one to two months before and continuing through the date of the IPO, the Company's CEO was in hiding and its management team was detained;

- That the investigations caused the Company to suspend operations in the months leading up to the IPO; and

- That at or around the time of the IPO, Yanjun Hu, a stockholder who had no formal position with the Company, secretly took control of BAOS.

(TAC ¶¶ 44–55; Tr. at 13:28, 16:16.) That is more than sufficient to satisfy the applicable pleading standard, which "does not require detailed factual allegations." *Iqbal*, 556 U.S. at 678 (quotation omitted).

The particular arguments advanced by the Auditors regarding the purported gaps in the TAC's allegations only underscore that their position is without merit. For example, the Auditors take issue with the particularity of the alleged time period during which the management team was detained, asserting the TAC alleges "only" that the detentions began one to two months before and continued through the date of the IPO "without providing any further specificity." (Auditor Br. at 20.) But that covers the critical juncture, a period during which the Auditors would need to perform consent procedures and (twice) consented to incorporation of their Audit

Reports in the Registration Statement. (TAC ¶¶ 83–94.) Furthermore, Yanjun Hu noted that the arrests lasted for at least a month. (Tr. at 14:03.) No further specificity is needed in that regard, particularly at the pleading stage.

Indeed, the Auditors advance arguments that invite the Court to draw inferences in their favor from the facts alleged, which is plainly improper under Rule 8. *See Litwin*, 634 F.3d at 706. For instance, they purport to fault the TAC for failing to allege "whether the detentions rendered these executives and managers unable to communicate with Friedman." (Auditor Br. at 19.) In doing so, they are inviting the Court to infer that after having been "arrested" and while being "detained" (TAC ¶ 48–52) the Company's management team was permitted to continue running the Company—including having access to electronic communications—such that they could respond to inquiries and requests from their auditors. Aside from straining credulity, that is an impermissible inference in the Auditors' favor. That inference is also contradicted by other well pled facts, *e.g.*, Yanjun Hu would not have needed to take control of the Company, (TAC ¶ 44), had the management team been able to continue its work and interface with third parties, as the Auditors suggest.[27] As Yanjun Hu noted during the call, when BAOS's CEO went into hiding, he instructed her to turn off her phone, presumably so she couldn't be located. (Tr. at 16:16.)

---

[27] The Auditors take apparent comfort in BAOS's having completed its IPO, which they claim shows it "must have been operational" (Auditor Br. at 20), but that similarly attempts to draw impermissible inferences in their favor. In addition, the completion of an IPO process—one that began many months before the arrests (TAC ¶ 29)—does not mean the Company continued to operate its online marketing solutions business on a day-to-day basis. Indeed, as noted in the Auditors' own exhibits, the Company employed only 75 employees. (Basaria Decl. Ex. B at 110.) The loss of the CEO and management team of 10 would be crippling, particularly with an ongoing investigation into the Company's activities. Based on the facts alleged in the TAC, and viewing the facts in the light most favorable to Plaintiffs, it is reasonable to infer the Company was able to complete it's IPO under Yanjun Hu's control—along with the Audit Directors control over the contents of SEC filings (TAC ¶ 24)—while its marketing solutions business was shut down.

Put simply, the Auditors ask the Court to employ an analysis akin to that imposed by the PSLRA for pleading scienter under Section 10(b), which requires taking into account "competing inferences" with "omissions and ambiguities" in mind. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 325–26 (2007). But no such a pleading standard applies here. *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 338 (S.D.N.Y. 2003) ("the PSLRA pleading requirements have no application to claims that arise under Section 11").[28]

Finally, the Auditors' legal authority fails to support dismissal here. As an initial matter, none of the cases on which they rely involve a situation remotely like that alleged here, *i.e.*, where during the period leading up to and including an IPO the issuer's CEO was in hiding, its management team was detained, operations had ceased, and an undisclosed shareholder had taken control. Put differently, there was no dispute in the cases on which the Auditors rely that the issuer's management team was at liberty and in fact running the company (as any reasonable investor would assume absent contrary disclosure).

Their authority is also inapposite for additional reasons. For example, *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 645 F. App'x 72 (2d Cir. 2016) (cited

---

[28] In addition, the Auditors assert that "Golden fails to connect the purported Baosheng investigation sufficiently with Friedman's audit opinion." (Auditor Br. at 18, *see also id.* at 20.) To begin, that ignores the consent process discussed at length above. Moreover, it ignores that the management team that was detained and forced into hiding in connection with the Chinese authorities' investigation was in place at the time of the Audit Report, and thus prepared the financial statements on which the Auditors opined. (*See* TAC ¶¶ 61–62, (*e.g.*, CEO was founder of BAOS, CFO joined January 2020); TAC ¶ 81 (Audit Report dated May 6, 2020)). Those events call into question the integrity of the management team responsible for the preparation of BAOS's financial statements on which the Auditors opined such that further procedures must have been completed to stand on the prior audit opinion, which could not have been completed without management. (*See* TAC ¶ 90.) Also as noted in the TAC (¶ 93), the financial statements also make representations about management's "ongoing" review of various aspects of the financial statements, and process that could not have been taking place with the management team no longer running the Company.

in Auditor Br. at 17), involved affirmance of dismissal of a Section 10(b) claim against an

auditor for failure to adequately allege a strong inference of scienter—which is not an element of

the Section 11 claim here—under the heightened pleading requirements of the PSLRA—which

do not apply here. *Id.* at 74. In doing so, the Second Circuit held the pleadings were deficient

because the plaintiffs asserted that the auditor would have discovered the fraud had they

conducted an "appropriate audit investigation" but "nowhere allege that [the auditor] was

*required* to check the documentation underlying the[] transactions and assets" at issue in the

alleged fraud." *Id.* (emphasis in original). By contrast, the TAC alleges—and the Auditors do not

dispute—that they were required to make inquiries and obtain representations from management

as part of their consent procedures.

The district court opinions cited by the Auditors are likewise distinguishable or

inapplicable. *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 498 (S.D.N.Y. 2018) (cited

in Auditor Br. at 17–18), did not address a theory of Section 11 auditor liability under

*Omnicare*'s omissions prong, instead addressing whether the auditor honestly believed it had

complied with professional standards. *Id.* at 498–99. Indeed, that opinion incorrectly stated that

"[f]or a statement of opinion to be actionable under section 11, a plaintiff must plausibly allege

that the opinion was not honestly held by the speaker at the time that the statement was made."

*Id.* at 463 (citing *Omnicare,* 575 U.S. at 183). That, of course, ignores the other two paths to

demonstrating opinion liability under *Omnicare*—including the omissions theory relevant here.

In *South Eastern Pennsylvania Transportation. Auth.* (cited in Auditor Br. at 17), unlike here

related to consent procedures, the complaint "fail[ed] to identify actual and material steps taken

or not taken by" the auditor. *Se. Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2015

WL 3833849, at *34 (M.D. Pa. June 22, 2015).

The cited portions of both *In re AmTrust Financial Services, Inc. Securities Litigation*, 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) (cited in Auditor Br. at 18) and *City of Warwick Retirement System v. Carvana Co.*, CV 2022-013054, slip op. (Ariz. Sup. Ct. Oct. 26, 2023) (Basaria Decl. Ex. E) (cited in Auditor Br. at 17), focus on a lack of connection between the relevant audit standards and material factual allegations. Here, however, the TAC directly connects professional standards to material factual allegations that show a failure to perform required consent procedures.[29] And in *Hunt v. Bloom Energy Corp.*, 2021 WL 4461171 (N.D. Cal. Sept. 29, 2021) (cited in Auditor Br. at 17), "[t]he complaint hardly mention[ed] [the auditor] or its audit report at all, stating simply that [the auditor] 'purportedly conducted an adequate and reasonable investigation into the business, operations, financial statements, and accounting of Bloom Energy.'" *Id.* at *15. Here, by contrast, the TAC dedicates an entire section to the false or misleading statements prepared or certified by the Auditors that includes and incorporates detailed allegations. (*See* TAC ¶¶ 81–94.)

---

[29] Moreover, *AmTrust* is of limited—if any—precedential value. Following the 2019 district court opinion cited by the Auditors, the complaint was amended and dismissed again for largely the same reasons (and with no new substantive discussion of the auditor defendant). *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2020 WL 2787117, at *1. On appeal, the Section 11 claim against the auditor was affirmed without substantive analysis because plaintiffs' brief only mentioned it "in a footnote" and thus any claim of error was "abandoned." *DeCarlo*, 122 F.4th at 52. But the Second Circuit vacated the district court's dismissal of the Section 10(b) claim against the auditor, holding that the plaintiffs had stated a claim for opinion liability under *Omnicare*. *Id.* at 51–55. And in doing so, the Second Circuit's reasoning directly conflicts with the district court's Section 11 analysis, *e.g.*, holding that, 'contrary to the District Court's conclusion, the [plaintiffs] were not required to allege a link between [the auditor]'s false certification and specific errors in [the company]'s financial statements to establish that [the auditor]'s false audit certification was material." *Id.* at 53. With respect to its holding on whether a Section 11 claim had been stated under the facts alleged, the district court's *AmTrust* opinion should be given no weight.

### 3.    There Is No Requirement to Allege an Error in the Company's Financial Statements to State a Section 11 Claim Against an Auditor

The Auditors further assert that the claims against them should be dismissed because "without a GAAP violation in the Company's underlying financial statements, Golden cannot allege a material misstatement or omission in the Audit Report opining on those financial statements in the IPO materials." (Auditor Br. at 5; *see also id.* at 22.) But Section 11 contains no such requirement. The text of the statute itself makes auditors liable for any part of a registration statement they "prepared or certified." 15 U.S.C. § 77k(a)(4). If such part of the registration statement is materially false or misleading, then Section 11 imposes liability on the auditor. *Id.* For the reasons explained above, that is the case here. (*See* Section VII.A, *supra*.)

To support their position, the Auditors place great weight on language from *In re China Valves Tech. Sec. Litig.* (cited in Auditor Br. at 4–5, 22), which states that "[t]he Auditor Defendants' liability is in an important respect derivative of the Company's—if plaintiffs have failed to allege a material misstatement or omission in the first place, they have failed to allege that the Auditor Defendants erred in not discovering and/or disclosing the phantom misstatement." 979 F. Supp. 2d 395, 413 (S.D.N.Y. 2013). But that only means that there must be a material misstatement in the Registration Statement—not that there need be an error in the audited financial statements specifically, as the Auditors claim. Put differently, auditor liability is derivative in the sense that there must be a material misstatement or omission in the issuer's Registration Statement, as the auditor is only liable for the portions of that filing that they prepare or certify.[30] Anything beyond that would be contrary to the text of the statute.

---

[30] That reading is confirmed by the opinion dismissing a prior version of the complaint in that same case, which is referenced in the sentence immediately preceding the language repeatedly quoted by the Auditors. *See China Valves*, 979 F. Supp. 2d 395 ("the Court's

In their brief, the Auditors also quote authority to suggest that Section 11 claims against auditors "*typically*" arise where financial statements have been restated, *i.e.*, there is a material error in the financial statements. Auditor Br. at 23 (emphasis added) (quoting *SunEdison*, 300 F. Supp. 3d at 470).[31] But that such a fact pattern is typical does not mean it is required. Under certain theories of liability the absence of a material error in the financial statements could merit dismissal. But this is not one of those cases.[32]

The Auditors' attempt to append this additional requirement onto Section 11 claims has no basis in the statutory text or any binding caselaw, and thus should be rejected.

## B.    Golden's Claim Against Friedman Should Not Be Dismissed on Statute of Repose Grounds

Time after time, Friedman and Marcum stated—plainly and publicly—that they had merged in September 2022. They announced in press releases first that "Friedman will merge

---

prior holding . . . demands dismissal here"). In that prior opinion, the court held in a footnote that because the complaint "fails to allege any material misstatement or omission in the relevant SEC filings," without calling out financial statement errors, "it fails to allege fraud on the part of China Valves, the Individual Defendants and the Auditor Defendants," reasoning it references without further analysis in dismissing the Section 11 claims. *In re China Valves Tech. Sec. Litig.*, 2012 WL 4039852, at *8 n.85, *9. These cases do not announce any sort of bright line rule, much less provide reasoning to support one.

[31] The quoted language from *SunEdison* also comes from a part of the opinion that did not address the auditor's liability. That portion of the opinion addressed allegedly false or misleading certifications of internal control over financial reporting by company management. *SunEdison*, 300 F. Supp. 3d at 470.

[32] The Auditors' citation to *Hurst v. Enphase Energy, Inc.* (cited in Auditor Br. at 23), is even further afield. 2021 WL 3633837 (N.D. Cal. Aug. 17, 2021). That case, which does not contain the word "audit," involves neither a Section 11 claim nor an auditor defendant, and based dismissal expressly on the PSLRA's heightened pleading standards—which do not apply here. *Id.* at *4 ("The PSLRA demands more"). The Auditors quote language from *Hurst* that the complaint there did "not point to any restatement of [the company]'s accounting," but it did so in discussing more generally that the complaint "did not allege a misstatement." *Id.* Here, the TAC alleges multiple misstatements.

into Marcum" and then that the "previously announced merger . . . is now complete." (TAC

¶¶ 115–16.) Friedman's social media pages state "Friedman LLP is now Marcum." (TAC ¶ 117.)

Even their clients, including BAOS, stated in SEC. filings that "Friedman LLP was merged with

Marcum." (TAC ¶ 118.)[33] In express reliance on these repeated representations, which by

definition mean that Friedman and its liabilities had been absorbed into Marcum, *see Merger*,

Black's Law Dictionary (12th ed. 2024), Golden named Marcum as Friedman's successor—

instead of Friedman itself—as a defendant in its initial complaint. (*See* D.E. 1 ¶¶ 9, 41, 63–64

("Compl.").)

Marcum and Friedman now claim these prior public statements were false. After the

initial complaint was filed, Marcum and Friedman communicated to Plaintiffs for the first time

their position that the two firms had not in fact merged but remained separate entities. (*See* TAC

¶ 121; Auditor Br. at 32–33.) After receipt of that information, Plaintiffs promptly amended to

add Friedman formally as a defendant. (*See* Amended Complaint, D.E. 26 ¶ 9 ("AC").) In an

attempt to gain a benefit from what they now claim to be false public statements, the Auditors

assert that Friedman should be dismissed because this amendment took place after the statute of

repose period had expired. (Auditor Br. at 25–27.) Even if Friedman has in fact not merged into

Marcum,[34] however, the Section 11 claim against Friedman should not be dismissed because it

---

[33] Apparently, so too did numerous other audit clients. A simple search of S.E.C. filings
for "Marcum w/7 merge* w/7 Friedman" on LexisNexis's Intellegize platform returns
over 100 hits. Further, the merger has been reflected in an SEC order. *See In the Matter
of Jason Jianxun Tang, Cpa, Respondent*, SEC. Release No. 4366, 2022 WL 17080793,
¶¶ 4–5, 11 (Nov. 17, 2022) ("Friedman merged with Marcum, a PCAOB-registered
public accounting firm, on September 6, 2022.")

[34] At a minimum, discovery into the nature of the transaction is necessary given the
current posture of the case. To be clear at the outset, it is "Marcum's position"—not
Plaintiff Golden's—"that Friedman should have been named in place of Marcum" and
that the two companies did not in fact merge. (TAC ¶ 121.) Although Plaintiffs have
requested materials supporting Marcum's position, "[a]s of the filing of [the Third

relates back to the filing of the initial complaint—which was undisputedly filed before the statute of repose had run—under Rule 15(c).

### 1.    The Requirements for Relation Back Under Federal Rule of Civil Procedure 15(c) Are Satisfied

Under Federal Rule of Civil Procedure 15(c)(1), and the accompanying relation back doctrine, an amendment adding a party to a complaint "relates back to the date of the original pleading when" (1) the amendment asserts a claim arising from the "conduct, transaction or occurrence" in the original pleading or (2) that the party to be added was added within the time period provided by Rule 4(m) and "received such notice of the action that it will not be prejudiced in defending on the merits; and knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." In their brief, the Auditors do not address these requirements explicitly, much less dispute that they have been satisfied here. (*See* Auditor Br. at 25–27.) That is because they cannot.

*First*, the amendment asserted a Section 11 claim against Friedman that arose from the same "conduct, transaction or occurrence" set out in the original complaint. Marcum was named in the original complaint merely as Friedman's successor—the Section 11 claim was based entirely on Friedman's conduct. (*See* Compl. ¶¶ 65–71.) The amended complaint simply added Friedman as a party for the same claim previously asserted only against Marcum. (*Compare id.*, *with* AC ¶¶ 74–80.)

*Second*, Friedman "received such notice of the action" that it cannot claim to be prejudiced in defending on the merits. The amended complaint was filed on March 5, 2024, well within the 90 days provided by Rule 4(m). (ECF No. 26.) Further, Friedman has not—and

---

Amended Complaint], counsel for Plaintiffs have not received any documents from counsel for Marcum." (*Id.*)

cannot—assert that it was somehow prejudiced even assuming a four-week delay in defending

on the merits. (*See* Auditor Br. 25–27.) It was Friedman's attorneys, who also represent Marcum,

that contacted Golden's attorneys to communicate that Friedman should have been named. (TAC

¶ 121; *see also* Auditor Br. 27–28 (identifying the same firm as representing both auditor

defendants).) Plaintiffs filed their amended complaint approximately a week later. (TAC ¶ 122;

Dkt. No. 26.) Friedman thus received proper notice and was not prejudiced.[35] *See, e.g.*, *Navarra*

*v. Marlborough Gallery, Inc.*, 2013 WL 1234937, at *5 (S.D.N.Y. Mar. 26, 2013) (no dispute

that there was proper notice where added defendant "was in contact" with plaintiff's "counsel

regarding the action" and attorneys for original and added defendants "at all relevant times,

represented by the same attorneys").

    *Third*, assuming Friedman is in fact a proper party, Friedman should have known the

action would have been brought against it but for its repeated public misrepresentations. Indeed,

this mistake was induced by Friedman and Marcum themselves through their repeated false

public statements. As discussed above, Marcum and Friedman made numerous public statements

reflecting that that they had merged in September 2022. (TAC ¶¶ 114–19.) And by definition, a

"merger" is "[t]he absorption of one organization (esp. a corporation) *that ceases to exist* into

another that retains its own name and identity and acquires the assets and liabilities of the

former." *Merger*, Black's Law Dictionary (12th ed. 2024) (emphasis added). Thus, Plaintiffs

were led to believe that Friedman no longer existed, and that Marcum had assumed its

liabilities—including for the claims asserted here. That suffices to constitute a mistake under

Rule 15(c)(1)(C). *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 549 (2010); *Bishop v. St. Jude*

---

[35] Indeed, the person designated to receive Freidman's service of process, Harriet
Greenberg, is a partner at Marcum. *Compare* Blodger Decl. Ex. 2, *with*
https://www.marcumllp.com/people/harriet-greenberg.

*Med. S.C., Inc.*, 2020 WL 4352682, at *10 (D. Minn. July 29, 2020) (noting that a "failure to understand the factual and legal differences between corporations constitutes a mistake concerning the proper party's identity under Rule 15(c)(1)(C)(ii)") (quotation omitted); *Powers v. Newell Brands, Inc.*, 2019 WL 2491896, at *5 (W.D.N.Y. June 14, 2019) (finding mistake where several entities underwent merger and Plaintiff alleged that defendants had "a convoluted corporate structure" following a merger that made Plaintiff reasonably believe that newly named defendant "was owned and operated by [original defendant] and a mere extension of them"); *Zhang v. Wen Mei, Inc.*, 2017 WL 8813132, at *11 (E.D.N.Y. Dec. 28, 2017) (mistake existed where the plaintiffs were mistaken as to the extent to which the corporate defendant was intertwined with the alleged unlawful conduct); *Mitchell v. CFC Fin. LLC*, 230 F.R.D. 548, 551 (E.D. Wis. 2005) (finding mistake where plaintiff, following a merger involving the defendant, researched but mistakenly identified incorrect defendant).

### 2.    Friedman's Position That Relation Back Cannot Apply When a Statute of Repose Has Run Is Incorrect.

In an effort to avoid the effect of Rule 15(c), the Auditors claim that the relation back doctrine cannot apply to the Securities Act's three-year statute of repose. (Auditor Br. at 25–27.) The Second Circuit has not addressed this issue. While the Auditors cite to *Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*, the Second Circuit in that case explicitly stated that "we need not address . . . whether Rule 15(c) allows 'relation back' of claims otherwise barred by a statute of repose." 721 F.3d 95, 110 n.18 (2d Cir. 2013). The Third Circuit, however, has held—in a case involving the same Securities Act statute of repose at issue here—that "Rule 15 permits relation back against statutes of repose." *SEPTA v. Orrstown Fin. Servs. Inc.*, 12 F.4th 337, 345 (3d Cir. 2021).

In *SEPTA*, the plaintiff filed complaints containing, among other things, Securities Act claims before the statute of repose expired. *Id.* at 342–44. The claims against certain defendants—*e.g.*, the underwriters and auditor—were dismissed in full while the action proceeded as to other defendants. *Id.* Following discovery, and after the statute of repose had run, the plaintiffs sought to reassert the previously dismissed claims against the underwriters and auditor. *Id.* At that point, though claims had been raised earlier based on their conduct, there were no claims against the auditor and underwriters pending. *Id.* Under those circumstances, the Third Circuit held that those reasserted claims were not barred by the statute of repose because they related back to the filing of the prior complaint. *Id.* at 345–52.

In doing so, the court explained that relation back was consistent with both the nature and purpose of statues of repose. *Id.* The relevant statutes stated that an "action" may not be "brought" outside the repose period, and the "action"—*i.e.*, the initial complaint—had been "brought" within the repose period and remained in litigation since. *Id.* And, unlike with equitable tolling, which is not permitted to extend statutes of repose, under Rule 15 "the repose period stays intact; a plaintiff must still bring an action before the deadline" and "Rule 15(c) merely gives plaintiffs a chance to alter the details of an already filed complaint." *Id.*

Moreover, under the facts at issue, the court held that permitting relation back did not violate the Rules Enabling Act, *i.e.*, doing so did not "abridge, enlarge, or modify any substantive right." *Id.* (quoting 28 U.S.C. § 2072(b)). "[T]he expiration of a repose period creates a vested right to be free from liability only as against those plaintiffs who do not have a pending action under the statute at that time . . . because statutes of repose create a deadline for *filing* actions, rather than *resolving* them." *Id.* (citation omitted); *accord Hogan v. Pilgrim's Pride Corp.*, 73 F.4th 1150, 1157 (10th Cir. 2023). Thus, "a defendant does not have a vested right for

repose as against a plaintiff who sues before the deadline as long as the plaintiff's action is pending when the deadline expires." *SEPTA*, 12 F.4th at 345–52.

While the court in *SEPTA* did not "reach whether a plaintiff may use relation back in this context to add new parties," *id.* at 350, Friedman here and the underwriters and auditor in *SEPTA* are similarly situated. As with the underwriters and auditors in *SEPTA*, a Securities Act claim had been brought based on Friedman's conduct before the statute of repose had run, the action in which those claims were brought was still pending at the time of amendment, and no claims against Friedman were pending at the time of amendment. (Compl. ¶ 65–71; AC ¶ 74–80; *see also* TAC ¶¶ 123–26.) Under those circumstances, Friedman did not have a vested right to repose. *SEPTA.*, 12 F.4th at 351. Accordingly, the relation back doctrine applies here or, at a minimum, fact issues as to whether Friedman had a vested right to repose preclude dismissal at the pleading phase. *See also Kessev Tov, LLC v. Doe(s)*, 2022 WL 2356626, at *6 (N.D. Ill. June 30, 2022); *United States ex rel. Carter v. Halliburton Co.*, 315 F.R.D. 56, 64 (E.D. Va. 2016) (holding Rule 15(c) "makes no distinction between statues of limitations and statutes of repose" and applies to "statutes of limitations and repose alike"); *Acierno v. New Castle Cnty.*, 2000 WL 718346, at *8–9 (D. Del. May 23, 2000) (holding that statute of repose does not prevent relation back under Rule 15(c)).[36]

---

[36] The district court cases the Auditors cite, all of which predate the Third Circuit's opinion in *SEPTA*, are also distinguishable factually. All but one of these cases denied relation back under Rule 15(c)(1)(B) where the party sought to add new claims, rather than the addition of a defendant due to a mistake it knew or should have known about. *See Fed. Deposit Ins. Corp. for Colonial Bank v. First Horizon Asset Sec. Inc.*, 291 F. Supp. 3d 364, 370 (S.D.N.Y. 2018); *Peifa Xu v. Gridsum Holding Inc.*, 2021 WL 773002, at *7 (S.D.N.Y. Feb. 23, 2021); *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 264 (S.D.N.Y. 2019); *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 450–51 (S.D.N.Y. 2017). The sole remaining case, *Bensinger Denbury Res. Inc.*, 31 F. Supp. 3d 503, 510 (E.D.N.Y. 2014), precluded the addition of a new plaintiff after the

### 3.    In Any Event, The Section 11 Claim Should Proceed Against Marcum

The Auditors' brief is conspicuously silent on what they believe should happen to Defendant Marcum if the Section 11 claim against Defendant Friedman is dismissed on statute of repose grounds. Because the Auditors do not seek dismissal of the claims against Marcum for reasons related to the statute of repose or assert that the claims against Marcum should be dismissed because it was not the correct party, Marcum should remain in the case.[37] Indeed, because of the impact of Marcum's false statements, it should be estopped or otherwise precluded from arguing that it did not merge with Friedman to escape liability should the claim against Friedman be dismissed on statute-of-repose grounds. For liability purposes, Marcum should be treated as having merged with Friedman and assumed its liabilities, consistent with its public statements.

In any event, discovery from Marcum must be had to determine whether, among other things, Marcum has direct or successor liability for claims against Friedman based on the nature of the transaction. *See, e.g.*, *NYKCool A.B. v. Pac. Int'l Servs.*, 2013 WL 1274561, at *12–14 (S.D.N.Y. Mar. 29, 2013) (outlining *de facto* merger and mere continuation theories of successor liability).

---

original plaintiff's original Securities Act claim was completely dismissed for lack of standing under the statute of repose.

[37] The Auditors obliquely mention in a footnote that "Golden makes no allegations regarding any statements or omissions by Marcum itself." (Auditor Br. at 1 n.1.) But they do not seek dismissal of Marcum on that basis.

VIII. **UNION AND ORIENT STATE A VIABLE CONTRACT CLAIM AGAINST BAOS**.

Union and Orient have stated a claim for breach of contract against BAOS. To state such a claim under New York law, a plaintiff must plead "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach." *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 112 (S.D.N.Y. 2018) (quotation omitted). BAOS does not contest that Union and Orient adequately plead the existence of a contract, their performance under that contract, or damages. (*See* BAOS Br. at 22–26; *see also* TAC ¶¶ 168–72.) The only dispute is whether Union and Orient plead a viable breach. They have done more than enough.

Union and Orient identify at least four breaches related to BAOS's false representations and warranties in the SPA. Those representations were false because "[t]he Chinese authorities investigation into BAOS (i) was reasonably expected to have material adverse impact on BAOS, (ii) was ongoing at the time BAOS warranted no investigations were ongoing, (iii) showed that BAOS was in violation of Chinese law, and (iv) established that BAOS's public disclosures contained material misrepresentations and omissions." (TAC ¶ 171.)

A. **Union and Orient Plead that BAOS Breached Section 3.1(*l*) by Failing to Disclose the Investigation**

Under Section 3.1(*l*)(iii) of the SPA, BAOS represented that:

> Neither the Company nor any Subsidiary . . . is or has been in violation of any statute, rule, ordinance or regulation of any governmental authority having proper jurisdiction over the Company or its Subsidiaries . . . .

(Mi Decl. Ex. F, ECF No. 143-6 ("SPA") § 3.1(*l*)(iii); *see also* TAC ¶ 100(c).) BAOS violated this warranty by failing to disclose the ongoing investigation of its executive team related to BAOS's involvement with an illegal gambling and money laundering scheme. (TAC ¶¶ 44, 47.) Contrary

to BAOS's claim, Orient and Union were not required to identify a particular statute that was at issue in the investigation. *See Gerszberg v. Iconix Brand Grp., Inc.*, 2018 WL 2108239, at *8 (S.D.N.Y. May 7, 2018) (denying motion to dismiss where "plaintiffs sufficiently allege that defendants were in violation of the law," and thus in breach of a warranty, by alleging that defendant "had been acting in violation of U.S. securities laws"). Here, plaintiffs allege that BAOS had been acting in violation of Chinese laws related to illegal gambling and money laundering. (TAC ¶¶ 44, 47.)

The one case BAOS cites for its position shows Orient and Union sufficiently plead a breach. (BAOS Br. at 22.) In *Prime Mover v. Elixir Gaming Technologies, Inc.*, the court considered breaches of representations and warranties made by two different defendants related to legal compliance and only dismissed the claims against the second. 793 F. Supp. 2d 651, 676–77 (S.D.N.Y. 2011). As to the first defendant, the court determined that it "breached the SPA by falsely warranting that it had not violated securities laws or regulations." *Id.* at 677. Similarly, Orient and Union allege that BAOS falsely warranted that it had not violated Chinese law when the evidence indicates otherwise. (TAC ¶ 170.) As the TAC details, Chinese authorities investigated BAOS and arrested its executives as part of an investigation into illegal gambling and money laundering activities. (*Id.* ¶ 47.) This investigation resulted in a 10 million RMB fine imposed on BAOS by the Chinese Authorities, indicating that BAOS was in violation of Chinese law. (*See Id.* ¶ 52(e).) Orient and Union specify precisely the illegal conduct that caused BAOS to be in breach of its warranty. This is sufficient to allege a violation of Chinese law, and a breach of warranty in the SPA.

**B.    Union and Orient Plead that BAOS Breached Sections 3.1(i) and (j) by Failing to Disclose the Investigation and its Material Impact**

Not only did BAOS's failure to disclose the investigation violate Section 3.1(*l*)(iii), but it also violated BAOS's representations and warranties that there were no undisclosed events with material adverse effects and that there were no threatened or ongoing investigations. Specifically, BAOS warranted that:

> Since the date of the latest audited financial statements included within the SEC Reports, except as specifically disclosed in a subsequent SEC Report filed prior to the date of this Agreement, (i) there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect . . .

(SPA § 3.1(i); *see also* TAC ¶ 100(a))

> Except as disclosed in the SEC Reports, there is no action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company, any Subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign . . . [which] could, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect.

(SPA § 3.1(j); *see also* TAC ¶ 100(b))

Union and Orient allege BAOS failed to disclose the adverse material effects of the investigation. As detailed above, BAOS failed to disclose that as part of the investigation, its executive team was detained or went into hiding, the Company suspended its operations, Yanjun Hu took control, and that BAOS was likely to lose its relationship with Sogou. (*See* TAC ¶73.) This is a clear violation of Section 3.1(j), where BAOS represented there were no pending investigations. This undisclosed information was also material. (*See* Section IV.C, *supra*.)

BAOS argues they were not required to disclose the investigation because it was not likely to cause a Material Adverse Effect, defined to mean that the event would have an impact

"on the results of operations, assets, business, or condition (financial or otherwise) of the Company." (*See* SPA § 3.1(b); BAOS Br. at 24.) To the contrary, the investigation substantially affected the operation of BAOS's business, its condition, and assets. BAOS "suspended operations," had a de facto change in leadership (replacing leaders that BAOS itself described as critical to its success, and knew or should have known due to the suspension of its operations and the ongoing investigation that it was likely to lose its business with Sogou). (TAC ¶ 73.) Each of these results of the investigation were material to BAOS's operations. (*See* Section IV.C, *supra*.)

BAOS continues to rely on its interpretation of the call transcript. (*See* BAOS Br. at 25.) This reading is inconsistent with call itself, and violates the bedrock principle that courts interpret allegations in the light most favorable to the Plaintiffs when considering motions to dismiss. (*See* Section IV.A, *supra*.)[38]

### C.    Union and Orient Plead that BAOS Breached Section 3.1(x) bsy Failing to Disclose Significant Material Events

Union and Orient also allege BAOS breached its warranties by omitting material information from its SEC disclosures. Under Section 3.1(x), BAOS warranted that:

> All of the disclosure furnished by or on behalf of the Company to the Purchasers regarding the Company and its Subsidiaries, their respective businesses and the transactions contemplated hereby is true and correct in all material respects and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

---

[38] BAOS also contends that Plaintiffs have improperly made allegations based on "information and belief." (BAOS Br. at 25.) BAOS, however, has not identified which allegations in Plaintiffs' TAC it finds objectionable. (*Id.*) Plaintiffs have alleged "upon information and belief" that the basis for the investigation was BAOS's relationship with Sogou and its involvement with an illegal gambling and money laundering scheme. These facts are uniquely within BAOS's possession, but even if they were not, the transcript of the call with Yanjun Hu supports those allegations. (*See* TAC ¶ 47; Tr. at 11:51.)

(SPA § 3.1(x); *see also* TAC ¶ 101)

To the extent the Court denies BAOS's motion to dismiss Golden's securities claims based on the material misstatements and omissions detailed above, it should also deny BAOS's motion to dismiss Union's and Orient's breach of contract claim under Section 3.1(x), because this section incorporates and certifies the accuracy of those same SEC filings.

BAOS responds to this argument by reiterating its prior claims that an investigation "without more" does not trigger an obligation to disclose. As previously articulated, however, BAOS's duty to disclose arises not simply because of the investigation, but because of the immediate and material impacts of that investigation on the operation of the company. (*See* Section IV.B *supra*.) BAOS also repeats its mischaracterization of the call transcript with Yanjun Hu, ignoring relevant portions of the transcript noting that the result of the investigation was that BAOS "suspended" operations. (*See* Tr. at 12:58.)

## **CONCLUSION**

For all the foregoing reasons, the Court should deny Defendants motions to dismiss in their entirety.

Respectfully Submitted,

Dated: February 7, 2025

DORSEY & WHITNEY LLP

By */s/ Ian Blodger*
    Daniel Goldberger
    goldberger.dan@dorsey.com
    51 West 52nd Street
    New York, NY 10019
    Telephone: (212) 415-9200
    Facsimile: (212) 953-7201


    Thomas P. Swigert (*NY#* 5858840)
    swigert.tom@dorsey.com
    Michael Rowe (*pro hac vice*)
    rowe.michael@dorsey.com
    Ian Blodger (*pro hac vice*)
    blodger.ian@dorsey.com
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

*Attorneys for Plaintiffs Orient Plus
International Limited, Union Hi-Tech
Development Limited, and Golden Genius
International Limited*

76

## **CERTIFICATE OF COMPLIANCE**

I, Ian Blodger, an attorney duly admitted *pro hac vice* to practice law in this Court, certify that, in accordance with the Court's January 24, 2025 Order, ECF No. 153, permitting Plaintiffs to file a single omnibus response brief of no more than 30,000 words, that certify that the foregoing memorandum of law contains 24,816 words, exclusive of the Table of Contents, Table of Authorities, the cover page, the signature block, and this certification. In preparing this certification, I relied on the word count of the word processing system used to prepare this memorandum of law.

*/s/ Ian Blodger*
Ian Blodger

77

<u>**CERTIFICATE OF SERVICE**</u>

I, Ian Blodger, certify that on February 7, 2025, I caused a true and correct copy of

**Plaintiff's Memorandum Of Law In Opposition To Defendant's Motion To Dismiss Third**

**Amended Complaint** and accompanying documents were filed electronically with the Clerk of

the Court for the United States District Court for the Southern District of New York using the

CM/ECF system and accomplished service via the same.

Executed this 7th day of February 2025 in Hennepin County, Minneapolis, Minnesota.


                                                                            */s/ Ian Blodger*                                             
                                                                            Ian Blodger

78