# **EXHIBIT 5**

 Neutral

As of: February 6, 2025 3:18 PM Z

# Danjanovich v. Robbins

United States District Court for the District of Utah, Central Division

July 28, 2006, Decided ; July 28, 2006, Filed

Case No. 2:04-CV-623 TS

**Reporter**
2006 U.S. Dist. LEXIS 52508 *

RANDALL DANJANOVICH, Plaintiff v. THOMAS ROBBINS, et al., Defendants

**Prior History:** Danjanovich v. Robbins, 2006 U.S. Dist. LEXIS 31175 (D. Utah, May 15, 2006)

## Core Terms

investment program, investors, invested, website, email, deposited, golf course, punitive damages, promised, returns, indirectly, attorney's fees, representations, jointly, updates, cause of action, misrepresentations, broker-dealer, solicited, entities, costs, funds, sale of securities, default judgment, sell securities, amounts, registration statement, prejudgment interest, further order, material fact

**Counsel:** [*1] For Randall Danjanovich, an individual, Plaintiff: James K. Tracy, CHAPMAN & CUTLER (UT), SALT LAKE CITY, UT; Adelaide Maudsley, CHAPMAN & CUTLER (UT), SALT LAKE CITY, UT; Jared L. Inouye, BENNETT TUELLER JOHNSON & DEERE LLC, SALT LAKE CITY, UT.

Thomas Robbins, Defendant, Pro se, FILLMORE, UT.

Richard Bybee, Defendant, Pro se, SALT LAKE CITY, UT.

For Clair Cox, Roger Cox, Douglas L. Litster, Tek Foundation, a Utah corporation, Tek Corp, a Utah Corporation, Defendant: Delano S. Findlay, MURRAY, UT.

**Judges:** TED STEWART, United States District Judge.

**Opinion by:** TED STEWART

## Opinion

FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court for a three-day bench trial on May 23, 2006, against the remaining Defendants: Douglas Litster ("Litster"), Clair Cox ("C. Cox"), and Roger Cox ("R. Cox"). Having heard the evidence presented at trial, reviewed the materials submitted by the parties, [1] and being otherwise fully informed, the Court makes the following findings of fact and conclusions of law.

[*2] I. FINDINGS OF FACT

PLAINTIFF

1. Plaintiff Randall Danjanovich ("Danjanovich" or "Plaintiff") is a high-school educated landscape contractor. Danjanovich has limited investment experience, having previously invested small amounts of money through a stockbroker, and is not a sophisticated investor.

DEFENDANTS

2. Defendant TEK Corporation ("TEK Corp.") is a Utah corporation headquartered in Salt Lake City, Utah, that claimed to be in the business of locating and providing funding for the advancement of educational

---

[1] The Court notes that Plaintiff has submitted detailed Proposed Findings of Fact and Conclusions of Law (Docket No. 242), while Defendants have twice submitted a one-page statement of Findings of Fact and Conclusions of Law (Docket Nos. 243 and 244) and a scant two-page statement of Conclusions of Law (Docket No. 245). The Court finds that none of Defendants' submissions are helpful in determining the matters now before the Court. While it has no bearing on the Court's determination of the merits of this action, the Court wishes to express its continued disappointment in how Defendants and their counsel have conducted themselves during the course of this litigation.

opportunities throughout the world. Default judgment was entered against TEK Corp. on May 16, 2006. [2]

3. Defendant TEK Corp.'s securities are not registered with the Securities and Exchange Commission ("SEC"), nor are they listed on any exchange or quoted through any quotation medium. [3]

[*3] 4. TEK Corp. and TEK Foundation never filed a registered statement with the SEC in connection with their investment programs. [4]

5. Defendant TEK Foundation is a Utah organization. Default judgment was entered against TEK Foundation on May 16, 2006. [5]

6. Richard Bybee ("Bybee") is an officer of TEK Corp. and was primarily responsible for developing TEK's website. Default judgment was entered against Bybee on August 8, 2005. [6] Bybee appeared as a witness for Defendants Lister, C. Cox, and R. Cox at trial. Danjanovich moved to strike Bybee's testimony regarding the TEK website on the grounds that documents and information about which he testified were not produced during discovery. The Court took the motion to strike under advisement.

[*4] 7. Randy Hamel ("Hamel") is the Vice President of Investment and Property Management of TEK Foundation. Hamel was voluntarily dismissed in this action on May 16, 2006, after he filed for bankruptcy. [7]

8. Quade Nelson ("Nelson") is a Vice President of TEK Foundation. Default judgment was entered against Nelson in this action on September 21, 2005. [8] Nelson subsequently filed for bankruptcy and received a discharge.

9. Thomas Robbins ("Robbins") is the Chief Executive Officer of TEK Foundation and an officer of TEK Corp. Judgment was entered against Robbins in this action on October 17, 2005. [9]

10. [*5] Scott Alder ("Alder") solicited investors for investment into TEK. He and C. Cox and Litster were business partners in other ventures. Default judgment was entered against Alder in this action on October 1, 2005. [10] On May 15, 2006, the Court entered an order excluding Alder from testifying at trial based on his repeated failure to appear for his noticed depositions. [11]

11. C. Cox is the Chief Financial Officer/Secretary/Treasurer of TEK Foundation and is an officer of TEK Corp. C. Cox had check-signing authority for TEK Corp., along with Robbins. C. Cox possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of TEK Foundation and TEK Corp. [12]

12. C. Cox invoked the *Fifth Amendment* repeatedly throughout [*6] his deposition. On May 15, 2006, the Court issued an order precluding C. Cox from testifying at trial concerning matters for which he had invoked the *Fifth Amendment* during discovery. [13] The Court took under advisement Plaintiff's request that an adverse inference be drawn against C. Cox. [14]

13. R. Cox is the president of TEK Foundation. R. Cox possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of TEK Foundation and TEK Corp. [15]

14. Douglas Litster is a Director of TEK Foundation and is an officer of TEK Corp. Litster participated in explaining TEK's investment program to investors and potential investors. Litster possessed, directly or indirectly, the power to direct or cause the direction of the management [*7] and policies of TEK Foundation and TEK Corp. [16]

15. TEK Corp., TEK Foundation, and their respective principles, including C. Cox and Litster, are not, nor

---

[2] Docket Nos. 223 and 224.

[3] Docket No. 211, Uncontested Fact 2.

[4] *Id.,* Uncontested Fact 24.

[5] Docket Nos. 223 and 224.

[6] Docket No. 75.

[7] Docket No. 228.

[8] Docket No. 95.

[9] Docket No. 109.

[10] Docket No. 100.

[11] Docket No. 219.

[12] Docket No. 234, at 4.

[13] Docket No. 214.

[14] *Id.*

[15] Docket No. 234, at 4.

[16] *Id.*

have they ever been, licensed broker-dealers in the state of Utah. [17]

16. The SEC brought an action against TEK Corp., Robbins, Litster, C. Cox, and Richard Bybee alleging securities fraud. [18] C. Cox and Litster have each been ordered in the SEC action to disgorge profits they earned in the TEK investment program, plus pay prejudgment interest and civil penalties of $ 100,000 each. [19]

 [*8] THE TEK INVESTMENT PROGRAM

17. TEK Corp. claimed to use TEK Foundation as a vehicle for the advancement of educational opportunities throughout the world. [20]

18. The TEK Investment Program involved the sale of securities to a number of investors. [21]

19. These securities were not registered. [22]

20. TEK established a day-trading investment program that Defendants promised at least a 20%-25% monthly return to investors on their investments.

21. Litster was familiar with and knew of those who invested in that program.

22. TEK also established [*9] another program, the underwriting program, where Defendants told investors they could achieve a 100% return per month on their investments.

23. Litster kept a list of investors in the TEK Investment Program at his home, but did not produce a copy of that list during this litigation.

24. Litster was in touch with Robbins at least two to three times per week while the TEK Investment Program was ongoing. Litster received directives and instruction from Robbins about the TEK Investment Program, including directives to prepare email correspondence and forward other email correspondence from Robbins to TEK investors, updating them about the program and its progress. Litster carried out those directives.

25. TEK Foundation established a website to provide investors and others with information about its management, its mission, and its charitable purposes. Investors were encouraged to visit the website.

26. The TEK website was comprised of various sections, including "leadership," which showed pictures and biographies of TEK management, including Litster and C. Cox.

27. In the "assets" section of its website, TEK disclosed that it held interest in various properties [*10] in the Western United States and Mexico. TEK did not own this property, but through joint venture arrangements, possessed a "beneficial interest" in the property and was able to "hypothecate" the property. Neither Litster nor C. Cox understood or could explain exactly what the term "hypothecate" meant. TEK did not disclose these property interests in its balance sheets for 2001, 2002, or 2003. One of the joint venture agreements between TEK and Universal Rockwell reflected $ 18 billion worth of property consisting of much of Riverside, California, to which TEK claimed right to ownership through an old Spanish land grant.

28. Alder raised money for investment into TEK. Alder appears as an "investor" in TEK's balance sheets. Alder was also involved in the day-trading investment program.

29. Alder invested $ 503,000 in TEK in 2002.

30. Between early 2002 through the end of 2003, Alder received approximately $ 160,000 from I-Trust and TEK Corp. Disbursements to Alder were usually made directly from the I-Trust account.

31. Alder solicited investors to participate in the TEK Investment Program.

32. Litster received email correspondence from Alder indicating that [*11] Alder had specific amounts coming in from various sources on certain dates and times in the day-trading investment program. These investments were directly deposited into the I-Trust Account.

33. C. Cox received at least $ 83,140 in profit as a result of his involvement with the TEK Corp. Investment

---

[17] Docket No. 211, Uncontested Fact 18.

[18] *Id.,* Uncontested Fact 19.

[19] *Id.,* Uncontested Facts 20-24.

[20] *Id.,* Uncontested Fact 4.

[21] Docket No. 220, at 1.

[22] Docket No. 211, Uncontested Fact 4.

Program. [23]

34. Litster received at least $ 84,723 in profit as a result of his involvement with the TEK Corp. Investment Program. [24]

35. TEK received approximately $ 4.2 million from investors.

36. TEK has, to date, repaid approximately $ 1.8 million to investors.

37. TEK and its principals, including Litster and C. Cox, continue to maintain that TEK is going to be able to pay back all of its investors.

I-TRUST

38. The I-Trust was a bank [*12] account into which money from TEK investors was deposited.

39. TEK Corp. and I-Trust are affiliated.

40. TEK Corp. made various deposits to the I-Trust account.

41. I-Trust made various payments to TEK Corp., including at least one for $ 125,000, and other amounts for rent and other expenses.

42. C. Cox invoked the *Fifth Amendment* as to whether I-Trust ever made deposits into TEK Corp. accounts or vice versa.

43. Monies that I-Trust received from investments were sent to TEK with instructions as to which investors such monies were to be disbursed. Alternatively, monies TEK received from investments or otherwise were deposited into I-Trust.

44. Litster received monies from I-Trust and TEK Corp. [25]

45. C. Cox received monies from I-Trust and TEK Corp. [26]

---

[23] *Id.,* Uncontested Fact 20.

[24] *Id.,* Uncontested Fact 21.

[25] *Id.,* Uncontested Fact 13.

[26] *Id.,* Uncontested Fact 14.

[*13] 46. Alder received monies from I-Trust and TEK Corp. [27]

RELATIONSHIP BETWEEN ALDER AND TEK, C. COX, AND LITSTER

47. Alder solicited investors to participate in the TEK Investment Program.

48. Litster and Alder corresponded by email periodically. In February 2002, Alder sent Litster an email enumerating amounts, times, and dates of investments. This email related to TEK investors and was a method by which Alder informed Litster that monies Alder had raised were deposited into I-Trust.

49. Litster and Alder had engaged in prior investment activities, dating back to about 1999.

50. Alder, C. Cox, and Litster were business partners in other ventures.

THE DANJANOVICH INVESTMENT IN TEK

51. Danjanovich met Alder in the summer of 2000. Alder wanted to construct a three-hole golf course at his home in St. George and Danjanovich agreed to do the work.

52. Alder mentioned to Danjanovich that he was involved in various investment programs, [*14] including one with Litster, and this was how he got his wealth. Alder did not ask him to invest at this time.

53. Danjanovich first became acquainted with TEK though Alder.

54. References to TEK Corp. and TEK Foundation were made interchangeably. Alder did not differentiate between the two and they were often collectively referred to as TEK. Danjanovich did not know that there was any difference between TEK Corp. and TEK Foundation.

55. Alder introduced Danjanovich to Litster and C. Cox on July 11, 2001, in the parking lot of the Thanksgiving Point Golf Course. The group then traveled to and toured the Saratoga Springs Golf Course (the "Golf Course Meeting"). Kent Danjanovich, Plaintiff's uncle, and a realtor from St. George were also present at the Golf Course Meeting.

---

[27] *Id.,* Uncontested Fact 15.

56. Kent Danjanovich was looking for an investor to invest as much as $ 3 million in the construction of the Saratoga Springs Golf Course.

57. Alder indicated to Danjanovich that Litster and C. Cox would have access to that kind of money. Alder said that $ 3 million would be a drop in the bucket comparted to what Litster and C. Cox were making in the investment programs in which they were involved.

 **[\*15]** 58. During the Golf Course Meeting, Litster and C. Cox mentioned an investment program to Danjanovich. They anticipated large earnings which they could then use to invest in the Saratoga Springs Golf Course.

59. Litster and C. Cox told Danjanovich that they were officers of TEK. C. Cox gave Kent Danjanovich his TEK Corp. business card.

60. Litster and C. Cox discussed buying the entire golf course development project (including the housing development) for approximately $ 50 million. Litster and C. Cox told Danjanovich that they could make enough money personally to buy the whole development.

61. At the Golf Course Meeting, Litster represented to Danjanovich that Litster was a high-ranking leader in the LDS church.

62. After the Golf Course Meeting, Danjanovich met with Litster and C. Cox on three separate occasions, including two meetings at the offices of TEK Corp. located on Fort Union Boulevard in Salt Lake City, and a brief meeting in passing in an elevator at the offices of TEK Corp.

63. Alder was present at one or more of these meetings.

64. During these meetings, Litster and C. Cox told Randy Danjanovich and Kent Danjanovich that their investment **[\*16]** program was proceeding, but that they were not ready to invest in the golf course at that time. They did, however, indicate that funds would be forthcoming.

65. At a meeting with Litster, C. Cox, and Alder, Kent Danjanovich was told that he and Randy Danjanovich could make more money than they could ever imagine through the TEK Investment Program. Kent Danjanovich told Randy Danjanovich about this.

66. Alder told Randy Danjanovich and Kent Danjanovich to look at TEK's website. Litster and C. Cox also told them about the website and directed them to visit the website.

67. Danjanovich visited TEK's website several times and reviewed the information before he invested. In particular, Danjanovich examined the biographies of TEK's officers and was impressed by their credentials.

68. With regard to the biography of Thomas Robbins, there was no information on the website about Robbins' felony convictions. Danjanovich would not have invested in TEK if he had known of these prior felony convictions.

69. Danjanovich also reviewed TEK's website which identified TEK's assets. Danjanovich was impressed by the listing of holdings on the web site and relied upon this information **[\*17]** in deciding to participate in the TEK Investment Program.

70. Kent Danjanovich reviewed similar information on the TEK website.

71. In January 2002, at a meeting at his home, Alder invited Danjanovich to invest in TEK.

72. Alder owed Danjanovich $ 7,500. Alder stated that he would invest this amount in TEK for Danjanovich.

73. Alder told Danjanovich that he should pool money from family and friends to invest in TEK. Alder informed him that he had to act quickly, however, as there was a limited window of time in which they could place their investments.

74. Alder informed Danjanovich that TEK had exclusive information from the United States government that would help TEK invest. Alder also told Danjanovich that the investment was risk free and that he could expect a 100% return per month on his investment.

75. Alder told Danjanovich that he could request his money back at any time and that it would be returned to him within fifteen business days.

76. Alder told Danjanovich that there were two ways in which Danjanovich could invest his money with TEK. Danjanovich could either give the money to Alder or he could directly deposit the money into the I-Trust **[\*18]** Account.

77. Alder gave Danjanovich specific information about the I-Trust Account, including the account number. Danjanovich verified that Robbins was a signer on the account before he made his deposit.

78. Danjanovich invested $ 197,000 in TEK, between

January 2002 and May 2002. Approximately $ 55,000 was deposited directly into the I-Trust Account.

79. Danjanovich initially invested $ 90,000 in TEK and received a promissory note from Alder. This promissory note prompted further investment.

80. The promissory note, dated February 26, 2002, guarantees repayment of the $ 90,000, with an interest rate of 100% per month. Danjanovich believed that the note was a guaranty. Danjanovich believed that if TEK did not repay his investment, then Alder would.

81. Danjanovich did not receive a note from Alder for the additional amounts he invested in TEK. He did not think he needed one.

82. In January 2002, Danjanovich began receiving daily trading statements.

83. The daily trading statements showed incredible returns, exceeding 100% per month.

84. Also beginning in January 2002, Danjanovich began receiving near-daily email updates associated with the TEK [*19] Investment Program.

85. These emails were either (1) written by Litster for delivery to investors or (2) were written by Robbins, sent to Litster, then forwarded by Litster to investors.

86. Many of the email updates Danjanovich received are addressed to "team@tekfoundation.org," which Danjanovich understood to be all of the people, including him, who participated in the TEK Investment Program.

87. Some of the email updates that Danjanovich received are from "team@tekfoundation.org" and addressed to "team@tekfoundation.org"; a few are from Alder; others are from "doug@tekcorp.org," which was Doug Litster, and addressed to "team@tekfoundation.org"; and still others appear as forwarded emails from Robert L. Norton, a man with whom Litster was living.

88. Litster acknowledges that he sent all of the email updates to TEK's investors.

89. The email updates provided updates about the status and progress of the TEK Investment program. Most indicated that the TEK Investment Program was progressing and that returns would become available soon.

90. Some email updates direct recipients to visit the TEK website.

91. Danjanovich invested additional money in the [*20] TEK Investment Program after he began receiving the email updates.

92. Danjanovich and Alder met Litster at a park where Litster was attending a softball game in early 2002. At that meeting, Litster acknowledged Danjanovich by name and told Alder and Danjanovich that the TEK Investment Program was going well but that funds were still not available.

93. Danjanovich began requesting the return or repayment of his investment in June 2002. He first made this request to Alder who indicated that it would be no problem to get Danjanovich his money back. Danjanovich never received the money.

94. Danjanovich contacted C. Cox on multiple occasions seeking the return or repayment of his investment. C. Cox never told Danjanovich that he would need to seek recovery of his investment from Alder, never disputed that Danjanovich was an investor of TEK, and never disputed that Danjanovich invested in TEK. C. Cox told Danjanovich that he would ensure that Danjanovich's money was returned to him.

95. Danjanovich also attempted to contact Doug Litster on a number of occasions. Litster declined to take his calls and did not respond to his emails. Litster never told Danjanovich that [*21] he was not an investor in TEK, that Danjanovich had not invested in TEK, or that he would have to get his money from Alder.

96. On one occasion, Danjanovich went to Litster's home and left a message with Litster's daughter to have Litster call Danjanovich. Within a few minutes, Alder called Danjanovich and told him that Litster did not want Danjanovich going to his residence.

97. In the summer of 2003, Danjanovich met with Robbins at Robbins' home in Fillmore, Utah. Danjanovich talked to Robbins about getting his money back. This was the first time that Danjanovich had met Robbins. Robbins indicated that he would return the money, but that the investments were not doing as well as planned. Robbins did not tell Danjanovich that he was not an investor, that he had not invested with TEK, or that he would need to get his money back from Alder.

98. Litster has spent time trying to raise money to pay back the TEK investors. Lister acknowledges that he

wants every investor to have their funds back and that he has been trying to raise money to return to Danjanovich, through Alder.

99. At least one disbursement from the TEK Investment Program was made to Alder in 2003, after **[*22]** Litster and C. Cox knew that Danjanovich was part of Alder's investment and had committed to Danjanovich that he would get his money back.

100. Danjanovich has not received any payment on the $ 197,000 investment he made in TEK.

101. Defendants Litster and C. Cox acted recklessly and intentionally. They affirmatively misled investors because they knew, or should have known, that statements about promised returns, TEK's assets, and the performance of the TEK Investment Program were not true.

THE ANASAZI FOUNDATION INVESTMENT IN TEK

102. Asa Nielson ("Nielson") is the chairman of the Board of Directors of the Anasazi Cultural Research Foundation (the "Anasazi Foundation"). He testified at trial as a witness for Plaintiff.

103. The Anasazi Foundation sought to raise funds to build a cultural center. To this end, Nielson was introduced to Robbins in March 2002. Robbins was interested in helping the Anasazi Foundation raise money.

104. Nielson was later introduced to Litster in August 2002, at a meeting at TEK's offices on Fort Union Boulevard in Salt Lake City, Utah. Nielson was told that Litster was a director of TEK Foundation. Nielson was also introduced **[*23]** to others at TEK, including C. Cox, Bybee, and Hamel, although he only interacted with Litster and C. Cox.

105. At that meeting, these individuals discussed the possibility of the Anasazi Foundation investing in TEK, which would then invest the money in the TEK Investment Program. The money earned would then be given back to the Anasazi Foundation.

106. After the initial meeting, the Anasazi Foundation invested $ 1.19 million in the TEK Investment Program by wiring the money to the I-Trust Account.

107. Like Danjanovich, Nielson received daily trading statements. Those daily trading statements came directly from Litster and promised high profit returns.

108. The statements look nearly identical to the ones received by Danjanovich. Like the statements sent to Danjanovich, many of the statements received by Nielson were sent to "team@tekfoundation.org."

109. Litster also promised and represented to the Anasazi Foundation numerous times that its money and the promised returns were forthcoming. To date, the Anasazi Foundation has received only a small amount in earnings, but has never received the principal amount it invested in TEK.

II. CONCLUSIONS OF LAW

Plaintiff's **[*24]** Amended Complaint contains the following causes of action: (1) violation of *section 12(a)(1)* of the Securities Act; (2) violation of *section 10(b)* of the Exchange Act and *Rule 10b-5*; (3) unregistered broker-dealer under Utah Securities Act; (4) misrepresentations under Utah Securities Act; (5) fraud; (6) breach of contract; and (7) punitive damages. Plaintiff also alleges that the individual Defendants are liable as control persons of the TEK entities.

The Court makes the following conclusions of law:

1. The Defendants organized and implemented a scheme to raise millions of dollars from investors, promising rates of return of up to 100% per month. Defendants used a corporation called "TEK Corp." and an entity named "TEK Foundation" (sometimes referred to collectively as "TEK") as a vehicle to implement this fraudulent scheme. Robbins, Litster, and C. Cox primarily controlled TEK Corporation. Defendants used Alder to solicit investments in the scheme. Danjanovich was led to believe that, at the very least, there was a relationship between Alder and TEK whereby Plaintiff was lead to believe that giving his investment to Alder was, in effect, investing in the TEK Investment Program.

**[*25]** 2. Defendants, including Litster and C. Cox, represented to potential investors that TEK Foundation was a charitable organization that was advancing education around the world and that TEK Corp. was raising funds for TEK Foundation. The remaining Defendants represented to investors that since TEK Foundation was a charitable organization, the United States government had given it access to confidential stock trading information that would allow it to make millions of dollars, risk free. This money would then be given to TEK Foundation to advance its charitable purposes and, at the same time, investors could make more money than they could ever imagine. None of this was true. Rather, Defendants were involved in a

scheme to raise large amounts of money for their own personal benefit.

3. The facts presented at trial establish that Defendants C. Cox and Litster personally made misrepresentations about TEK, its assets, and the TEK Investment Program to Danjanovich to solicit his participation in that program, that they controlled TEK Corp., that they controlled the I-Trust Account into which funds were deposited, that they sold securities without a license, that the securities [*26] were not registered, and that they benefitted personally from Danjanovich's investment.

CONTROL PERSONS UNDER 15 U.S.C. § 77o AND 15 U.S.C § 78t4. On May 16, 2006, the Court entered default judgment against Defendants TEK Corp. and TEK Foundation. [28]

5. 15 U.S.C. § 77o provides:

> Every person who . . . controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

6. 15 U.S.C. § 78t provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any [*27] rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

7. The Tenth Circuit has stated that these provisions, although worded differently, are interpreted the same. [29] In order to establish a prima facie case of control person liability, the plaintiff must establish: (1) a primary violation of the securities laws; and (2) control over the primary violator by the alleged controlling person. [30] Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to show lack of culpable participation or knowledge. [31]

8. The Utah Securities Act provides: [*28]

> Every person who directly or indirectly controls a seller or buyer liable under Subsection (1), every partner, officer, or director of such a seller or buyer, . . . are also liable jointly and severally with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have know, of the existence of the facts by reason of which the liability is alleged to exist. [32]

9. In his First Amended Complaint, Danjanovich alleged that "[t]he Individual Defendants possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of TEK Foundation and TEK Corp." [33]

[*29] 10. C. Cox, R. Cox, and Litster admitted this allegation. [34] Moreover, the Court entered an Order finding that "Clair Cox, Douglas Litster, and Roger Cox 'possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of TEK Foundation and TEK Corp.'" [35]

11. Even if C. Cox and Litster did not admit they were control persons, Plaintiff has met his burden to prove they exercised the requisite control over the TEK entities. They helped form TEK Corp. and TEK Foundation and held management positions in the TEK entities. They were involved in the TEK entities' daily business affairs and were familiar with their financial dealings. They had direct contact with the TEK investors through in-person meetings and telephone conversations. Litster also had direct contact in sending out near-daily emails to TEK Investors. C. Cox had check-signing authority for TEK Corp. C. Cox and Litster failed to meet their burden [*30] to show lack of

---

[28] Docket Nos. 223 and 224.

[29] *Maher v. Durango Metals, Inc., 144 F.3d 1302, 1305 n.7 (10th Cir. 1998)*.

[30] *Id. at 1305*.

[31] *Id.*

[32] *Utah Code Ann. § 61-1-22(4) (2005)*.

[33] Docket No. 64, P 54.

[34] Docket No. 83, P 54.

[35] Docket No. 234, at 4.

culpable participation or knowledge.

12. Plaintiff offered no evidence to show that R. Cox exercised the requisite "control" over the TEK entities. The only evidence presented was that he was named as the president of TEK Foundation and that he provided a resume and a picture for the TEK website. R. Cox had no involvement in the daily business affairs of the TEK entities. R. Cox has met his burden of showing a lack of culpable participation or knowledge.

VIOLATION OF SECTION 12(1) OF THE SECURITIES ACT

13. Section 12(a)(1) of the Securities Act [36] creates civil liability for any person who offers or sells a security in violation of Section 5 of the Securities Act, 15 U.S.C. § 77e.

14. Section 12(a)(1) of the Securities Act of 1933 provides:

> Any person who (1) offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b) of this section, to the **[*31]** person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security. [37]

15. Section 77e is as follows:
> Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly --
> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
> (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale. [38]

**[*32]** 16. Section 5(a) of the Securities Act makes it unlawful for persons to use any means or instruments of transportation or communication in interstate commerce or of the mails to sell a security for which a registration statement is not in effect. [39] Section 5(c) of the Securities Act makes it unlawful to offer to sell a security for which a registration statement has not been filed. [40] **[*33]** The elements of a Section 5 claim "are '(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale.'" [41]

17. As to the first element, Defendants admit that no registration statement was filed for the TEK Investment Program or any investments made in conjunction with such program. [42]

18. As to the second element, Defendants do not dispute that the TEK investment involved the sale of securities. [43] The Securities Act defines the term "security" as including an "investment contract." [44] The Supreme Court has defined "investment contract" to mean "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares **[*34]** in the enterprise are evidence by formal certificates or by normal interests in the physical assets employed in the enterprise." [45]

---

[36] 15 U.S.C. § 77l(a)(1).

[37] Id.

[38] 15 U.S.C. § 77e(a).

[39] Id. See also SEC v. International Chemical Dev. Co., 469 F.2d 20, 27 (10th Cir. 1972)("Section 5(a) requires that there be an effective registration prior to sales of securities.").

[40] 15 U.S.C. § 77e(c). See also International Chemical Dev. Co., 469 F.2d at 27 ("Section 5(c) makes it unlawful for any person to make use of interstate commerce or the mails to offer to sell a security which has not been registered.").

[41] Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 124 n.4 (2d Cir. 1998)(quoting In re Command Credit Corp., 1995 SEC LEXIS 989, 1995 WL 279776, *2 (S.E.C. Apr. 19, 1995)).

[42] Docket No. 211, Uncontested Fact 2.

[43] Docket No. 220, at 1.

[44] 15 U.S.C. § 77b(1).

[45] SEC v. W.J. Howey Co., 328 U.S. 293, 298-99, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946).

19. The TEK Investment Program involved the investment of money for the raising of funds for TEK Foundation and its purported charitable purposes. The TEK Investment Program promised substantial profits and returns to its investors. These same promises and representations were made to Danjanovich by Alder, C. Cox, and Litster. Litster or C. Cox personally represented to Kent Danjanovich that he and Randy Danjanovich could make more money than they ever imagined by participating in the investment program.

20. As to the third element, Defendant individually and through the TEK entities used instruments of interstate commerce -- email correspondence and the Internet -- in connection with the sale of securities. C. Cox and **[*35]** Litster solicited investors in the TEK Investment Program by inviting them to visit the TEK website. The TEK website included material and information about TEK, its assets, its management, and its mission that C. Cox and Litster knew, or show have known, would be relied upon by investors. They personally solicited Danjanovich's participation in the TEK Investment Program when they invited him to visit the TEK website and told him about the TEK Investment Program, how the program works, and what returns it would generate for investors.

21. Litster also corresponded by email with investors, including Danjanovich, almost on a daily basis, about their investments, the anticipated return on investments, and the TEK Investment Programs. While Litster denies that he sent emails to Danjanovich directly, the evidence presented at trial rebuts this claim.

22. Based on this, Plaintiff has met his burden for making a prima facie case for a violation of Section 77e.

23. R. Cox has met his burden to show lack of culpable participation and knowledge. Litster and C. Cox, however, have failed to meet their burden. They knew that Alder was soliciting participants or had obtained money **[*36]** from others for use in the TEK Investment Program. They invited Danjanovich's participation when they told him about the TEK website and suggested that he could learn more about the TEK Investment program there. They also represented that returns in amounts that were greater than the Danjanovichs could imagine could be made through the investment program. C. Cox and Litster are also liable as control persons of TEK.

24. C. Cox and Litster violate 15 U.S.C. § 77e. Danjanovich is, therefore, entitled to recover from C. Cox and Litster jointly and severally the full amount of the investment he made in the TEK Investment Program in the amount of $ 197,000, plus interest and attorney's fees.

25. Danjanovich seeks an interest rate of at least 25% per annum. The Court finds that this rate is inappropriate and will award prejudgment interest pursuant to a T-Bill Rate Analysis to be conducted by Plaintiff.

26. As of the date of trial, Danjanovich had incurred $ 169,494 in attorney's fees and costs in this action. Danjanovich has been billed for $ 72,702 of that total amount. Danjanovich is awarded attorney's fees and costs in the amount of $ 72,702.

**[*37]** SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5

27. Section 10(b) of the Exchange Act prohibits fraudulent conduct in connection with the offer, purchase, and sale of securities. [46]

28. In order to establish a violation of Section 10(b) and Rule 10b-5 [47] thereunder, Plaintiff must show: (1) that defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of this reliance. [48]

**[*38]** 29. In order "to fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" [49]

---

[46] 15 U.S.C. § 78j(b).

[47] 17 C.F.R. § 240.10b-5.

[48] Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1095 (10th Cir. 2003).

[49] Basic, Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)(quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)).

The Supreme Court has stated that "the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." [50]

30. Defendants made a number of untrue or misleading statements that they knew or should have known that would be relied upon, such as: that TEK would pay to Danjanovich a return of 100% per month; that TEK Corp. had access to confidential government information that would allow it to generate these large profits with little or no risk; and that TEK had numerous [*39] and substantial real estate assets. These misrepresentations were material. They related to basic information about TEK, including its management, its assets, its business plan, and its purpose.

31. Under the second element, as has been discussed above, these statements were made in connection with the sale of securities.

32. Third, these misrepresentations were made with the intent to defraud and/or were recklessly made. TEK and its principles knew that they could not honor promises of returns of 100% per month, that the did not have confidential investment information from the United States government, and that they did not have millions of dollars worth of property assets.

33. Fourth, Plaintiff relied on the misleading statements. Danjanovich visited the TEK website before he invested, as he was told to do. He examined the credentials of the "leadership" of TEK and was impressed by them. Kent Danjanovich was told that he and Randy Danjanovich could make more money than they could imagine in the TEK Investment Program. Plaintiff relied on these statements in investing.

34. Finally, Plaintiff suffered damages as a result of this reliance. Plaintiff invested $ 197,000 [*40] in the TEK Investment Program and that money has not been returned to him.

35. Defendants' only defense is that Danjanovich invested with Alder, not with TEK, and that they did not make representations directly to Danjanovich. As stated previously, the Court finds that Defendants did make these representations directly to Danjanovich and his uncle. Further, Defendants may still be held liable even if they did not personally make representations to Danjanovich.

36. "There is no requirement that the alleged violator directly communicate misrepresentations to plaintiffs[]. . . ." [51] It is enough that Defendant "knew or should have known that his representation would be communicated to investors." [52]

37. Under this standard, Defendants C. Cox and Litster are liable because of the representations made on the website and through Alder. Further, C. Cox and Litster are control persons of [*41] TEK.

38. C. Cox and Litster violated *Section 10(b)* and *Rule 10b-5* thereunder, with respect to the investment Danjanovich made in the TEK Investment Program. Therefore, Danjanovich is entitled to recover from C. Cox and Litster jointly and severally the full amount of the investment he made in the TEK Investment Program, in the amount of $ 197,000.

39. Danjanovich seeks an interest rate of at least 25% per annum. The Court finds that this rate is inappropriate and will award prejudgment interest pursuant to a T-Bill Rate Analysis to be conducted by Plaintiff.

ACTING AS AN UNREGISTERED BROKER-DEALER

40. *Utah Code Ann. § 61-1-3(1)* states that "[i]t is unlawful for any person to transact business in this state as a broker-dealer or agent unless the person is licensed under this chapter."

41. A broker-dealer "means any person engaged in the business of effecting transactions in securities for the account of others or for the person's own account." [53]

[*42] 42. *Utah Code Ann. § 61-1-22* imposes liability on those that act as an unregistered broker-dealer. *Section 61-1-22(1)(a)* states:
> A person who offers or sells a security in violation of Subsection 61-1-3(1) . . . is liable to the person selling the selling the security or buying the security from him, who may sue either at law or in equity to

---

[50] *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)*.

[51] *Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1226 (10th Cir. 1996)*.

[52] *Id.*

[53] *Utah Code Ann. § 61-1-13(c)(i)*.

Case 1:24-cv-00744-JLR    Document 155-5    Filed 02/07/25    Page 13 of 15

Page 12 of 14
2006 U.S. Dist. LEXIS 52508, *42

recover the consideration paid for the security, together with interest at 12% per year from the date of payment, costs, and reasonable attorney's fees, less the amount of any income received on the security, upon the tender of the security or for damages if he no longer owns the security.

43. That section also allows for treble damages, along with interest, costs, and attorney's fees upon a showing that the violation was reckless or intentional. [54]

44. Neither TEK, nor any of its principals, including C. Cox and Litster, was a licensed broker-dealer in Utah at the time Danjanovich participated **[*43]** in the TEK Investment Program. [55]

45. Therefore, C. Cox and Litster violated Utah Code Ann. § 61-1-22(1)(a). Further, Utah law imposes joint and several liability for control persons. [56] Since the Court has entered default judgment against TEK Corp. and TEK Foundation, C. Cox and Litster are also liable as control persons of TEK.

46. Under Utah securities law, Danjanovich is entitled to recover the consideration paid, interest at 12%, reasonable attorney's fees, and costs. Further, Utah Code Ann. § 61-1-22(2) allows for treble damages upon a showing that the violation was reckless or intentional. The Court concludes that Defendants acted recklessly or intentionally. They affirmatively **[*44]** misled investors because they knew statements about promised returns, TEK's assets, and the performance of the TEK Investment Program were not true. Danjanovich is, therefore, awarded $ 197,000 trebled -- amounting to $ 591,000 -- plus 12% annual interest from June 2002, the month in which Danjanovich first requested return of his investment.

MISREPRESENTATIONS

47. Utah Code Ann. § 61-1-1(2) states: "It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly to: (2) Make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading."

48. Utah Code Ann. § 61-1-22(2) provides for civil liabilities and allows for treble damages, interest, costs, and attorney's fees upon a showing that the violation was reckless and intentional.

49. For the same reasons set forth above in discussion of Plaintiff's federal and state law securities claims, the Court finds that Plaintiff has proven his claim for misrepresentation.

50. Under **[*45]** Utah securities law, Danjanovich is entitled to recover the consideration paid, interest at 12%, reasonable attorney's fees, and costs. Further, Utah Code Ann. § 61-1-22(2) allows for treble damages upon a showing that the violation was reckless or intentional. The Court concludes that Defendants acted recklessly or intentionally. They affirmatively misled investors because they knew statements about promised returns, TEK's assets, and the performance of the TEK Investment Program were not true. Danjanovich is, therefore, awarded $ 197,000 trebled -- amounting to $ 591,000 -- plus 12% annual interest from June 2002, the month in which Danjanovich first requested return of his investment.

FRAUD

51. [I]n order to prevail on a claim of fraud, all the elements of fraud must be established by clear and convincing evidence. Those elements are: (1) a representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representer either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge on which to base such representation; (5) for the purpose or inducing the other party to act **[*46]** upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage. [57]

52. Danjanovich has proven the elements of his fraud claim in connection with his other federal and state securities law claims. Representations made to Danjanovich, either through Alder, C. Cox, or Litster, or through the TEK website, concerned material facts about TEK, its assets, and the TEK Investment Program which were false. C. Cox and Litster either knew these

---

[54] Id. § 61-1-22(2).

[55] Docket No. 211, Uncontested Fact 18.

[56] Utah Code Ann. § 61-1-22(3).

[57] Secor v. Knight, 716 P.2d 790, 794 (Utah 1986)(citations omitted).

representations were false or made these representations recklessly. These representations were made to induce Danjanovich to invest his money, and Danjanovich did so relying on these statements. Danjanovich was injured by so relying on these statements. Danjanovich invested $ 197,000 in the TEK Investment Program and, to date, has not received any portion of that investment [*47] back.

53. The Court concludes that Danjanovich has presented sufficient evidence to meet the clear and convincing standard required and that C. Cox and Litster are liable to Danjanovich on his common law fraud claim.

BREACH OF CONTRACT

54. "The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." [58]

55. Danjanovich maintains that he had a contract with Defendants as a result of his investment. The Court believes that while Danjanovich may have a contract with Defendants TEK Corp. and/or TEK Foundation as a result of the investment, the Court finds that this contract does not extend to C. Cox and Litster.

56. Therefore, the Court finds that Plaintiff's breach of contract claim fails.

PUNITIVE [*48] DAMAGES

57. Punitive damages constitute an extraordinary remedy and should be applied with caution. [59] Punitive damages are only appropriate in exceptional circumstances. [60] Punitive damages "punish conduct which manifests a knowing or reckless indifference toward, and disregard of, the rights of others." [61] Punitive damages "must serve the interests of society by punishing and deterring outrageous and malicious conduct which is not likely to be deterred by other means." [62] Punitive damages may be awarded when the nature of the wrong complained of and the injury inflicted goes beyond merely violating rights of another in that it is found to be willful and malicious. [63]

58. Courts [*49] should consider the following factors to determine if punitive damages are appropriate and the amount of those damages, if any: (1) the nature of the alleged misconduct; (2) the extent of the effect of the misconduct on the lives of plaintiff and others; (3) the probability of future recurrence of such misconduct; (4) the relationship between the parties; (5) the relative wealth of the defendant; (6) the facts and circumstances surrounding the misconduct; and (7) the amount of actual damages awarded. [64]

59. In considering these factors, the Court finds that the conduct in this case is egregious. But the Court cannot find that it warrants the imposition of punitive damages. This is especially true considering that, under some of Plaintiff's causes of action, he is entitled to treble damages. Thus, Plaintiff's request for punitive damages is denied.

RELATED MATTERS

[*50] The Court must address two other matters related to the disposition of this action:

60. First, C. Cox invoked the *Fifth Amendment* throughout his deposition in responding to questions about a number of aspects of the TEK Investment Program, its investors, and the association between Alder and TEK. Before trial, the Court ordered that C. Cox could not testify on these matters at trial. The Court took under advisement Plaintiff's request that an adverse inference be drawn against C. Cox to these same matters. The Court indicated that "[i]f Plaintiff can present evidence which connects Defendant Cox to his claim for relief, then the Court may impose an adverse

---

[58] *Bair v. Axiom Design, L.L.C., 2001 UT 20, 20 P.3d 388, 391 (Utah 2001)*(citing *Nuttall v. Berntson, 83 Utah 535, 30 P.2d 738, 741 (Utah 1934))*.

[59] *First Sec. Bank of Utah, N.A. v. J.B.J. Feedyards, Inc., 653 P.2d 591, 598 (Utah 1982)*.

[60] *Synergetics v. Marathon Ranching Co., 701 P.2d 1106, 1112-13 (Utah 1985)*.

[61] *Id. at 1112*.

[62] *Id.*

[63] *First Sec. Bank, 653 P.2d at 598*.

[64] *Synergetics, at 1112*. *See also* *Crookston v. Fire Ins. Exch., 817 P.2d 789, 808 (Utah 1991)*(setting out factors).

inference." [65] At trial, Danjanovich satisfied the threshold requirement of connecting C. Cox to Danjanovich's requested claims for relief. Thus, the Court has imposed an adverse inference against C. Cox.

61. Second, at trial, Plaintiff's counsel moved to strike Bybee's testimony and the related web pages exhibit to [*51] which he testified, on the ground that such were not identified or produced by Defendant during discovery. The Court took the motion under advisement. The Court finds that Bybee's testimony was not credible and that the other Defendants' testimony concerning the website was also not credible. The Court finds that Plaintiff is disadvantaged by Defendants' failure to disclose the nature of Bybee's testimony concerning the timing of the website. The Court also finds that Plaintiff was disadvantaged because the web pages were not produced in discovery. Therefore, the Court grants Plaintiff's motion to strike Bybee's testimony and such fact is reflected in this Order.

III. CONCLUSION

It is therefore

ORDERED that with respect to Plaintiff's first cause of action for selling securities without a registration statement under federal securities law, C. Cox and Litster are jointly and severally liable to Danjanovich for $ 197,000, the amount of his investment in the TEK Investment Program, plus prejudgment interest to be determined by a T-Bill Rate Analysis to be conducted by Plaintiff. It is further

ORDERED that with respect to Plaintiff's second cause of action for Section 10(b) violations [*52] under federal securities law, C. Cox and Litster are jointly and severally liable to Danjanovich for $ 197,000, the amount of his investment in the TEK Investment Program, plus prejudgment interest to be determined by a T-Bill Rate Analysis to be conducted by Plaintiff. It is further

ORDERED that with respect to the third and fourth causes of action for unregistered broker-dealer and misrepresentations under the Utah Securities Act, C. Cox and Litster are jointly and severally liable to Danjanovich for $ 591,000, plus 12% annual interest from June 2002, the month in which Danjanovich first requested the return of his investment, plus attorney's fees and costs in the amount of $ 72,702. It is further

ORDERED that with respect to the fifth cause of action for common law fraud, C. Cox and Litster are jointly and severally liable to Danjanovich for $ 197,000. It is further

ORDERED that Plaintiff's sixth cause of action for breach of contract fails. It is further

ORDERED that with respect to Plaintiff's seventh cause of action, the Court will not impose punitive damages. It is further

ORDERED that Plaintiff prepare and submit a form of judgment, which includes (1) an award of prejudgment [*53] interest according to a T-Bill Rate Analysis in accordance with the Court's decision as stated above and (2) an award of post-judgment interest at the applicable federal rate within five (5) days of this Order. The Clerk of the Court will then be directed to close this case.

DATED July 28, 2006.

BY THE COURT:

TED STEWART

United States District Judge

**End of Document**

---

[65] Docket No. 219, at 6.