UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ORIENT PLUS INTERNATIONAL
LIMITED; UNION HI-TECH
DEVELOPMENT LIMITED; and GOLDEN
GENIUS INTERNATIONAL LIMITED,

                          Plaintiffs,

           -against-

BAOSHENG MEDIA GROUP HOLDINGS
LIMITED; WENXIU ZHONG; SHENG
GONG; YU ZHONG; ZUOHAO HU; ADAM
(XIN) HE; YUE JIN; YANJUN HU;
UNIVEST SECURITIES, LLC; THE
BENCHMARK COMPANY, LLC;
WESTPARK CAPITAL, INC.; FRIEDMAN
LLP; and MARCUM LLP,

                      Defendants.

Case No. 1:24-cv-00744 (JLR)

**<u>OPINION AND ORDER</u>**

---

JENNIFER L. ROCHON, United States District Judge:

       Within months of going public, Baosheng Media Group Holdings Limited

("Baosheng") lost its largest client, accounting for the vast majority of its revenue, in the wake

of an alleged investigation by the Chinese authorities.  After discovering the investigation,

three Baosheng shareholders — Orient Plus International Limited ("Orient"), Union Hi-Tech

Development Limited ("Union"), and Golden Genius International Limited ("Golden")

(collectively, "Plaintiffs") — brought this action against Baosheng, seven individuals, three

underwriters, and two independent auditors, based on Baosheng's alleged failure to disclose

the investigation — and its risks and consequences — to investors.

       The Third Amended Complaint (the "TAC") asserts four causes of action pursuant to

sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l, 77o, and

state law.  In the first cause of action, Golden asserts claims under section 11 against

Baosheng; Univest Securities, LLC ("Univest"), the Benchmark Company, LLC ("Benchmark"), and WestPark Capital, Inc. ("WestPark") (collectively, the "Underwriter Defendants"); Friedman LLP ("Friedman") and Marcum LLP ("Marcum") (together, the "Auditor Defendants"); directors Wenxiu Zhong, Sheng Gong, Yu Zhong, Zuohao Hu, and Adam (Xin) He; and CFO Yue Jin. The second and third causes of action by Golden assert claims under section 12(a)(2) against Baosheng and Univest, and under section 15 against Wenxiu Zhong, Sheng Gong, Yu Zhong, Zuohao Hu, Adam (Xin) He, Yue Jin, and Yanjun Hu (collectively, the "Individual Defendants."). In the fourth cause of action, Orient and Union assert a claim against Baosheng under New York law for breach of the parties' stock purchase agreement.

Defendants now move to dismiss the various claims in the TAC. For the reasons that follow, Baosheng's motion is DENIED; the Underwriter Defendants' motion is DENIED; Wenxiu Zhong, Sheng Gong, Yue Jin, and Yanjun Hu's motion is GRANTED in part and DENIED in part; the Independent Director Defendants' motion is GRANTED in part and DENIED in part; and the Auditor Defendants' motion is GRANTED.

## BACKGROUND

### I. Factual Background[1]

#### A. The Parties and the IPO

Defendant Baosheng "is an online marketing solution provider based in China" and "incorporated under the laws of the Cayman Islands." TAC ¶ 5. "Among other services,

---

[1] Unless otherwise noted, the facts herein are drawn from the TAC and the transcript attached as an exhibit thereto, in addition to "statements incorporated by reference, and public disclosure documents filed with the SEC." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019); *see DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").

[Baosheng] advises advertisers on online marketing strategies, offers advertising optimization services and facilitates the deployment of online ads of various forms such as search ads, in-feed ads, mobile app ads and social media marketing ads." *Id.* On July 10, 2020, Baosheng filed a registration statement (as amended, the "Registration Statement") with the U.S. Securities and Exchange Commission (the "SEC"). *Id.* ¶ 29. After several amendments, the Registration Statement became effective on February 5, 2021. *Id.* ¶ 30; *see* Dkt. 142-2 ("Registration Statement"). On February 8, 2021, Baosheng's "ordinary shares began trading on NASDAQ," TAC ¶ 30; on February 9, 2021, Baosheng filed its final prospectus (the "Prospectus"); and on February 10, 2021, Baosheng "completed its [IPO] through a firm commitment underwriting . . . , raising $31.2 million," *id.* ¶ 39; *see* Dkt. 143-3 ("Prospectus").

Defendants Wenxiu Zhong, Sheng Gong, and Yue Jin signed the Registration Statement. *Id.* ¶¶ 11-12, 16. Zhong was chairperson of the board and chief executive officer of Baosheng, *id.* ¶ 11, Gong was a director of Baosheng, *id.* ¶ 12, and Jin has been Baosheng's chief financial officer since January 2020, *id.* ¶ 16. Defendant Yanjun Hu was "in actual control of a significant percentage of [Baosheng] stock" and allegedly "had actual control over [Baosheng] in the months leading up to its IPO." *Id.* ¶ 17. Defendants Yu Zhong, Zuohao Hu, and Adam (Xin) He (the "Independent Director Defendants") were independent directors of Baosheng at the time of the IPO and served as members of Baosheng's audit committee (the "Audit Committee"), with He serving as the chairperson. *Id.* ¶¶ 13-15. The Audit Committee's responsibilities included:

> reviewing with the independent auditors any audit problems or difficulties and management's response; discussing the annual audited financial statement with management and the independent auditors; . . . meeting separately and periodically with management and the independent auditors; and monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of [Baosheng's] procedures to ensure proper compliance.

*Id.* ¶ 34 (omission in original) (quoting Registration Statement at 122).  All Individual

Defendants are citizens and residents of China.  *See id.* ¶¶ 11-17.

Defendant Univest, a New York limited liability company with a principal place of

business in New York; Defendant Benchmark, a Delaware limited liability company with a

principal place of business in New York; and Defendant WestPark, a Colorado corporation

with a principal place of business in California, were underwriters for Baosheng's IPO.

*Id.* ¶¶ 6-8, 35-36.  Univest served as the lead underwriter and "exercised its over-allotment

option under the firm commitment underwriting agreement to purchase an additional $4.5

million worth of ordinary shares for sale to the public."  *Id.* ¶ 40; *see id.* ¶¶ 6, 35.

The Auditor Defendants are New York limited liability partnerships with principal

places of business in New York.  *Id.* ¶¶ 9-10.  Friedman "served as an independent auditor at

the time of [Baosheng]'s IPO," *id.* ¶ 9, and Marcum is a certified public accounting firm, *see*

*id.* ¶ 10.  "In a Registration Statement filed on August 4, 2023, [Baosheng] stated that

'Friedman LLP was merged with Marcum LLP on September 1, 2022.'"  *Id.* ¶ 38.

Plaintiffs Orient and Golden are business entities incorporated in the British Virgin

Islands, and Plaintiff Union is a business entity incorporated in the Marshall Islands.  *See*

*id.* ¶¶ 2-4.  On March 2, 2021, "Plaintiff Golden purchased $3.5 million worth of [Baosheng]

ordinary shares directly from Univest," and "continues to hold these shares."  *Id.* ¶ 41.  On

March 17, 2021, Plaintiffs Orient and Union entered into a stock purchase agreement (the

"SPA") with Baosheng "to purchase $10 million worth of unregistered [Baosheng] ordinary

shares directly from the company."  *Id.* ¶ 42; *see* Dkt. 143-6 ("SPA").  "Since Plaintiffs'

initial investment of $13.5 million in March 2021, [Baosheng]'s stock price has declined

approximately 96%."  TAC ¶ 132.

**B. Call Between Orient's Principal and Defendant Yanjun Hu**

In or around June 2023, Orient's principal, Hu Dong, had a phone call with Defendant

Yanjun Hu to discuss, among other things, "Plaintiffs' investment in [Baosheng],

[Baosheng]'s reduced share price, and certain transactions between [Baosheng] and Yanjun

Hu or companies owned or controlled by Yanjun Hu." TAC ¶ 43. A transcript of this call and

a certified translation of the call are attached to the TAC. *See generally* Dkt. 128-1 ("Call

Tr.").

The relevant excerpts of the call are reproduced below:

[Hu]: This was the situation: Back in 2019, because of the issue with [Baosheng's CEO], which I helped her, oh, was it in 2020? Was it 2020 or 2021? I helped [Baosheng's CEO] handle it, which was, [p]eople were being arrested at Sogou. It was Sogou, because, back then it was a, I think it involved gambling funds in Macau. What was involved was that it had a domestic gaming company, which used Sogou to promote this game. Essentially, it can be understood that at that time, the [Chinese] Ministry of Public Security set up a special project to specifically investigate this case. The money earned by the domestic gaming company, was then remitted back to the gambling funds in Macau. This was the so-called "Alvin Chau Cheok Wa" incident.

[Dong]: I know, as soon as you said it, I was thinking of Suncity.

[Hu]: Suncity, right. In this incident, the game was being promoted by Sogou, and BAOSHENG was Sogou's biggest Agent. . . . So, at the time, ten members of BAOSHENG's senior management were arrested on the spot. A lot of people were also arrested from Sogou as well. After the arrests, the entire company's operations were suspended . . . [in] 2021.

[Dong]: Didn't you just become listed in 2021? Was that before or after you were listed?

[Hu]: A month or two before the company was listed. They started arresting people. But at that time, I thought it was just a temporary thing. . . . Because there were several layers of separation here. First, it was the game company, which was in Wuxi. That company was completely controlled and people were arrested.

[Dong]: So it was totally wiped out. OK.

[Hu]: Yes, at the time, we thought that the arrests would only happen to that game company, and that . . . Sogou would not be affected. So, at the time, we

thought we would just have a dozen people over there to cooperate and to tell about the situation.

[Dong]: They kept them over there.

[Hu]: Yes, later when they were in there, that is, understand the situation, but they didn't come back after a week, two weeks, then a month. . . . At the end, this matter concluded when Sogou, including the agency rights . . . were all gone, all gone, including the collaboration was also terminated completely.

[Dong]: Oh[.]  So it had a pretty big effect, too[.]

[Hu]: Yes.  So, 2020 and 2021 were largely impacted.  2022 was largely impacted as well.  And what then?  Basically, later [Baosheng's CEO] came to me, because I was working in the media industry.  So she asked whether, because of what was happening at the time, basically, the agency relationship with Sogou, she could not take it on anymore.  Because there was already this, . . . then of course, a fine was imposed on BAOSHENG, amounting to almost 10 million. . . . Sogou's fine was 1.4 billion. . . .

In the end, this is how this matter was handled.  Basically, the outcome of the Alvin Chau Cheok Wa incident was that Sogou was considered an accomplice, and Sogou was a direct beneficiary of Alvin Chau Cheok Wa.  Sogou was fined for the entirety of the proceeds, everything it earned and the like.  Then, BAOSHENG's relevant proceeds over the last few years related to this client, amounting to over ten million, was also taken away in the form of fines. . . .

[Dong]: When did you handle this matter?  Before the company was listed?  Or after listing?

[Hu]: After the handling, after the listing.  By the time the company was listed, everything was taken care of at the second half of 2021.

[Dong]: That must be very painful, because the people were still in custody.  Because generally speaking, people would be detained for a period of time.  That's what usually happens for them to cough up the money, right?  That's how it's done.

[Hu]: At that time, I even went to Wuxi to bail people out.  So I was also step-by-step, because I already invested too much.  I even went to Wuxi to bail people out. . . . That's why later, when I deal with this issue, I took over the company as a matter of course.  I had no choice. — I had invested too much, so I had to do it.  At the time, [Baosheng's CEO] even hid away, she was too scared.  Later on, it was a good thing that she hid away.  Back then, I asked her to turn off her mobile phone, and I told her I would take care of this matter.  Later on, I found connections with Wuxi Municipal Public Security Bureau, also Jiangsu Provincial Department of Public Security, discussing with people in these places.  Then, it took two or three months, then I finally got her off the hook on this

matter. Then what happened was that a fine was imposed, confiscating the entirety of income from this customer, pre-tax income, as long as it was completely given up as a fine. That's how this thing ended. Otherwise, it would have been a big mess if it was like Sogou at that time. They kept saying, your BAOSHENG is also a listed company. . . . Also an accomplice. Then they also impose a fine of a few hundred million[.]

[Dong]: When they first started arresting people, the company wasn't listed yet, right? It wasn't listed when people started being arrested? Were things still OK back then?

[Hu]: There was cooperation with the investigation.

[Dong]: So it was really listed first, and then [—]

[Hu]: [—] It wasn't actually called "arrest" either. Anyway, at first they called in three people to cooperate with the investigation. At that time, we thought, OK, that's normal. During those years, they were going after people working on data, working on big data, or even working on Bitcoin. They were all just called in to cooperate with the investigation. . . .

[Dong]: Damn! That's how they get their revenue, it's a lot of money. Right now, Yiyang in Hunan Province is just relying on this for revenue. It's so much money, too. Incredible, this.

[Hu]: This is in fact a very simple issue. This is what they are relying on. They see that Sogou is a listed company, and they see that BAOSHENG is a listed company. They don't bother companies that are not listed. They are actually just targeting you for becoming a listed company. And then, actually, it was OK for me, because I have a friend who works at the Department of Public Security in Jiangsu. At least I knew someone, so I got some leniency on this matter. . . . Later on, . . . I basically had to take over. After I took over, I didn't keep any profits, and sold at cost to BAOSHENG. Do you understand? This is what happened. . . . So, of course this was disclosed as a related party transaction. There was no problem with this. It was fully disclosed.

Call Tr. at 40-49 (timestamps omitted).

According to Plaintiffs' interpretation of the transcript, "Yanjun Hu disclosed that in the months leading up to [the] IPO, . . . [Baosheng] executives and managers were taken into custody by Chinese authorities, . . . one executive went into hiding, [Baosheng] suspended its operations, and Yanjun Hu took control of [Baosheng]." TAC ¶ 44. Plaintiff further alleges, based on the call "and upon information and belief," that "those Chinese authorities

investigated [Baosheng] because of its relationship with Sogou, a large internet search engine and [Baosheng]'s largest customer." *Id.* ¶ 47.  Plaintiffs aver that "Sogou was involved with the Suncity Group ('Suncity'), a gaming company that had been under investigation by the Chinese authorities since 2019 for illegal gambling and money laundering activities," and that the Chinese authorities "targeted" Baosheng because Baosheng allegedly "promoted Suncity on Sogou." *Id.*  Baosheng's "annual authorized agency agreement with Sogou expired in March 2021" and "was not renewed subsequently." *Id.* ¶ 50.

As alleged in the TAC, Plaintiffs draw the following conclusions from the call: (1) "Beginning one to two months before and continuing through the date of the IPO, [Baosheng] was under investigation by the Chinese authorities," and "[t]his investigation involved China's Ministry of Public Security"; (2) "Beginning one to two months before and continuing through the date of the IPO, Chinese authorities detained ten members of [Baosheng's] management team and its CEO went into hiding because of this investigation"; (3) "The investigation by Chinese authorities and related detentions caused significant disruptions to [Baosheng], which suspended its operations in the months leading up to the IPO"; (4) "At and around the time of the IPO, [Baosheng] was controlled by Yanjun Hu, an undisclosed non-management, non-director stockholder"; (5) "This investigation was not resolved until the second half of 2021, [and] resulted in a fine of almost 10 million RMB"; and (6) "As a direct result of the investigation, [Baosheng] lost is largest client, Sogou, which accounted for 82.3% of its revenue in the year prior to its IPO." *Id.* ¶ 52.  Plaintiffs thus allege that various statements in the Registration Statement and Prospectus were materially misleading, in violation of the Securities Act and in breach of the SPA, because "Defendants never disclosed the Chinese authorities' investigation, detention, and penalties to investors or the public." *Id.* ¶ 128; *see id.* ¶¶ 133-172.

**C. Alleged Misrepresentations and Omissions in the Registration Statement and Prospectus**

Based on the call between Hu Dong and Yanjun Hu, Plaintiffs allege that Baosheng's "Registration Statement and Prospectus contain numerous materially false or misleading statements, omit to state material facts necessary to make the statements therein not misleading, and omit to state information required by SEC regulations." TAC ¶ 56.

First, "[i]n the Registration Statement and Prospectus, [Baosheng] noted that it was subject to one pending and one recently decided material legal proceeding, listing an employment dispute and a breach of contract dispute." *Id.* ¶ 57. Plaintiffs argue that these statements were materially false or misleading because they failed to disclose that Baosheng "was also party to legal proceedings initiated by the Chinese authorities related to [Baosheng]'s involvement with Sogou and Suncity," which "resulted in the detention of ten [Baosheng] executives and managers and caused [Baosheng] to effectively shut down in the months leading up to and at the time of the IPO." *Id.* ¶ 58; *see also id.* ¶ 52(f) ("As a direct result of the investigation, [Baosheng] lost [its] largest client, Sogou, which accounted for 82.3% of its revenue in the year prior to its IPO."). Relatedly, Plaintiffs allege that Baosheng violated Items 103 and 303 of SEC Regulation S-K, which require, respectively, the disclosure of certain material pending legal proceedings, 17 C.F.R. § 229.103, and known material trends, events and uncertainties, *see id.* § 229.303. Plaintiffs contend that the Chinese authorities' investigation was a material legal proceeding within the meaning of Item 103, *see* TAC ¶¶ 97-98, and that the investigation "and detention of [Baosheng's] executives and managers . . . was a material event and uncertainty" within the meaning of Item 303, *id.* ¶ 96; *see id.* ¶ 95.

Second, Baosheng "stated in its Registration Statement and Prospectus that '[r]elying on [its] management's extensive industry experience, deep industry insights and well-established network of media resources, [it] ha[d] grown rapidly from a start-up online marketing agency founded in 2014 to a multi-channel online marketing solution provider." *Id.* ¶ 59. Baosheng also "repeatedly stated . . . that one of its 'competitive strengths' was its 'experienced and visionary management,' specifically identifying Defendant [and CEO] Wenxiu Zhong as an essential member of the leadership team." *Id.* ¶ 60; *see id.* ¶ 61. The Registration Statement and Prospectus also identified Defendant Sheng Gong as a director and Defendant Yue Jin as CFO, and included these Defendants' biographies. *See id.* ¶ 62. Plaintiffs argue that these statements were materially false or misleading "because, at the time of the Registration Statement and Prospectus, [Baosheng] was not managed by these individuals" — "[r]ather, Chinese authorities had detained many of these individuals or they had gone into hiding and [were] unable to manage [Baosheng]," and "Defendant Yanjun Hu controlled [Baosheng] during this period." *Id.* ¶ 63.

Third, Baosheng's Registration Statement and Prospectus included numerous statements about its growth. Specifically, Baosheng stated that it had "successfully implemented [its] business model, and [its] business experienced substantial growth from [its] inception to December 31, 2019," *id.* ¶ 64; that "it had seen 'rapid growth' 'since the arrival of Wenxiu Zhong,' and that it 'expect[s to] continue to expand,'" *id.* ¶ 65 (alteration in original); and that it "ha[d] successfully implemented [its] business model," *id.* ¶ 66. The Registration Statement and Prospectus also included a detailed description of Baosheng's "[g]rowth [s]trategy," which Baosheng credited with helping the company "secur[e] the authorized agency status for distributing the ad inventory of Sogou," a "leading search engine[] in China, in 2016." *Id.* ¶ 67 (emphasis omitted). Plaintiffs argue that these

statements were materially false and misleading because "Chinese authorities detained ten executives and managements or others went into hiding, which made it practically impossible for [Baosheng] to execute its growth strategy.  In fact, [Baosheng] had suspended operations and Defendant Yanjun Hu took control of the Company in or around the time of the IPO." *Id.* ¶ 68.

Fourth, the Registration Statement and Prospectus included several references to Sogou.  Specifically, Baosheng stated that it was "one of the authorized agencies of Sogou," which "render[ed] [Baosheng] one of the go-to online advertising service providers for acquisition of ad inventory offered by Sogou," *id.* ¶ 69; that Baosheng "ha[d] been an authorized agency of Sogou since 2016, and was its top authorized agency with reference to [its] comprehensive capability in 2017," *id.* ¶ 70; that Baosheng's "strategy ha[d] seen [it] securing the authorized agency status for distributing the ad inventory of Sogou," *id.* ¶ 71; that "Sogou . . . had been [Baosheng's] top customer since [it] obtained [its] authorized agency status," *id.* ¶ 72; and that Baosheng was "recognized as the top authorized agency for Sogou in 2017, which . . . signifies [its] success in delivering SEM services and procuring advertisers for Sogou," *id.*  Plaintiffs argue that these statements were materially false or misleading because, "[i]n connection with an investigation of Sogou, Chinese authorities detained ten executives and managements or others went into hiding, [Baosheng] had suspended operations, and Defendant Yanjun Hu took control of the Company in or around the time of the IPO."  *Id.* ¶ 73.  Moreover, Baosheng's "agency agreement with Sogou expired in March 2021, the same month Plaintiffs purchased shares in [Baosheng]," and Baosheng's "Directors and Executives knew or should have known that Baosheng would not be able to renew its agency agreement with Sogou at the time it made these statements in its Registration Statement and Prospectus."  *Id.*

11

Fifth, Baosheng "included certain risk factors in its Registration Statement and Prospectus" that Plaintiffs aver "were false and misleading because the risks had already materialized and were harmful to the business." *Id.* ¶ 74. Specifically, Baosheng stated in its Registration Statement and Prospectus that (A) the company's "financial condition and business prospects ***could*** be materially and adversely affected" "***[i]f*** [it] fail[ed] to maintain [its] relationships with [its] business stakeholders, mainly advertisers and media," *id.* ¶ 75 (first alteration in original); (B) that "losing one or more of [Baosheng's] customers" that "contributed to a significant percentage of [its] total revenue . . . ***could*** result in a material adverse impact on [its] financial performance and business prospects," *id.* ¶ 76; (C) that "[n]on-compliance with laws and regulations on the part of any third parties with which [Baosheng] conduct[ed] business ***could*** expose [it] to legal expenses, compensations to third parties, penalties and disruption of [its] business, which ***may*** adversely affect [its] results of operations and financial performance," *id.* ¶ 77; (D) that Baosheng's "ongoing operations and growth ***could*** be affected" "***[i]f*** [it] fail[ed] to attract, recruit or retain [its] key personnel including [its] executive officers, senior management and key employees," *id.* ¶ 78; (E) that "[l]egal claims, government investigations or other regulatory enforcement actions ***could*** subject [Baosheng] to civil and criminal penalties," *id.* ¶ 79; and (F) "[u]ncertainties regarding interpretation and enforcement of the laws, rules and regulations in China ***may*** impose adverse impact on [Baosheng's] business, operations and profitability," *id.* ¶ 80. Plaintiffs argue that these risks "had already materialized because [Baosheng] knew, or should have known, that it would lose its relationship with Sogou, which accounted for over 80% of [Baosheng]'s revenue in the year prior," due to the government investigation and the proceedings against Sogou, *id.* ¶ 75; *see id.* ¶ 76; that "Sogou's non-compliance with laws and regulations had already caused disruption to [Baosheng]'s business by triggering the Chinese

12

authorities' investigation into [Baosheng] and detention of its executives and managers,"
*id.* ¶ 77; that "key personnel, including Defendant Wenxiu Zhong, were detained by or hiding
from Chinese authorities," *id.* ¶ 78; that "Chinese authorities were already investigating
[Baosheng] and that investigation led to significant civil penalties," *id.* ¶ 79; and that "the
uncertainties associated with the Chinese government's investigation and detention of
[Baosheng's] executives had adversely impacted [Baosheng]'s business, operations, and
profitability prior to its IPO," *id.* ¶ 80.

### D. Baosheng's Alleged Breach of the SPA

The March 17, 2021 SPA between Orient, Union, and Baosheng "referenced
[Baosheng's] public filings, including its Prospectus, and solicited Orient and Union's
purchase of additional securities based upon the information contained therein."  TAC ¶ 99.
The SPA included several warranties, including that "there has been no event, occurrence or
development that has had or that could reasonably be expected to result in a Material Adverse
Event," defined as "an event that has 'a material adverse effect on the results of operations,
assets, business, or condition (financial or otherwise) of the Company and the subsidiaries,
taken as a whole,'" *id.* ¶ 100(a) (quoting SPA § 3.1(b)(ii)); that "there was no 'investigation
pending' by any government entity that could reasonably be expected to have a Material
Adverse Effect on the company," *id.* ¶ 100(b) (quoting SPA § 3.1(j)); that Baosheng "has not
'been in violation of any statute, rule, ordinance or regulation of any governmental authority
having proper jurisdiction over the Company or its Subsidiaries,'" *id.* ¶ 100(c) (quoting SPA
§ 3.1(*l*)); and that "none of [Baosheng's] prior filings, including its Prospectus, 'contained any
untrue statement of a material fact or omitted to state a material fact required to be stated
therein or necessary in order to make the statement therein, in the light of the circumstances
under which they were made, not misleading,'" *id.* ¶ 101 (quoting SPA § 3.1(x)).  Plaintiffs

contend that Baosheng breached these warranties because the alleged investigation into Baosheng by the Chinese authorities "(i) was reasonably expected to have material adverse impact on [Baosheng], (ii) was ongoing at the time [Baosheng] warranted no investigations were ongoing, (iii) showed that [Baosheng] was in violation of Chinese law, and (iv) established that [Baosheng]'s public disclosures contained material misrepresentations and omissions." *Id.* ¶ 171.

### E. Allegedly False or Misleading Statements Prepared or Certified by Friedman

Plaintiffs contend that Friedman's audit report (the "Audit Report") on Baosheng's 2018 and 2019 year-end financial statements included in the Registration Statement (the "Financial Statements") contained the following materially false or misleading statements:

- "In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of [Baosheng] as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America." TAC ¶ 81(a).

- "These consolidated financial statements are the responsibility of the Company's management." *Id.* ¶ 81(b).

- "Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements." *Id.* ¶ 81(c).

- "We believe that our audits provide a reasonable basis for our opinion." *Id.* ¶ 81(d).

Plaintiffs also allege that Friedman's consents to the inclusion of its reports in the Registration Statement and Prospectus (the "Consents") were materially false or misleading. *See id.* ¶ 82-83. The Consents, dated January 27, 2021, and February 8, 2021, read as follows:

> We hereby consent to the inclusion in this Amendment No. 3 to Form F-1 of our report dated May 6, 2020, except for note 15, as to which the date is July 10, 2020, with respect to the consolidated balance sheets of Baosheng Media Group Holdings Limited and subsidiaries as of December 31, 2019 and 2018, and consolidated statements of income and comprehensive income, cash flows and changes in shareholders' equity for each of the years in the two-year period ended December 31, 2019. We also consent to the reference to our firm under the heading 'Experts' in such Registration Statement.

*Id.* ¶ 82.

According to Plaintiffs, these statements were materially false or misleading because "Friedman had failed to comply with applicable professional standards related to its consent to inclusion of its audit report[] in the Registration Statement," *id.* ¶ 83(a); "[Baosheng]'s management team, including the CEO, in place at the time Friedman issued its audit report, were detained or in hiding as a result of the investigation by Chinese authorities," *id.* ¶ 83(b); "[Baosheng] was being run at the time of the IPO by an undisclosed non-management, non-director stockholder," *id.* ¶ 83(c); "[t]he investigation had caused the company to suspend operations in the months leading up to the IPO," *id.* ¶ 83(d); and "[Baosheng] was likely to lose its largest client," *id.* ¶ 83(e). Plaintiffs emphasize that the Public Company Accounting Oversight Board ("PCAOB") Auditing Standards required Friedman to either modify its report or withhold its consent to the inclusion of its report in the Registration Statement, but that Friedman — though it was or should have been aware of the events discussed in the call between Dong and Hu — failed to modify its report accordingly or withhold its consent. *Id.* ¶¶ 84-89. Similarly, the Auditing Standards create certain obligations with regard to investigations of a company by a governmental agency, and "[i]f specific information comes to the auditor's attention that provides evidence concerning the existence of possible illegal acts that could have a material indirect effect on the financial statements, the auditor should apply audit procedures specifically directed to ascertaining whether an illegal act has

occurred." *Id.* ¶ 89. "Those procedures include inquiries of management," and the outcome of an auditor's investigation may require it "to issue an adverse or qualified opinion, disclaim an opinion, or withdraw from the engagement." *Id.* According to Plaintiffs, "it would not have been possible for Friedman to have complied with the applicable professional standards in connection with its consent to inclusion of its audit report[] due to the detention of [Baosheng]'s executives and managers." *Id.* ¶ 90. Plaintiffs argue that Friedman failed to comply with professional standards either by not uncovering that Baosheng's "executives and managers were no longer running [Baosheng] and it had suspended operations as a result of the investigation by Chinese authorities," *id.* ¶ 91, or by having uncovered that information but "nonetheless providing consent to the inclusion of its unqualified audit reports and fail[ing] to disclose that material fact about its inquiry as well as the material facts it had learned that do not fairly align with its audit report and consent," *id.* ¶ 92.

Plaintiffs point as well to the following statements contained in Friedman's certification of Baosheng's 2018 and 2019 financial statements, which were included in the Registration Statement and Prospectus:

- "On an ongoing basis, management reviews these estimates and assumptions using the currently available information. Changes in facts and circumstances may cause [Baosheng] to revise its estimates." *Id.* ¶ 93(a).

- "Management reviews the adequacy of the allowance for doubtful accounts on an ongoing basis, using historical collection trends and aging of receivables. Management also periodically evaluates individual customer's financial condition, credit history and the current economic conditions to make adjustments in the allowance when necessary." *Id.* ¶ 93(b).

- Repeated references to "Ms. Wenxiu Zhong, the chairperson of [Baosheng]'s board of directors and the chief executive officer ('CEO') of the [Baosheng]." *Id.* ¶ 93(c).

Plaintiffs allege that these statements were materially false or misleading because "[Baosheng's] management team, including the CEO who prepared these financial statements

that Friedman certified, were detained or in hiding as a result of the investigation by Chinese authorities," *id.* ¶ 94(a); "[Baosheng] was being run at the time of the IPO by an undisclosed non-management, non-director stockholder," *id.* ¶ 94(b); and the investigation by Chinese authorities "had caused the company to suspend operations in the months leading up to IPO," *id.* ¶ 94(c).

### F.  The Underwriter Defendants' and Auditor Defendants' Alleged Negligence

Plaintiffs contend that the Underwriter Defendants and Friedman, which "assisted [Baosheng] with its securities filings," were "negligent in failing to correct [Baosheng's] securities filings to prevent a material misstatement or omission" "[g]iven the significant disruption caused by the investigation into [Baosheng] by Chinese authorities."  TAC ¶ 102.

As to the Underwriter Defendants, Plaintiffs contend that Univest, Benchmark, and WestPark "would or should have been in direct communication with [Baosheng]'s directors and senior executives in preparing for the IPO," *id.* ¶¶ 104, 109, and thus "would or should have known that [Baosheng] was under investigation due to the material operational disruptions caused by the Chinese authorities' investigation and from conversation with [Baosheng]'s executives," *id.* ¶¶ 106, 111.  Accordingly, Plaintiffs assert that the Underwriter Defendants were "at least negligent in failing to conduct adequate diligence or investigation into the accuracy of the Registration Statement and Prospectus when it became clear that [Baosheng] was under investigation."  *Id.* ¶¶ 107, 112.

As to the Auditor Defendants, Plaintiffs contend that "[h]ad Friedman performed the required procedures in accordance with applicable professional standards, it would have discovered that [Baosheng] was under investigation, that it had suffered material operational disruptions due to the Chinese authorities' investigation, that its management team was detained by and/or in hiding from the Chinese authorities, and would have learned that

17

[Baosheng]'s relationship with its largest client was at risk." *Id.* ¶ 125.  Accordingly, Plaintiffs assert that "Friedman was at least negligent in failing to (i) adhere to PCAOB auditing standards; and/or (ii) conduct adequate diligence or investigation in connection with the Registration Statement." *Id.* ¶ 126.  Plaintiffs' initial complaint did not name Friedman as a Defendant because Plaintiffs were under the impression that Marcum and Friedman had fully merged into one entity in 2022 based on various public statements. *See id.* ¶ 122.  For example, Marcum announced in a press release on May 3, 2022, that "Friedman will merge into Marcum," *id.* ¶ 115, and in another press release on September 6, 2022, that "[t]he previously announced merger of [Marcum] and [Friedman] is now complete, effective as of September 1," *id.* ¶ 116 (first alteration in original).  Moreover, Friedman's Twitter and LinkedIn pages state that "[e]ffective September 1, 2022, Friedman LLP is now Marcum," *id.* ¶ 117, and a Baosheng registration statement, filed August 8, 2023, states that "[Friedman] was merged with [Marcum] on September 1, 2022," *id.* ¶ 118, and that "Friedman had 'filed its application to withdraw [its] PCAOB registration on December 30, 2022," *id.* ¶ 119.[2]

## II.    Procedural History

Plaintiffs initiated this action on February 1, 2024.  *See* Dkt. 1.  On March 5, 2024, Plaintiffs filed an amended complaint as of right, adding Friedman as a Defendant, *see* Dkt. 26, and on April 24, 2024, Plaintiffs filed a second amended complaint (the "SAC") with minor revisions, *see* Dkts. 77-1, 82, after obtaining permission from the Court and the consent of all served Defendants, *see* Dkts. 77, 78.

---

[2] Although the TAC states that Friedman's PCAOB withdrawal request "is currently pending," *id.* ¶ 120, the PCAOB's Registration, Annual, and Special Reporting System lists May 7, 2024, as the withdrawal date of Friedman's registration, *see* Firm Summary for Friedman LLP, Pub. Co. Acct. Oversight Bd.: Registration, Ann. & Special Reporting Sys., https://rasr.pcaobus.org/Firms/FirmSummaryPublic.aspx?FirmID=DDCDC381991E5D65622 02DCC55FECBC5 [https://perma.cc/4E45-T7KB].

After Defendants moved to dismiss the SAC, *see* Dkts. 97, 100, 103, 113, Plaintiffs moved for leave to file the TAC, which attached the call transcript as an exhibit, added new factual allegations and the breach-of-contract claim, and removed Orient and Union's securities claims, *see* Dkts. 118, 120-2.  The Court subsequently denied Defendants' pending motions to dismiss the SAC as moot, *see* Dkts. 122, 126, granted Plaintiffs' motion for leave to file the TAC, *see* Dkt. 127, and dismissed Orient and Union's securities claims without prejudice, *see id.*  Plaintiff filed the TAC on November 1, 2024.  *See* TAC.

On December 20, 2024, Defendants filed motions to dismiss in five groups: (1) the Underwriter Defendants brought a Rule 12(b)(6) motion, *see* Dkt. 136; Dkt. 139 ("Underwriters Br."); (2) Defendants Wenxiu Zhong, Sheng Gong, Yue Jin, and Yanjun Hu brought a motion to dismiss under Rules 12(b)(2) and 12(b)(6), *see* Dkt. 137; Dkt. 138 ("CEO Br."); (3) Baosheng seeks to dismiss the TAC under Rule 12(b)(6),[3] *see* Dkt. 140; Dkt. 145 ("Baosheng Br."); (4) the Auditor Defendants similarly seek to dismiss under Rule 12(b)(6), *see* Dkt. 141; Dkt. 144 ("Auditors Br."); and (5) the Independent Director Defendants move to dismiss under Rules 12(b)(2) and 12(b)(6), *see* Dkt. 146; Dkt. 147 ("Ind. Dir. Br.").  On February 7, 2025, Plaintiffs filed an omnibus opposition to Defendants' motions to dismiss, *see* Dkt. 154 ("Opp."), and on March 7, 2025, Defendants filed their reply briefs, *see* Dkt. 158

---

[3] Baosheng's Notice of Motion to Dismiss also cites to Rule 12(b)(1), *see* Dkt. 140, but Baosheng's Memorandum of Law does not cite to Rule 12(b)(1) or otherwise address subject matter jurisdiction, *see* Dkt. 154.  Assuming that Baosheng's citation to Rule 12(b)(1) refers to its statute-of-limitations defense, the Court will assess that defense under Rule 12(b)(6), which is the proper vehicle for challenging the timeliness of the Securities Act claims asserted here.  *See Adams v. Crystal City Marriott Hotel*, No. 02-cv-10258 (PKL), 2004 WL 744489, at *2 (S.D.N.Y. Apr. 6, 2004) ("Rule 12(b)(6) provides the most appropriate legal basis for a motion to dismiss on statute of limitations grounds, because expiration of the statute of limitations presents an affirmative defense."); *see, e.g.*, *In re Alstom SA*, 406 F. Supp. 2d 402, 407 (S.D.N.Y. 2005) (assessing defenses based on Securities Act's statute of limitations under Rule 12(b)(6)).

("Auditors Reply"), Dkt. 160 ("CEO Reply"); Dkt. 161 ("Underwriters Reply"); Dkt. 162

("Ind. Dir. Reply"); Dkt. 163 ("Baosheng Reply").  On July 8, 2025, the Court held oral

argument on the pending motions to dismiss.  *See* Dkt. 178 ("Oral Arg. Tr.").

## LEGAL STANDARDS

### I.    Rule 12(b)(2)

"On a motion to dismiss for lack of personal jurisdiction, the 'plaintiff bears the

burden of establishing that the court has jurisdiction over the defendant.'"  *SEC v. Straub*, 921

F. Supp. 2d 244, 251 (S.D.N.Y. 2013) (quoting *In re Magnetic Audiotape Antitrust Litig.*, 334

F.3d 204, 206 (2d Cir. 2003) (per curiam)).  "[T]he showing a plaintiff must make to defeat a

defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the

procedural posture of the litigation.'"  *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 751

(S.D.N.Y. 2017) (alteration in original) (quoting *Dorchester Fin. Sec., Inc. v. Banco BRJ,*

*S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam)).  "[P]rior to discovery, Plaintiffs must make

a *prima facie* showing that jurisdiction exists."  *Mucha v. Volkswagen Aktiengesellschaft*, 540

F. Supp. 3d 269, 282 (E.D.N.Y. 2021) (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*,

883 F.3d 68, 81 (2d Cir. 2018)), *aff'd sub nom. Mucha v. Winterkorn*, No. 21-1511, 2022 WL

774877 (2d Cir. Mar. 15, 2022) (summary order). "[T]he plaintiff's prima facie showing may

be established solely by allegations."  *In re Braskem*, 246 F. Supp. 3d at 751 (quoting

*Dorchester*, 722 F.3d at 84).  The district court must "construe[] the pleadings and affidavits

in the light most favorable to plaintiffs, resolving all doubts in their favor," but "'will not

draw argumentative inferences in the plaintiff's favor' and need not 'accept as true a legal

conclusion couched as a factual allegation.'"  *Id.* (first quoting *Dorchester*, 722 F.3d at 85;

and then quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013)).

## II.    Rule 12(b)(6)

"To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hudson Shore Assocs. Ltd. P'ship v. New York*, 139 F.4th 99, 106 (2d Cir. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "In making this assessment, 'a court must "accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally."'" *Xeriant, Inc. v. Auctus Fund LLC*, 141 F.4th 405, 411 (2d Cir. 2025) (quoting *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009)).  In addition to the complaint and the facts alleged therein, a court considers "written instruments attached, statements incorporated by reference, . . . public disclosure documents filed with the SEC," and "items of which it has taken judicial notice." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019) (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).  "If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control[s], and the court need not accept the allegations in the complaint as true." *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013) (quoting *Poindexter v. EMI Rec. Grp. Inc.*, No. 11-cv-00559 (LTS), 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012)).

On a Rule 12(b)(6) motion, "pleadings are typically subject to [Rule] 8," which "requir[es] a 'short and plain statement of the claim.'" *Gamm*, 944 F.3d at 462 (quoting Fed. R. Civ. P. 8).  "This is understood to require 'more than an unadorned, the[-]defendant-unlawfully-harmed-me accusation' but does not require 'detailed factual allegations.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).  Claims of fraud, however, are subject to Rule 9(b) and "must be 'state[d] with particularity.'" *Id.* (alteration in original) (quoting Fed. R. Civ.

P. 9(b)).  The Second Circuit "ha[s] held that Rule 9(b) and the PSLRA require a securities-fraud complaint to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Id.* (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

## DISCUSSION

The Court will address Defendants' threshold arguments regarding personal jurisdiction, the statute of limitations, and the proper pleading standard before turning to the merits of Plaintiffs' securities and contract claims.  First, the Court will defer ruling on the Individual Defendants' motions to dismiss for lack of personal jurisdiction under Rule 12(b)(2) pending rebriefing from the parties.  Second, the Court finds that Golden's Securities Act claims are not time-barred.  Third, the Court determines that Rule 8, not Rule 9(b), supplies the appropriate pleading standard for Golden's Securities Act claims.  Lastly, the Court concludes that Golden has failed to state a claim under section 11 against the Auditor Defendants or under section 15 against Yanjun Hu and the Independent Director Defendants, but has adequately stated claims under section 11, section 12(a)(2), section 15, and New York law against all other applicable Defendants.

### I.    Personal Jurisdiction

Section 22 of the Securities Act "authorizes nationwide service of process," *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 349 (S.D.N.Y. 2019) (citing 15 U.S.C. § 77v(a)), and confers personal jurisdiction over nonresident defendants "to the extent that the Due Process Clause of the Fifth Amendment permits," *In re Alstom SA*, 406 F. Supp. 2d 346, 398 (S.D.N.Y. 2005).  Under the Fourteenth Amendment, "[t]he due process test for personal jurisdiction has two related components: the 'minimum contacts inquiry' and the

'reasonableness' inquiry." *Straub*, 921 F. Supp. 2d at 252 (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)). And, until just a few months ago, the Fifth Amendment analysis was "basically the same." *Fuld v. Pal. Liberation Org.*, 82 F.4th 74, 86 (2d Cir. 2023) (citation omitted), *rev'd and remanded*, 145 S. Ct. 2090 (2025); *see id.* at 86 n.6 (explaining that "the analysis under the Fourteenth Amendment is limited to the defendant's contacts with the forum state, while the Fifth Amendment permit[ted] consideration of the defendant's contacts with the United States as a whole").

This past term, however, the Supreme Court extinguished this line of Second Circuit precedent and "decline[d] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment." *Fuld*, 145 S. Ct. at 2105. Observing that "[t]he Constitution confers upon the Federal Government — and it alone — both nationwide and extraterritorial authority," *id.* at 2104, the Supreme Court reasoned that "it makes little sense to mechanically import the limitations that the Fourteenth Amendment imposes on the authority of *state* courts, which is restricted consonant with the States' more constrained sovereign spheres," *id.* at 2105. Instead, "the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* at 2105. The Court did not "delineate the outer bounds of the Federal Government's power, consistent with due process, to hale foreign defendants into U.S. courts," *id.* at 2106, nor did it decide whether the Fourteenth Amendment's reasonableness inquiry was still "constitutionally required" under the Fifth Amendment. *Id.* at 2109.

The Individual Defendants assert that the Supreme Court's decision in *Fuld v. Palestinian Liberation Organization* should not control this Court's analysis of personal jurisdiction in this case. *See* Dkt. 177 at 2-3. They argue, instead, that courts in this Circuit

must still consider "three recognized bases for exercising jurisdiction over a foreign defendant" under the Securities Act, namely whether the foreign defendant (1) "does business in the forum," (2) "does an act in the forum," or (3) "causes an effect in the forum by an act done elsewhere." *Id.* (quoting *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 134 (S.D.N.Y. 2021)).  The Second Circuit first applied these bases in *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir. 1972), in considering the due-process limits of personal jurisdiction over nonresident defendants in the context of section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.  Before propounding these three "bases," the Second Circuit quoted from the Supreme Court's decision in *Hanson v. Denckla*, 357 U.S. 235 (1958), which deemed it "essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Leasco*, 468 F.2d at 1340 (quoting *Hanson*, 357 U.S. at 253).  As the Supreme Court recently emphasized in *Fuld*, however, *Hanson* was interpreting the Fourteenth Amendment, and "purposeful availment" speaks to a defendant's contacts with the forum, a standard that has not been imported into the Fifth Amendment.  *See Fuld*, 145 S. Ct. at 2103-05. Accordingly, *Leasco*'s three "bases" for exercising jurisdiction in the securities-law context based on *Hanson* are not helpful here.

While the Court agrees with Plaintiffs that *Fuld* has broadened the due-process inquiry, *see* Dkt. 175 at 2, it would not be prudent to resolve the Individual Defendants' Rule 12(b)(2) motions based on stale briefing.  Accordingly, the Court will request rebriefing on the issue of personal jurisdiction in light of *Fuld*, as Defendants suggest, and defer ruling on the Individual Defendants' Rule 12(b)(2) motions.  *See* Dkt. 177 at 3 ("We will further brief the Court on the implications of the *Fuld* holding if applied in this action . . . ."); *cf.*

*McGraw-Hill Glob. Educ. Holdings, LLC v. Mathrani*, 295 F. Supp. 3d 404, 416 (S.D.N.Y. 2017) (noting, in context of ordering jurisdictional discovery, that district courts "have broad discretion in formulating the appropriate procedure to consider its personal jurisdiction"). Notwithstanding this, the Court will still address the arguments raised in the Individual Defendants' Rule 12(b)(6) motions. Although the Second Circuit has "traditionally treat[ed] personal jurisdiction as a threshold question to be addressed prior to consideration of the merits of a claim, that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues," *Moreira v. Société Générale, S.A.*, 125 F.4th 371, 397 n.17 (2d Cir. 2025) (quoting *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013)), such as "[i]n cases involving 'multiple defendants — over some of whom the court indisputably has personal jurisdiction — in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action,'" *ONY, Inc.*, 720 F.3d at 498 n.6 (quoting *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012)).

## II.    Statute of Limitations

The Court turns next to Defendants' argument that Golden's Securities Act claims are time-barred under section 13's one-year statute of limitations. *See* 15 U.S.C. § 77m. "Because the statute of limitations is an affirmative defense, Defendants carry the burden of showing that Plaintiff failed to plead timely claims." *Horowitz v. Sunlands Tech. Grp.*, No. 19-cv-03744 (LDH) (RML), 2022 WL 4392401, at *4 (E.D.N.Y. Sept. 21, 2022) (citing *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008)). As set forth below, the Court finds that Defendants have not carried this burden.

Section 13 provides that claims under the Securities Act must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. "A securities-law

violation is discovered when the plaintiff learns 'sufficient information about [the violation] to . . . plead it in a complaint' with enough 'detail and particularity to survive a [Rule] 12(b)(6) motion to dismiss.'" *Fed. Hous. Fin. Agency ex rel. Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017) (first alteration and omission in original) (quoting *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)). "'[W]hen the circumstances would suggest . . . the probability that' a violation of the securities laws has occurred," courts "deem the plaintiff on inquiry notice and assume that a reasonable person in his or her shoes would conduct further investigation into the potential violation." *Id.* (alteration and omission in original) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005)). "[T]he limitations period begins to run only when, in the course of that investigation, the reasonable plaintiff would have discovered sufficient information to plead a securities-law violation adequately." *Id.* (citing *Merck & Co. v. Reynolds*, 559 U.S. 633, 651 (2010)).

Baosheng contends that Golden was on inquiry notice of a potential securities-law violation in September 2021, when Baosheng notified investors that it had lost revenue due to the nonrenewal of Sogou's agency agreement after it expired in March 2021. *See* Baosheng Br. at 20; *see* Dkt. 143-10 at 7, 10. The Individual Defendants similarly argue that Golden was put "on notice of potential wrongdoing based on . . . Baosheng's public filings" from 2021 and 2022 that disclosed the failure to secure renewal of Sogou's agency agreement and subsequent losses in revenue. CEO Br. at 12; Ind. Dir. Br. at 12; *see* Dkt. 143-11 (Cayman Islands winding-up petition filed by Plaintiffs in April 2024 referencing Baosheng's filings from 2021 and 2022). The Court is not persuaded.

While a reasonable investor certainly could have surmised that the loss of Sogou was the result of possible wrongdoing, Baosheng's public filings do not suggest any probable

wrongdoing. *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 285 (S.D.N.Y. 2009) ("[S]torm warnings" triggering the duty to investigate "exist only when the available information makes wrongdoing 'probable, not merely possible.'" (quoting *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006), *abrogated in other part by Merck*, 559 U.S. 633)).  Because Baosheng's disclosures warned that the renewal of Sogou's contract upon expiration was not guaranteed, *see, e.g.*, Registration Statement at 18, the fact of Sogou's nonrenewal would not, without more, have alerted a reasonable investor that Baosheng's IPO disclosures might have been misleading, *see Jiajia Luo v. Sogou, Inc*., 465 F. Supp. 3d 393, 411 (S.D.N.Y. 2020) (noting that a Securities Act claim is not viable where a disclosure "warns of the exact risk that later materialized" but may be viable "where a disclosure, while technically accurate, disproportionately communicated the severity of the risk posed" (citation omitted)). Similarly, a reasonable investor could not have found it surprising — let alone suggestive of wrongdoing — that the loss of Sogou resulted in a decline in revenue.  *See, e.g.*, Registration Statement at 18 ("Any failure to renew these agency agreements . . . may have a material adverse impact on our results of operations."); *id.* at 105 (disclosing that Sogou accounted for 82.9% of Baosheng's revenue during the first six months of 2020 and acknowledging Baosheng's "reliance on Sogou").

Even if Baosheng's public filings were enough to put a reasonable investor on inquiry notice of potential wrongdoing, Defendants have failed to establish "when, in the course of [further] investigation, the reasonable plaintiff would have discovered sufficient information to plead a securities-law violation adequately."  *Nomura*, 873 F.3d at 119.  Baosheng argues that, "[a]s a shareholder, Golden could have taken steps to request, obtain, and inspect Baosheng's books and records or made other efforts to assess whether there was cause for concern immediately upon the loss of Sogou as a customer," Baosheng Br. at 20, but

Baosheng has provided no evidence of what a reasonable plaintiff would have found in those books and records.  And, as Plaintiffs note, the Registration Statement expressly stated that ordinary shareholders would "have no general right under the Cayman Companies Law to inspect or obtain copies of [Baosheng's] . . . corporate records" (with some exceptions). Registration Statement at 133.

Accordingly, Defendants have not established that Golden should have discovered sufficient facts to plead a securities-law claim prior to Dong Hu's phone call with Yanjun Hu in June 2023.  Because Plaintiffs brought this action within a year of that call, Golden's claims under the Securities Act are not time-barred.

## III.   Pleading Standard

Before turning to the merits of Golden's Securities Act claims, the Court must determine the appropriate pleading standard.  *See In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 277 (E.D.N.Y. 2023) ("In assessing Section 11 or Section 12(a)(2) Securities Act claims, courts must 'conduct a preliminary inquiry into whether plaintiffs' allegations are premised on fraud, or merely on negligence, to determine the appropriate pleading standard.'" (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014))).  Baosheng and the Underwriter Defendants argue that Golden's claims sound in fraud and must be analyzed under Rule 9(b)'s heightened pleading standard, whereas Golden contends that Rule 8 applies because the TAC "pleads pure negligence and has disclaimed any fraud theory."  Opp. at 12; *see* Baosheng Br. at 21; Underwriters Br. at 11-12. The Court concludes that Rule 8's pleading standard applies.

"[W]hile a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b)."  *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).  "[A] plaintiff cannot

evade the requirements of Rule 9 through artful pleading," *Carpenter v. Oscar Health, Inc.*, No. 22-cv-03885 (VSB), 2025 WL 722729, at *4 (S.D.N.Y. Mar. 6, 2025) (quoting *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 401 (S.D.N.Y. 2020)), and "[c]ourts must look beyond formalisms," *In re Dentsply Sirona*, 665 F. Supp. 3d at 277 (citing *City of Omaha*, 450 F. Supp. 3d at 402)).  Accordingly, a plaintiff's express disclaimer of a fraud theory, without more, is insufficient to avoid Rule 9(b), *see Carpenter*, 2025 WL 722729, at *4 (citing *City of Omaha*, 450 F. Supp. 3d at 401), and courts must instead "consider whether 'the wording and imputations of the complaint are classically associated with fraud,'" *id.* (quoting *Rombach*, 355 F.3d at 172).

Baosheng and the Underwriter Defendants argue that the TAC sounds in fraud because Golden alleges that Defendants "knew" of material omitted facts, or that "it became clear" to the Underwriter Defendants prior to the IPO that Baosheng was under investigation.  *See* Baosheng Br. at 21; Underwriters Br. at 12.  However, allegations that a defendant knew or should have known about an undisclosed fact "are consistent with negligence," *Nayani v. LifeStance Health Grp., Inc.*, No. 22-cv-06833 (JSR), 2023 WL 3260260, at *2 (S.D.N.Y. May 4, 2023), and "are insufficient" standing alone "to establish that [a plaintiff's] claims sound in fraud," *Carpenter*, 2025 WL 722729, at *4.  In other words, "just because 'a fact was known and not disclosed does not mean, as a matter of law, that the circumstances of the resulting omission sound in fraud.'"  *In re Grab Holdings Ltd. Sec. Litig.*, No. 22-cv-02189 (JLR), 2024 WL 1076277, at *14 (S.D.N.Y. Mar. 12, 2024) (quoting *Wallace v. IntraLinks*, No. 11-cv-08861 (TPG), 2013 WL 1907685, at *12 (S.D.N.Y. May 8, 2013)); *accord Pappas v. Qutoutiao Inc.*, No. 23-1233, 2024 WL 4588491, at *2 (2d Cir. Oct. 28, 2024) (summary order); *see also Carpenter*, 2025 WL 722729, at *4 (rejecting argument that plaintiffs' claims sounded in fraud based on allegations that defendants "knew" about, but failed to disclose,

contradictory and adverse information).  More broadly, the TAC's allegations regarding Defendants' purported knowledge of undisclosed information and the existence of false and misleading statements "simply track the elements of section 11, and a plaintiff cannot be held to allege fraud whenever he tracks those elements." *Nayani*, 2023 WL 3260260, at *2; *accord In re Hub Cyber Sec. Ltd.*, No. 23-cv-05764 (AS), 2025 WL 872078, at *13 (S.D.N.Y. Mar. 20, 2025); *see also Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 559 (S.D.N.Y. 2017) ("To hold that bare recitations of the elements of the causes of action triggered Rule 9(b) would be contrary to the holding of the Court of Appeals in *Rombach*, 355 F.3d at 178, that claims under Section 11 need not sound in fraud . . . .").  *Compare* TAC ¶ 75 ("[Baosheng] knew, or should have known, that it would lose its relationship with Sogou . . . because of the Chinese authorities' investigation."), *with Wandel v. Gao*, 590 F. Supp. 3d 630, 640 (S.D.N.Y. 2022) ("For claims under Sections 11 and 12(a)(2), the duty to disclose arises only when the issuer knew — or should have known — of the omitted fact at the time the statements were made.").

To bolster their argument that Golden's Securities Act claims sound in fraud, Defendants point to two instances in the TAC where Plaintiffs employ the terms "induce" and "concealed."  Baosheng Br. at 21; Underwriters Br. at 12; *see* TAC ¶ 152 ("The Registration Statement and Prospectus were used to induce investors . . . to purchase [Baosheng] common units."); TAC ¶ 156 ("The Prospectus . . . concealed and failed to disclose material facts.").  To be sure, a claim may sound in fraud where the complaint alleges that a defendant "affirmatively chose to conceal the omitted facts at issue."  *Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 545 (S.D.N.Y. 2017).  That is, Rule 9(b) may apply where a plaintiff "allege[s] that defendants intentionally concealed information in the filing at issue," *Pappas*, 2024 WL 4588491, at *3, or "acted with a fraudulent intent . . . to conceal the

information," *Carpenter*, 2025 WL 722729, at \*4. Here, however, the Court does not interpret the TAC's isolated use of the words "conceal" and "induce" to constitute an allegation of fraudulent intent — these verbs are passively attributed to Baosheng's disclosure documents rather than to any of the Defendants, *see* TAC ¶¶ 152, 156, and the TAC expressly and repeatedly disclaims any allegation "that Defendants . . . acted with scienter or fraudulent intent," *id.* ¶¶ 134, 165. Nor does the TAC contain any other language implying fraud or its elements that does not merely track the requirements of a Securities Act cause of action. *See Pappas*, 2024 WL 4588491, at \*2 ("A plaintiff may retain the application of the Rule 8 notice pleading standard by expressly pleading negligence, disclaiming fraud, eschewing language in its Section 11 or Section 12(a)(2) claims implying fraud or the elements thereof, and separating allegations supporting fraud claims from allegations supporting negligence claims."). In sum, applying a heightened pleading standard based on the sporadic appearance of certain keywords in a nearly 200-paragraph complaint, divorced from its broader context, would be unduly formalistic and contravene the Second Circuit's requirement that courts conduct "a case-by-case analysis . . . to determine whether 'the gravamen of the complaint is plainly fraud.'" *In re Refco*, *Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (quoting *Rombach*, 355 F.3d at 172); *see City of Omaha*, 450 F. Supp. 3d at 401 ("[T]he Second Circuit made clear that this is not a formalistic inquiry."); *Sharma v. Rent the Runway, Inc.*, 751 F. Supp. 3d 82, 111 (E.D.N.Y. 2024) (declining to apply Rule 9(b) where defendants argued that the complaint was "littered with classic fraud 'buzzwords'").

Here, Golden "'carefully couch[es]' [its] claims 'in the language of negligence.'" *In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 225 (E.D.N.Y. 2022) (quoting *In re Refco,* 503 F. Supp. 2d at 632). For example, the TAC alleges that the Underwriter Defendants "fail[ed] to conduct adequate diligence or investigation into the accuracy of the

Registration Statement and Prospectus." TAC ¶ 107; *see, e.g.*, *In re Orion Sec. Litig.*, No. 08-cv-01328 (RJS), 2009 WL 2601952, at *2 (S.D.N.Y. Aug. 20, 2009) ("Allegations that an underwriter failed to conduct sufficient due diligence in connection with its role in an IPO, without more, do not sound in fraud."). The TAC further alleges that Friedman failed to "conduct adequate diligence or investigation in connection with the Registration Statement," TAC ¶ 126, and that neither Baosheng nor Univest "made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were accurate and complete in all material respects," *id.* ¶ 160. *See, e.g.*, *In re Refco*, 503 F. Supp. 2d at 632 (finding that claims sounded in negligence where "plaintiffs allege[d] that Refco's corporate officers and auditors 'did not conduct a reasonable investigation of the statements contained in the [relevant documents], and did not possess reasonable grounds for believing that the statements in those documents were true and not misleading'"). Also sounding in negligence is Golden's allegation that "[b]y virtue of [Baosheng's directors' and CFO's] failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material fact necessary to make the statements made therein not misleading." TAC ¶¶ 138; *see, e.g.*, *In re Hub Cyber*, 2025 WL 872078, at *12 (finding that claims sounded in negligence where plaintiffs alleged that "[d]efendants, in the exercise of reasonable care, should have known of the misstatements and omissions" in the relevant documents (citation omitted)). Lastly, Plaintiffs' decision not to plead any fraud claims under the Securities Exchange Act, while not dispositive, further supports the application of Rule 8 here. *See Sharma*, 751 F. Supp. 3d at 100 (applying Rule 8 to Securities Act claims and finding it "crucial that [p]laintiffs [did] not bring claims under section 10(b) of Securities Exchange Act, which would require satisfying the heightened pleading under Rule (9)(b)"); *In re Hub Cyber*, 2025 WL 872078, at *12 (applying Rule 8 to

Securities Act claims where "unlike many similar cases, plaintiffs ha[d] [not] alleged claims under section 10(b)"); *cf. Pappas*, 2024 WL 4588491, at *2 ("[A] Section 11 or Section 12(a)(2) claim joined with a Section 10(b) claim [under the Exchange Act] is subject to Rule 9(b) where the plaintiff makes only '"nominal efforts"' to plead a negligence-based claim and makes '"no effort . . . to show any other basis for the claims levied at the Prospectus"' other than that the defendant acted with scienter." (omission in original) (quoting *Rombach*, 355 F.3d at 171)).

Defendants argue that "[t]he gravity of this case" warrants the application of Rule 9(b). Oral Arg. Tr. at 65:1-3 (counsel for Baosheng); *see* Underwriters Br. at 15 (emphasizing "the magnitude and depth of the hidden facts alleged"). But even if Golden could have drawn from the gravity of the alleged behavior to assert a potential fraud claim, they specifically elected not to bring such a claim and instead brought Securities Act claims that require only negligence or strict liability. *See, e.g.*, *In re Refco*, 503 F. Supp. 2d at 632 ("[I]t is clear that plaintiffs believe that Refco and various persons associated with it, including most, if not all, of the defendants, were engaged in a massive fraud. This fact, however, does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence").[4] Thus, given Plaintiffs' clear disclaimer of fraud, the absence of a section 10(b)

---

[4] At oral argument, the Underwriter Defendants pointed the Court to *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07-cv-00976 (LAP), 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008), but the Court finds this case distinguishable. *See* Oral Arg. Tr. at 44:13-45:3. In *Ladmen*, the district court found that a Securities Act complaint sounded in fraud despite disclaiming fraud, eschewing a section 10(b) claim, and employing some language sounding in negligence. 2008 WL4449280, at *11-13. The court applied Rule 9(b) given the nature of the plaintiffs' allegations — the plaintiffs accused the defendants of deliberately withholding information regarding the rapid deterioration of their first-generation satellites in order to extract money from investors through the IPO to fund a new generation of satellites, all while blatantly and repeatedly misrepresenting the quality, functionality, and viability of its existing satellites. *Id.* at *11. In the instant case, however, the TAC does not claim that Defendants, for example, intentionally concealed the investigation to extract funds from the IPO, or engaged in a

claim, and language that tracks the requirements of sections 11 and 12 without averring fraud or its elements, the Court finds that the TAC does not sound in fraud and will analyze the TAC pursuant to Rule 8's pleading standard.

## IV.    Golden's Securities Act Claims

"Collectively, the language of sections 11 and 12(a)(2) creates three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (citing 15 U.S.C. §§ 77k(a), 77*l*(a)(2)). "Section 11 applies to registration statements, and section 12(a)(2) applies to prospectuses and oral communications," *id.* at 358, and both sections require a plaintiff to "show that the relevant communication either misstated or omitted a material fact," *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010); *see also In re Morgan Stanley*, 592 F.3d at 359 ("Claims under sections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements . . . ."). "Section 15, in turn, creates liability for individuals or entities that 'control[] any person liable" under section 11 or 12." *In re Morgan Stanley*, 592 F.3d at 358 (quoting 15 U.S.C. § 77o). "Thus, the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12." *Id*.

Baosheng and the Individual Defendants dispute whether Defendants had a duty to disclose information regarding the investigation and whether that information was material.

---

knowing and consistent campaign of lying to investors regarding the nature of Baosheng's relationship with Sogou.  Instead, Plaintiffs deliberately avoid accusing Defendants of engaging in fraudulent conduct.

The Individual Defendants also argue that a negative-causation defense bars Golden's claims as a matter of law, and that Golden has failed to plead control-person liability under section 15 as to the Independent Director Defendants and Yanjun Hu.  In addition, the Underwriter Defendants assert that they should prevail on an affirmative defense of due diligence.  Lastly, the Auditor Defendants contend that Golden has failed to allege that the Audit Report, Consents, or Financial Statements contain any actionable misstatements or omissions.  The Court addresses these arguments in turn below and concludes that Golden has stated a section 11 claim against Baosheng, the Underwriter Defendants, Wenxiu Zhong, Sheng Gong, the Individual Director Defendants, and Yue Jin; a section 12(a)(2) claim against Baosheng and Univest; and a section 15 claim against Wenxiu Zhong, Sheng Gong, and Yue Jin; but has failed to state a section 11 claim against the Auditor Defendants or a section 15 claim against the Independent Director Defendants or Yanjun Hu.

### A.  Golden's Section 11 and 12(a)(2) Claims Against Baosheng

Golden alleges that Baosheng's failure to disclose the Chinese authorities' investigation and its effects contravened SEC disclosure obligations and rendered various statements in the Registration Statement and Prospectus misleading by omission. TAC ¶¶ 134-137, 156-158.  Defendants argue in response that Baosheng had no duty to disclose a nascent investigation into uncharged regulatory noncompliance and that its offering documents sufficiently warned of the risk of losing Sogou as a client.  *See* Baosheng Br. at 10-15, 17-19; Ind. Dir. Br. at 16-21; CEO Br. at 16-21; *see also* Underwriters Br. at 10-11. As explained in more detail below, the Court finds that Golden has plausibly alleged that Baosheng had a duty to disclose the investigation and its associated risks and effects and that Baosheng's omission of that information was materially misleading notwithstanding its risk disclosures.

*1.  Item 103/Item 8.A.7 Did Not Require Disclosure*

The Court first addresses whether disclosure of the investigation and its associated

risks and effects was required under Item 103 of Regulation S-K or Item 8.A.7 of Form 20-F.[5]

Item 103 of Regulation S-K requires the disclosure of "material pending legal proceedings . . .

to which the registrant or any of its subsidiaries is a party or of which any of their property is

the subject."  17 C.F.R. § 229.103.  Similarly, Item 8.A.7 of Form 20-F requires the disclosure

of "legal or arbitration proceedings, . . . which may have, or have had in the recent past,

significant effects on the company's financial position or profitability," including

"governmental proceedings pending or known to be contemplated."  Form 20-F at 33, Sec. &

Exch. Comm., https://www.sec.gov/about/forms/form20-f.pdf [https://perma.cc/XGS6-

3G8X].  In this context, courts in this Circuit have held that an "investigation alone is not a

'pending legal proceeding' or a 'proceeding[] known to be contemplated by governmental

authorities'" that requires disclosure.  *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d

1, 19 (S.D.N.Y. 2016) (alteration in original) (quoting 17 C.F.R. § 229.103) (citing *City of*

*Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 711, 718 (S.D.N.Y.

2013)).  This is true even where the government authority has "undert[aken] different avenues

_____

[5] Although the parties refer to Item 103 and Item 8.A.7 interchangeably, Item 103 applies only
to "domestic registrants and 'foreign private issuers' that have elected to file on domestic
forms subject to Regulation S-K disclosure requirements."  Modernization of Regulation S-K
Items 101, 103, and 105, 85 Fed. Reg. 63726, 63727 n.12 (Oct. 8, 2020) (to be codified at 17
C.F.R. pts. 229, 239, 240).  Baosheng did not elect to file on domestic forms and is thus
subject to the disclosure requirements set forth in Item 8.A.7 rather than Item 103.  *See id.*;
*see, e.g.*, Baosheng Media Group Holdings Ltd., Registration Statement (Form F-1) (Aug. 30,
2020); Baosheng Media Group Holdings Ltd., Annual Report (Form 20-F) (Apr. 30, 2021).
Because Items 103 and 8.A.7 "require substantially similar disclosures with respect to
material legal proceedings, including proceedings initiated (or known to be contemplated) by
governmental authorities," 10C *Harold S. Bloomenthal & Samuel Wolff*, *International Capital*
*Markets and Securities Regulation* § 34:67 (2025), Westlaw SECINTCAP, and because the
parties rely only on authorities interpreting Item 103, the Court will treat both Items as
providing coextensive disclosure obligations.

of investigation," such as "subpoenaing documents and sworn testimony," *id.* at 18, and "is considering making a recommendation" that a lawsuit or charges be brought against the company, *id.* at 19 (citation omitted). Rather, disclosure of an investigation is not required until the "investigation matures to the point where litigation is apparent and substantially certain to occur." *Richman v. Goldman Sachs Grp.*, Inc., 868 F. Supp. 2d 261, 274-75 (S.D.N.Y. 2012); *see also id.* at 272 ("An investigation on its own is not a 'pending legal proceeding' until it reaches a stage when the agency or prosecutorial authority makes known that it is contemplating filing suit or bringing charges." (citation omitted)).

Baosheng, the Individual Defendants, and the Underwriter Defendants argue that the investigation, as of February 2021, was not a "legal proceeding" for which disclosure was required pursuant to Item 103 or Item 8.7.A. The Court agrees. Critically, Plaintiffs allege that the Chinese authorities' investigation "was not resolved until the second half of 2021, result[ing] in a fine of almost 10 million RMB." TAC ¶ 52(e). Although Yanjun Hu's representation that Baosheng was ultimately fined and treated as "an accomplice" indicates that the investigation matured, at some point, into a legal proceeding that resulted in a government penalty, *see* Call Tr. at 16:16-17:16, neither the transcript nor the TAC contains any other facts from which the Court could infer that the investigation matured to that point prior to the IPO, when disclosure would have been required under Item 103 or Item 8.7.A. Indeed, Yanjun Hu's statement that the government does not "bother companies that are not listed" undermines any such conclusion. *Id.* at 18:30. And while Yanjun Hu initially stated that members of Baosheng's senior management were "arrested" prior to the listing, *see id.* at 12:58-13:28, he later clarified that "[i]t wasn't actually called 'arrest,'" and that "[t]hey were all just called in to cooperate with the investigation," *id.* at 17:21-17:31, which suggests that the investigation had not yet matured prior to the IPO. Even if this "cooperation" entailed

a period of detention by the Chinese authorities, the TAC provides no context regarding the Chinese legal system or any other information from which the Court could infer that the detention of a company's executives to cooperate with such an investigation means that the imposition of a fine, formal charges, or other legal action has occurred or is "substantially certain to occur." *In re Lions Gate*, 165 F. Supp. 3d at 12 (quoting *Richman*, 868 F. Supp. 3d at 274); *see In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 471 (S.D.N.Y. 2006) ("With respect to a company's failure to disclose impending litigation, there is no requirement 'to make disclosures predicting such litigation,' absent an allegation that the litigation 'was substantially certain to occur during the relevant period.'" (quoting *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006) (summary order))); *Richman*, 868 F. Supp. 2d at 273 ("[D]efendants [a]re not bound to predict as the 'imminent' or 'likely' outcome of the investigations that indictments of [the company] and its chief officer[s] would follow . . . ." (second, third, and fourth alterations in original) (quoting *Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241, 248 (E.D.N.Y.1989))).  Given the absence of any clear timeline of the investigation or any other facts from which the Court could draw the plausible inference that the investigation had matured into formal legal action against Baosheng prior to the IPO — rather than at some later time — the Court finds that there was no duty to disclose the investigation as a "legal proceeding" under Item 103 or Item 8.7.A.

### 2. Item 303/Item 5 Required Disclosure

This does not end the inquiry, however, as the disclosure of a pending investigation and related developments may still be required under Item 303 of Regulation S-K or the

analogous Item 5 of Form 20-F.[6]  *See, e.g.*, *City of Westland*, 928 F. Supp. 2d at 718 (finding

duty to disclose government investigation under Item 303 but not under Item 103); *see also*

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95-96, 95 n.8 (2d Cir. 2016) (holding that

Item 303 required disclosure where company faced "serious, ongoing criminal and civil

investigations," *id.* at 95 n.8).  Indeed, Golden's Item 303 theory is broader than its Item 103

theory insofar as it does not hinge on the definition of a "legal proceeding."  Specifically, the

TAC "alleges that [Baosheng] and its management knew of the investigation and its ongoing

materially detrimental effects on [Baosheng]'s operations and the fact that the investigation

jeopardized its relationship with Sogou."  Opp. at 34 (citing TAC ¶¶ 44, 47-48, 54, 63).  With

this in mind, the Court agrees with Plaintiffs that the TAC plausibly alleges that disclosure

was required under Item 303.

Item 303 provides that a registrant must "[d]escribe any known trends or

uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable

impact on . . . revenues or income from continuing operations."  *Panther Partners Inc. v.*

*Ikanos Commc'ns., Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (alteration and omissions in

original) (quoting 17 C.F.R. § 229.303(b)(2)(ii)).  "[T]he essential obligation imposed by Item

303 is to explain . . . '[i]f there has been an important change in [the] company's business or

---

[6] Although "'Item 303 does not apply to foreign corporations[,]' . . . 'the SEC has stated that
its interpretations of Item 303 apply to . . . disclosures drafted pursuant to Item 5 of Form
20-F, which does apply to foreign corporations.'"  *Willard v. UP Fintech Holding Ltd.*, 527 F.
Supp. 3d 609, 619 n.5 (S.D.N.Y. 2021) (quoting *Panther Partners Inc. v. Jianpu Tech. Inc*.,
No. 18-cv-09848 (PGG), 2020 WL 5757628, at *7 n.5 (S.D.N.Y. Sept. 27, 2020)).
"Accordingly, like the parties, the Court will treat Form F-1," which incorporates the
"requirements of Item 5 of Form 20-F, . . . 'as calling for the same disclosure as Item 303 of
Regulation S-K.'"  *Id.* (quoting *Panther Partners*, 2020 WL 5757628, at *7 n.5); *see also*
*Tseng v. De Vries*, No. 22-2787, 2023 WL 8073087, at *1 n.2 (2d Cir. Nov. 21, 2023)
(summary order) (noting that "Item 5 of Form 20-F is the analogue of Item 303 for foreign
corporations" and assuming without deciding that "the duties arising under Item 5(D) are
identical to those arising under Item 303").

environment that significantly or materially decreases the predictive value of [the] reported results' so as to prevent 'the latest reported results from misleading potential investors.'" *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 (S.D.N.Y. 2021) (second, third, and fourth alterations in original) (quoting *Lowinger v. Pzena Inv. Mgmt., Inc.*, 341 F. App'x 717, 720 (2d Cir. 2009) (summary order)).  Accordingly, Item 303 requires a plaintiff to allege "that 'a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'"  *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 599 (S.D.N.Y. 2022) (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011)), *aff'd sub nom. Tseng v. De Vries*, No. 22-2787, 2023 WL 8073087 (2d Cir. Nov. 21, 2023) (summary order); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 510 (S.D.N.Y. 2013) ("[A]n issuer has a duty to disclose any trend, event or uncertainty that is 'known and existing at the time of the IPO' that 'was reasonably likely to have a material impact' on the issuer's financial condition," and "'whether, and to what extent' that known trend, event or uncertainty that 'might reasonably be expected to materially impact . . . future revenues.'"  (omission in original) (quoting *Panther Partners*, 681 F.3d at 121)).

First, the Court finds that Plaintiffs have plausibly alleged that Baosheng and its management had actual knowledge, prior to the IPO, of the ongoing government investigation, the resulting detention of Baosheng and Sogou executives, and the subsequent suspension or interruption of Baosheng's operations.  These allegations are plausible based on a reading of the transcript that draws all reasonable inferences in Plaintiffs' favor. Specifically, Yanjun Hu explained that "[a] month or two before the company was listed," up to ten members of Baosheng's senior management were "arrested on the spot," or at least detained for questioning to cooperate with an investigation into Sogou or Baosheng's

involvement with Sogou, and that "[a]fter the arrests, the entire company's operations were suspended." Call Tr. at 12:58-13:28.[7]  Although there is some ambiguity as to whether "the entire company[]" refers to Sogou or Baosheng because Hu refers to both companies in the preceding two sentences, *see id.*, the Court "must . . . construe ambiguities in the light most favorable to upholding the plaintiff's claim," *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).  Similarly, there are some ambiguities as to the timeline of the investigation, but these must also be resolved in Plaintiffs' favor.  For example, Hu stated that he "handle[d] this matter . . . after the listing," Call Tr. at 15:39-44, which the Underwriter Defendants rely on to argue that Baosheng was not a target of the investigation until after the IPO, *see* Underwriters Br. at 1, 5, 7.  However, Hu then added that "everything was taken care of at the second half of 2021," Call Tr. at 15:44, which Plaintiffs interpret to mean that Hu "handled the fine and fallout" after the IPO, but not necessarily that "everything related to the investigation 'occurred' in the second half of 2021."  Opp. at 31 (emphasis omitted).  Plaintiffs' interpretation is reasonable and consistent with Hu's representation that at least three members of Baosheng's management team were brought in to cooperate with the government prior to the IPO.  Call Tr. at 13:28, 17:31.  Construing these ambiguities and drawing all reasonable inferences in Plaintiffs' favor, the Court finds it plausible based on the transcript

---

[7] Baosheng cites to *Menora Mivtachim Insurance v. International Flavors & Fragrances Inc.* to call into question the reliability of Yanjun Hu's representations.  *See* Baosheng Br. at 11-12. But *Menora* is not useful here, as that decision was specifically opining on a complaint's reliance on "confidential witnesses who lacked firsthand knowledge of [the company]'s operations and simply relayed hearsay to plaintiffs' counsel."  No. 19-cv-07536 (NRB), 2021 WL 1199035, at *11 (S.D.N.Y. Mar. 30, 2021), *aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022).  Here, in contrast, Yanjun Hu is not a confidential witness, and Hu's representations are based on his plausibly alleged firsthand knowledge of Baosheng's operations — not hearsay.  The Court likewise finds inapposite *Rapoport v. Asia Electronics Holding Co.*, where the court dismissed a securities complaint based on the "[p]laintiffs' unconvincing reliance on [a] newspaper article" to contend that the defendants violated Chinese law.  88 F. Supp. 2d 179, 185 (S.D.N.Y. 2000).

that Baosheng's operations were suspended or substantially interrupted at some point prior to the IPO due to the investigation.  *See also Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 313 (S.D.N.Y. 2018) (declining to resolve "battle of competing inferences" on motion to dismiss); *Merryman v. J.P. Morgan Chase Bank, N.A.*, No. 15-cv-09188 (VEC), 2016 WL 5477776, at *9 (S.D.N.Y. Sept. 29, 2016) ("[T]he Court cannot pick between equally plausible scenarios when deciding a motion to dismiss." (collecting cases)).

Second, the Court finds that Plaintiffs have plausibly alleged that the investigation, prior to the IPO, already "had" or was "reasonably likely to have" a material effect on Baosheng's financial condition or results of its operations.  *Willard*, 527 F. Supp. 3d. at 619 (quoting 17 C.F.R. § 229.303(b)(2)(ii)); *see Garnett*, 632 F. Supp. 3d at 599.  While Item 103 requires disclosure of a pending investigation if legal action is "substantially certain to occur," *In re Lions Gate*, 165 F. Supp. 3d at 12 (quoting *Richman*, 868 F. Supp. 3d at 274), Item 303 requires disclosure of a pending investigation if any material impact on the company — not just legal action — already occurred or was "reasonably likely to occur," *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 88-89 (S.D.N.Y. 2017) (citation omitted).

Baosheng contends that Item 303, like Item 103, did not require the company to accuse itself of wrongdoing, *see* Baosheng Br. at 15, but this misapprehends the relevant inquiry.  Plaintiffs do not allege, for purposes of Item 303, that the investigation was reasonably likely to result in government fines or a finding of wrongdoing against Baosheng (even if it ultimately did), but rather that "the investigation *already* had a materially negative effect on [Baosheng], including suspending its operations and jeopardizing its relationship with Sogou."  Opp. at 35.  For this reason, the Underwriter Defendants' argument that Baosheng should not have been expected to predict the exact consequences of the

investigation falls flat.  *See* Underwriters Br. at 10-11.  Even if Baosheng "was uncertain about [the] likely effect" of the investigation, the company was still "required under Item 303 to 'disclose the manner in which [it] might reasonably be expected to materially impact' [the company's] future revenues." *Ind. Pub. Ret. Sys.*, 818 F.3d at 96 (quoting *Litwin*, 634 F.3d at 719); *see also Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 644 (S.D.N.Y. 2017) (finding that defendants' uncertainty "about the likely effect" of known tax law changes did not excuse failure to disclose under Item 303).  At bottom, the Court finds it plausible that a government investigation into Baosheng's largest client for possible violations of Chinese law, which resulted in the detention of three to ten Baosheng executives as at least cooperators and was expansive enough to interrupt Baosheng's operations even briefly, created a reasonably likely risk that Sogou would sever its relationship with Baosheng, which would have a material impact on the company.

    *Indiana Public Retirement System v. SAIC, Inc.*, is instructive.  In that case, the plaintiffs had adequately pleaded that the company had actual knowledge that a manager was engaged in a fraudulent scheme and was facing related ongoing investigations that "subjected it to numerous undisclosed risks" such as potential harm to its relationships with customers that "would adversely affect its current business, as well as its future revenues and growth prospects."  818 F.3d at 94 (citation omitted); *see id.* at 95 n.8.  Although the company had already lost a contract with a major customer prior to the IPO (unlike here), the Second Circuit also emphasized the company's "possible exposure to . . . liability arising from the [fraud] and the resulting risk of loss of revenue from *future* contracts."  *Id.* at 96 (emphasis added).  The court ultimately held that even if the company was "aware of the fraud" prior to the filing of its annual report but "uncertain about its likely effect," Item 303 still required

disclosure. *Id.* at 95-96.[8]  In the instant case, Plaintiffs have similarly plausibly alleged that

the investigation and its possible consequences posed a "risk of loss of revenue from future

contracts," *id.* at 96, namely, the agency agreement with Sogou, "which accounted for 82.3%

of [the company]'s revenue in the year prior to its IPO," TAC ¶ 52(f).  Baosheng was required

under Item 303 to disclose such a risk, even if it could not predict with certainty the outcome

of the investigation.  *See also Panther Partners*, 681 F.3d at 121-22 (holding that known

defect in company's product, which, among other things, "jeopardized [the company's]

relationship with clients who at that time accounted for the vast majority of its revenues,"

created uncertainties for which disclosure was required under Item 303, even if precise scope

of defect was not yet known).

### 3.   The TAC Pleads that the Omissions Were Material and Baosheng's Risk Disclosures Were Insufficiently Curative

"Materiality is an 'inherently fact-specific finding' that is satisfied when a plaintiff

alleges 'a statement or omission that a reasonable investor would have considered significant

in making investment decisions.'"  *Litwin*, 634 F.3d at 716-17 (first quoting *Basic Inc. v.*

*Levinson*, 485 U.S. 224, 236 (1988); and then quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d

154, 161 (2d Cir. 2000)).  In other words, materiality "is established 'when there is "a

substantial likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information made

available."'"  *Garnett*, 632 F. Supp. 3d at 596 (quoting *Matrixx Initiatives, Inc. v. Siracusano*,

563 U.S. 27, 38 (2011)).  "As the Second Circuit has noted, '[w]here the principal issue is

materiality, an inherently fact-specific finding, the burden on plaintiffs to state a claim [under

---

[8] Although *Indiana Public Retirement System* involved a section 10(b) claim rather than a section 11 or 12(a)(2) claim, the Second Circuit's analysis of the scope of Item 303's disclosure obligations did not turn on scienter or other considerations specific to section 10(b).

Sections 11 and 12(a)(2)] is even lower' than the burden to allege the existence of an omission or misstatement." *Id.* at 597 (alterations in original) (quoting *Litwin*, 634 F.3d at 718). Accordingly, "[a] plaintiff who plausibly pleads an unlawful omission comes close to stating a section 11 claim because materiality 'will rarely be dispositive in a motion to dismiss.'" *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (quoting *In re Morgan Stanley*, 592 F.3d at 360)).

Defendants argue that the omission of the investigation was not material because the Registration Statement and Prospectus specifically disclosed the risk of losing Sogou as a client, so further disclosure would not have significantly altered the total mix of information available to investors. *See, e.g.*, Baosheng Br. at 18-19; Ind. Dir. Br. at 20-21. They point, for example, to the Prospectus, which "identified Sogou as a 'top customer,' the risk of its revenue concentration with Sogou, various efforts to 'mitigate' the company's 'over-reliance' on Sogou, and even the risk of liability and business interruptions for their *customers'* non-compliance with the Advertising Laws," Baosheng Br. at 18 (quoting Prospectus at 21, 22, 26, 105), and "disclosed that Baosheng's agency agreement with Sogou was subject to annual renewal and that there was no guarantee of renewal, which could have a material impact on Baosheng's operations," *id.* at 18-19 (citing Prospectus at 15-16, 18). Plaintiffs respond that "[t]hese risk disclosures are not only insufficient, but themselves constitute a material misstatement of fact." Opp. at 39. The Court agrees with Plaintiffs.

"[W]hen a registration statement warns of the exact risk that later materialized, a Section 11 claim will not lie as a matter of law," although "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Horowitz v. Sunlands Tech. Grp.*, No. 19-cv-03744 (FB) (SMG), 2021 WL 1224517, at *3 (E.D.N.Y. Mar. 31, 2021) (second alteration in original) (first quoting *In re ProShares*, 728

F.3d at 102; and then quoting *Rombach*, 355 F.3d at 173).  Moreover, "[c]ourts in this Circuit have held that a company's purported risk disclosures are misleading" — and independently actionable — "where the company warns only that a risk may impact its business when that risk has already materialized."  *In re Facebook*, 986 F. Supp. 2d at 516 (collecting cases); *see Jiajia Luo*, 465 F. Supp. 3d at 407 ("'Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.'  'Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate.'" (first quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014); and then quoting *In re Morgan Stanley*, 592 F.3d at 366)).

As explained above, Plaintiffs have plausibly alleged that the reasonably likely risk of losing Sogou as a client due to the investigation was already apparent at the time of the IPO, and Baosheng's warnings about the risk of losing its clients were framed hypothetically and did not capture the presently increased likelihood of the risk of losing Sogou.  *See, e.g.*, TAC ¶ 75 ("*[I]f* we fail to maintain our relationships with our business stakeholders, mainly advertisers and media, our business, results of operations, financial condition and business prospects *could* be materially and adversely affected." (quoting Prospectus at 15; Registration Statement at 15)); *id.* ¶ 76 ("[C]ertain customers contributed to a significant percentage of our total revenue . . . and losing one or more of them *could* result in a material adverse impact on our financial performance and business prospects." (quoting Prospectus at 18; Registration Statement at 18).  "'[B]ecause [Baosheng]'s statements were hypothetical' and the warned-of risks were not, the cautionary statements 'are not curative.'"  *Winter v. Stronghold Digit. Mining, Inc.*, 686 F. Supp. 3d 295, 309 (S.D.N.Y. 2023) (quoting *City of Omaha*, 450 F. Supp.

3d at 409); *see City of Omaha*, 450 F. Supp. 3d at 409 ("Warning of risks that *could* occur at

some *future date* does not warn investors that those risks have already come to pass.").

While Baosheng did warn investors that its agency agreements with companies like

Sogou were "subject to renewal upon expiry" and that these agreements could "usually" be

"terminate[d] . . . based on business needs at [the companies'] discretion," Prospectus at 15;

Registration Statement at 15, "[a] generic warning of a risk will not suffice when undisclosed

facts on the ground would substantially affect a reasonable investor's calculations of

probability," *Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18-cv-09848 (PGG), 2020 WL

5757628, at *13 (S.D.N.Y. Sept. 27, 2020) (quoting *Meyer*, 761 F.3d at 251).  Here, the

omission of information regarding the alleged investigation into Sogou for noncompliance

with the Advertising Law, Baosheng's involvement with that investigation, and the resulting

disruptions to Baosheng's operations was materially misleading insofar as it "would cause a

reasonable investor to make an overly optimistic assessment of the risk" that Sogou would not

renew its agency agreement with Baosheng.  *Meyer*, 761 F.3d at 251.  Baosheng's generic,

hypothetical warnings that it could lose its customers in the future do not insulate it from

liability.  *Cf. id.* ("Although [the prospectus] warned of a financial risk to the company from

environmental violations, the failure to disclose then-ongoing and serious pollution violations

would cause a reasonable investor to make an overly optimistic assessment of the risk.").

Given the insufficiency of Baosheng's warnings and Sogou's 80-plus-percent contribution to

Baosheng's revenue, the omission of the heightened risk of losing Sogou as a result of the

investigation was plausibly material insofar as it would have "'significantly altered the total

mix of information' available to an investor."  *In re Lions Gate*, 165 F. Supp. 3d at 14

(quoting *Basic*, 485 U.S. at 232); *see Litwin*, 634 F.3d at 720 (finding that omission was

plausibly material where defendant "omitted information . . . that plaintiffs allege was

reasonably likely to have a material effect on . . . [the company] as a whole" and where defendant's "failure to disclose that information masked a reasonably likely change in earnings, as well as the trend, event, or uncertainty that was likely to cause such a change").

Similarly, Baosheng's warnings regarding the Chinese regulatory framework and its customers' hypothetical noncompliance were insufficient. *See* TAC ¶ 77 ("[N]on-compliance with laws and regulations on the part of any third parties with which we conduct business ***could*** expose us to . . . disruption of our business, which ***may*** adversely affect our results of operations and financial performance." (quoting Prospectus at 21; Registration Statement at 21)); *id.* ¶ 80 ("[U]ncertainties regarding interpretation and enforcement of the laws, rules and regulations in China ***may*** impose adverse impact on our business, operations and profitability." (quoting Prospectus at 28; Registration Statement at 28)). These disclosures were not curative because they "impl[ied] that the risk of regulation [was] a theoretical one, rather than — as Plaintiff[s] allege[] — a risk that ha[d] already materialized in the marketplace" and implicated its largest customer. *Panther Partners*, 2020 WL 5757628, at *13; *see also id.* at *12 (holding that hypothetical disclosures regarding China's unclear regulatory framework and risk of noncompliance by users of company's platform were insufficient where government "already adopted a regulatory framework" and "providers operating on [company]'s platform [were] violating those regulations"). These disclosures were also misleading given Plaintiffs' plausible allegation that Sogou's noncompliance with the Advertising Laws — and the investigation into Baosheng's potential involvement — *already* resulted in the detention of Baosheng's management and the suspension of its operations, and *already* posed a heightened risk that Baosheng would lose its largest client. Given the disruptions caused by the investigation and the importance of Sogou to Baosheng's revenue stream, the Court is unable to conclude at this early juncture that information

regarding the investigation and its potential risks was "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance" and therefore immaterial as a matter of law. *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 151 (2d Cir. 2021) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

Accordingly, Plaintiffs have plausibly alleged that the Registration Statement and Prospectus contained material misstatements and omissions stemming from Baosheng's failure to disclose the investigation and its associated risks and effects.[9] Golden has thus stated a claim against Baosheng under sections 11 and 12(a)(2).

### B. Golden's Section 11 Claims Against the Underwriter Defendants and Section 12(a)(2) Claim Against Univest

Section 11 "'imposes . . . negligence liability on underwriters[]' for material misstatements or omissions in a registration statement." *Nomura*, 873 F.3d at 99 (quoting *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156 (2d Cir. 2012)). In addition to the arguments already addressed, the Underwriter Defendants contend that the securities claims asserted against them should be dismissed based on a due-diligence defense. As a threshold matter, the Underwriter Defendants appear to conflate the distinct affirmative defenses of due diligence under section 11 and reasonable care under section 12(a)(2). *See In re Morgan Stanley*, 592 F.3d at 359 n.7 ("[S]ection 11 provides several due

---

[9] Neither Baosheng nor the Individual Defendants raise independent arguments regarding "Plaintiffs' allegations that there were material misstatements and omissions regarding statements about management, growth, and Sogou" — which the Individual Defendants assert are "all based on the alleged [i]nvestigation and fail for the same reasons." CEO Br. at 17 n.13; Ind. Dir. Br. at 17 n.10. Accordingly, the Court does not address those additional allegations because Plaintiffs have plausibly alleged material representations and omissions stemming from the investigation. *See also* CEO Br. at 14 n.8 ("[A]ll factual allegations are repetitively based on the same set of allegations — that the Investigation and its related effects should have been disclosed.").

diligence defenses available to non-issuer defendants, and section 12(a)(2) contains a 'reasonable care' defense." (citation omitted)).  In any case, "'[a] defendant's assertion of the due diligence defense requires an exquisitely fact intensive inquiry into all of the circumstances surrounding the facts upon which the Section 11 claim is premised,' and the same is true for a defense of reasonable care under Section 12(a)(2)."  *Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*, 68 F. Supp. 3d 439, 466 (S.D.N.Y. 2014) (quoting *In re WorldCom, Inc. Sec. Litig.*, No. 02-cv-03288 (DLC), 2005 WL 638268, at *11 (S.D.N.Y. Mar. 21, 2005)), *aff'd*, 873 F.3d 85. "Generally speaking, defendants bear the burden of demonstrating the applicability of each of these defenses, which are therefore unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6)."  *In re Morgan Stanley*, 592 F.3d at 359 n.7; *see also Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 329 (S.D.N.Y. 2012) ("[D]ue diligence cannot be asserted as a basis for dismissal pursuant to Rule 12(b)(6)."), *aff'd*, 712 F.3d 136 (2d Cir. 2013); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 494 (S.D.N.Y. 2010) ("[T]he due diligence defense[] [is] an issue inappropriate for consideration on a motion to dismiss."), *aff'd sub nom. In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167 (2d Cir. 2011).

Without wading too deeply into an underdeveloped quagmire of facts at the pleading stage, the Court finds the Underwriter Defendants' arguments unavailing.  They contend that they are entitled to rely "as a matter of law" on the expertise of Baosheng's counsel, which "gave an opinion letter, attached to the [R]egistration [S]tatement, confirming without qualification that [Baosheng's] disclosures concerning legal proceedings and its business existence were accurate."  Underwriters Br. at 3; *see id.* at 19-20.  "While an underwriter is generally entitled to rely on the expertised portions of a registration statement, in order to do so the underwriter must meet the burden of proof that it 'had no reasonable ground to believe

and did not believe' that the expertised portions contained untruths or omissions." *Griffin v. PaineWebber Inc.*, 84 F. Supp. 2d 508, 512-13 (S.D.N.Y. 2000) (citation omitted) (quoting 15 U.S.C. § 77k(b)(3)(C)). "This is not a question properly resolved on a motion to dismiss." *Id.* at 513; *see, e.g.*, *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 401 (S.D.N.Y. 2013) (noting that underwriters carried burden to establish expert-reliance defense and finding this defense inappropriate for resolution on motion to dismiss). More generally, the TAC contains no allegations regarding the reasonableness of the Underwriter Defendants' reliance on, or their belief in, the opinion letter, and so it cannot be said that this affirmative defense is "clear from the face of the complaint." *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) (quoting *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008)); *see also UBS Ams.*, 858 F. Supp. 2d at 339 (rejecting due-diligence defense at pleading stage and reasoning that "a Securities Act defendant cannot simply claim that she blindly reported information given to her by third parties and thereby avoid liability for inaccuracies that made their way into the offering materials"); *In re OSG*, 971 F. Supp. 2d at 401 ("Despite the Underwriter Defendants' contention that reliance [on expertised portions of a registration statement] is per se reasonable in the absence of red flags, no such rule of law exists. . . . Plaintiffs are not required to additionally plead red flags or facts negating the Underwriters' defense.").

Second, the Underwriter Defendants more broadly contend that they could not, with "their more limited access than counsel, . . . be expected to suspect that: (i) [Baosheng's] counsel was being defrauded; and (ii) [Baosheng's] representations about its very business existence were fraudulent." Underwriters Br. at 20-21. Again, this inquiry is too fact intensive for the Court to resolve at this juncture. Golden's core allegation against the Underwriter Defendants is that they failed to conduct a "reasonable and diligent investigation" into the accuracy of the Registration Statement and Prospectus, TAC ¶¶ 139, 160, and it

would be plainly inappropriate to decide as a matter of law, on an almost nonexistent factual record, whether the Underwriter Defendants' reliance on the representations of Baosheng and its counsel were reasonable.

Because the Underwriter Defendants cannot prevail on their affirmative defenses at this stage, the Court finds that Golden has stated a claim under section 11 as to the Underwriter Defendants and under section 12(a)(2) as to Univest based on the plausibly alleged misrepresentations and omissions in the Registration Statement and Prospectus.

### C. Golden's Section 11 Claims Against Wenxiu Zhong, Sheng Gong, the Independent Director Defendants, and Yue Jin

Strict liability for material misstatements and omissions in the Registration Statement extends to all Individual Defendants except for Yanjun Hu, who neither signed the Registration Statement nor was a director at the time of its filing. *See In re Lehman Bros.*, 650 F.3d at 175 (identifying "signatories of the registration statement" and "directors . . . at the time of filing" as parties to whom strict liability extends "for material misstatements or omissions in registration statements" (citing 15 U.S.C. § 77k(a))). The Individual Defendants argue that they can still avoid section 11 liability on an affirmative defense of negative causation because Golden's alleged losses are not connected with Defendants' alleged misrepresentations and omissions. *See* CEO Br. at 21-22; Ind. Dir. Br. at 21-22. The Court is not convinced.

"'[U]nlike securities fraud claims pursuant to section 10(b)' . . . , 'plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege . . . loss causation.'" *Winter*, 686 F. Supp. 3d at 310 (alterations and second omission in original) (quoting *In re Morgan Stanley*, 592 F.3d at 359). "The absence of loss causation — known as 'negative causation' —is instead an 'affirmative defense' that defendants bear the burden of proving, 'reflecting

Congress's "desire to allocate the risk of uncertainty to the defendants.""" *Id.* (quoting *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007)).  To establish this defense, a defendant must "prov[e] that the allegedly misleading representations did not cause the depreciation in the stock's value." *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 418 (S.D.N.Y. 2009).  The Second Circuit has described this as a "heavy burden," and a defendant may prevail at the pleading stage only when "facts supporting the defense appear on the face of the complaint, and it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (first quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009); and then quoting *United States v. Space Hunters, Inc.*, 429 F.3d 416, 426 (2d Cir. 2005)); *see also Levine*, 508 F. Supp. 2d at 272-73 ("Because an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial."); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009) ("[T]he affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion."); *Winter*, 686 F. Supp. 3d at 310 ("Where courts have found dismissal appropriate on a negative causation defense at the motion to dismiss phase, it is in the 'perhaps unusual' case where 'negative causation is apparent on the face of the Complaint.'" (quoting *In re Britannia*, 665 F. Supp. 3d at 418)).

The Individual Defendants have not carried this heavy burden.  They argue that the TAC establishes that "[t]he loss of Sogou as a client occurred at the earliest after the Registration Statement became effective," CEO Br. at 21, and thus Golden's alleged damages stemming from that loss cannot, as a matter of law, be "connected to any alleged misrepresentation that could have been included in the Registration Statement," *id.* at 22. While it is undisputed that Baosheng's "annual authorized agency agreement with Sogou

expired in March 2021" — after the IPO — and "was not renewed subsequently," TAC ¶ 50,

Plaintiffs' claims are not based on that formal termination date.  Rather, Plaintiffs plausibly

allege that it was already reasonably likely prior to the IPO that Baosheng would lose Sogou

as a customer and that Baosheng's disclosures concealed the extent of that risk.  *See id.*  In

other words, Baosheng's alleged omissions and misrepresentations misled Golden into

believing that the loss of Sogou was more remote than it actually was, and Golden suffered a

foreseeable investment loss when the agreement with Sogou was ultimately terminated and

not renewed.  Plaintiffs have thus plausibly alleged that Baosheng's disclosures "disguised the

very risk to which [plaintiff] fell victim," which is sufficient to establish causation at this

stage.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (alteration in

original) (quoting *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 189 (2d Cir. 2001));

see *Panther Partners*, 2020 WL 5757628, at *16 (rejecting negative-causation defense at

pleading stage because losses that occurred after IPO were "not inconsistent" with allegation

that undisclosed material risks existed prior to the IPO); *see also Lentell*, 396 F.3d at 173 ("If

the significance of the truth is such as to cause a reasonable investor to consider seriously a

zone of risk that would be perceived as remote or highly unlikely by one believing the fraud,

and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to

that information may be deemed a foreseeable or proximate cause of the loss." (quoting

*Castellano*, 257 F.3d at 188)).

       For these reasons, the Court finds that the Individual Defendants have not established

a negative-causation defense at this juncture.  In the absence of a successful affirmative

defense, and because Golden has sufficiently pleaded the existence of material

misrepresentations and omissions in Baosheng's Registration Statement and Prospectus, the

Court finds that Golden has stated a section 11 claim against Wenxiu Zhong, Sheng Gong, the Independent Director Defendants, and Yue Jin.

### D. Golden's Section 15 Claims Against the Individual Defendants

"Section 15 imposes joint and several liability on '[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under [section 11 or section 12] . . . unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.'" *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11-cv-02700 (PKC), 2012 WL 3957916, at *11 (S.D.N.Y. Sept. 10, 2012) (alterations and omissions in original) (quoting 15 U.S.C. § 77o(a)).  To establish control-person liability under section 15, a plaintiff must demonstrate "(1) a primary violation of the Securities Act and (2) 'control' by the defendant" over a primary violator.  *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 305 (S.D.N.Y. 2021) (quoting *Singh v. Schikan*, 106 F. Supp. 3d 439, 447 (S.D.N.Y. 2015)).  "Control over a primary violator may be established by showing that the defendant has 'the power to direct or cause the direction of the management and policies' of a primary violator."  *In re Dentsply Sirona*, 665 F. Supp. 3d at 294 (quoting *In re Lehman Bros.*, 650 F.3d at 185).  "To plead a control person violation, a plaintiff must allege that the defendant had '[a]ctual control over the wrongdoer and the transactions in question.'"  *Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 260 (E.D.N.Y. 2019) (alteration in original) (quoting *In re Alstom SA*, 406 F.Supp.2d at 487).  "[A]ctual control is essential to control person liability."  *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 578 (S.D.N.Y. 2012) (emphasis omitted) (quoting *In re Blech Sec. Litig.*, 961 F. Supp. 569, 586 (S.D.N.Y. 1997)).

Defendants Wenxiu Zhong, Sheng Gong, and Yue Jin do not dispute control, and argue only that Plaintiff's section 15 claim must be dismissed due to the lack of a primary

violation of the Securities Act.  *See* CEO Br. at 22.  Because the Court has found that Golden

established a primary violation of sections 11 and 12(a)(2), the Court also finds that Golden

has stated a claim under section 15 against Wenxiu Zhong, Sheng Gong, and Yue Jin.  *See In

re Grab Holdings*, 2024 WL 1076277, at *25 (declining to dismiss section 15 claims against

defendants who "argue[d] only that [p]laintiffs' controlling-person claims should be dismissed

because the primary-violation claims fail").

Defendant Yanjun Hu and the Independent Director Defendants argue, however, that

Golden's section 15 claims against them should be dismissed for failure to state a claim

because Golden has not established that they were controlling persons.  The Court addresses

these arguments below and finds that Plaintiffs have not stated a section 15 claim against

these Defendants.

### 1.   *The Independent Director Defendants*

The Independent Director Defendants — Defendants Yu Zhong, Zuohao Hu and

Adam (Xin) He — argue that Golden has failed to plausibly allege their control over

Baosheng based solely on their status as directors and members of the Audit Committee, *see*

Ind. Dir. Br. at 23, while Golden contends that the TAC's allegations regarding the Audit

Committee's responsibilities are sufficient to establish its members' control, *see* Opp. at 43-

44.  The Court finds that Plaintiffs have not sufficiently pleaded control-person liability as to

the Independent Director Defendants.

The Independent Director Defendants are correct that "[n]either director status nor

mere membership on an audit committee, standing alone, is sufficient to demonstrate actual

control over a company."  *In re Satyam Comp. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450,

482 (S.D.N.Y. 2013) (citing *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F.Supp.2d 371, 436

(S.D.N.Y. 2001)); *see also Emerson*, 393 F. Supp. 3d at 260 ("[B]oilerplate allegations that a

party controlled another based on officer or director status are insufficient."); *Ho*, 887 F. Supp. 2d at 578 (S.D.N.Y. 2012) ("Although determining a person's liability as a control person is a 'fact-intensive inquiry[] [that] generally should not be resolved on a motion to dismiss,' the '[s]tatus of defendants as directors, "standing alone, is insufficient to establish their control."'" (alterations in original) (quoting *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011))). That said, "[a]llegations of membership on an Audit Committee may, in certain circumstances, provide a basis for liability under the group pleading doctrine." *In re Refco*, 503 F. Supp. 2d at 642 (quoting *In re Alstom SA*, 406 F. Supp. 2d at 449).

> As previously stated, the Audit Committee's responsibilities included:
>
> reviewing with the independent auditors any audit problems or difficulties and management's response; discussing the annual audited financial statement with management and the independent auditors; . . . meeting separately and periodically with management and the independent auditors; and monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of [Baosheng's] procedures to ensure proper compliance.

TAC ¶ 34 (omission in original) (quoting Prospectus at 122). Pursuant to the Prospectus, the Audit Committee was also tasked with "reviewing the adequacy and effectiveness of [Baosheng's] accounting and internal control policies and procedures and any steps taken to monitor and control major financial risk exposures." Prospectus at 122; *see* Opp. at 44.

While the Audit Committee may have been responsible for "meeting separately and periodically" and "discussing financial statements" with Baosheng's management, TAC ¶ 34, this does not sufficiently establish, for example, that the Audit Committee members "ha[d] the power to control those who" drafted Baosheng's financial statements, or that the Audit Committee members were "in a position to approve [Baosheng's] financial statements" or otherwise had control over procedures designed to "ensur[e] a measure of accuracy in the

contents of company reports and SEC registrations." *In re Alstom SA*, 406 F. Supp. 2d at 488-89 (citing *In re Livent*, 151 F. Supp. 2d at 437); *see In re Livent*, 151 F. Supp. 2d at 437 (reasoning that control-person liability "seeks indirectly to foster accountability by imposing a penalty on those who are in a position to monitor the truthfulness of corporate public representations and establish standards to that end, but fail to do so, to the detriment of the corporation's investors"). At best, Plaintiffs' allegations regarding the Audit Committee's responsibilities establish that its members had some power to influence the company's decisions by "discussing" Baosheng's filings with management or "reviewing" the adequacy of procedures designed to ensure the accuracy of those filings. TAC ¶ 34. However, "the power to influence managerial decisions is not the same as 'power to direct the management and policies of the primary violator,'" *Ho*, 887 F. Supp. 2d at 578 (quoting *In re Tronox*, 769 F. Supp. 2d at 208), and Plaintiffs' allegations do not plausibly establish that the members of the Audit Committee had any power to direct the design of Baosheng's reporting and compliance procedures, management's adherence to those procedures, or the content of the filings submitted pursuant to those procedures. *See also City of Westland*, 928 F. Supp. 2d at 721 ("A distinction exists between outside directors and high-ranking officers; corporate officers usually are presumed to possess the ability to control the actions of their employees.").

*In re Satyam Computer Services*, cited by Plaintiffs, is distinguishable. In that case, control-person liability was established as to members of the audit committee who had "everyday involvement with the [c]ompany" and were "responsible for overseeing the [c]ompany's financial reporting process" and "ensuring the accuracy of [the company]'s financial statements." 915 F. Supp. 2d at 477; *see also id.* at 482 (noting that members of audit committee had "responsibility to oversee the [c]ompany's financial reporting,

accounting, and internal controls").  Here, the TAC does not support a plausible inference that members of the Audit Committee had everyday involvement with Baosheng, beyond "periodical[]" meetings with management.  TAC ¶ 34.  Further, the Audit Committee's stated responsibility for "reviewing" and "discussing" Baosheng's compliance procedures and financial statements, *id.*, is markedly more limited than the *Satyam* audit committee's responsibility for "oversee[ing] the [c]ompany's financial reporting, accounting, and internal controls," *In re Satyam Comp. Servs.*, 915 F. Supp. 2d at 477, and "ensuring that the financial statements are correct, sufficient, and credible," *id.* at 465; *see also In re Refco*, 503 F. Supp. 2d at 639-40 (finding that audit committee members had control where they "prepared and approved" the registration statement and "were responsible for overseeing [the issuer's] financial reporting").

At bottom, there is no support in the TAC for the inference that the Audit Committee members had everyday involvement with Baosheng's business operations or otherwise "exercised actual control over the dissemination of the alleged misstatements that [they] did not [themselves] make or over the people who drafted or otherwise signed off on those misstatements."  *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 670 (S.D.N.Y. 2017) (dismissing claim for control-person liability against member of company's disclosure committee who was "charged, by virtue of his *status* as a member . . . , with 'supporting' senior management's appraisals of disclosures and with 'examining' reports," and member of ethics committee whose "alleged responsibility to 'propos[e] actions' [was] a far cry from control over the misstatements that he did not himself make, or over the individuals who did make them" (first alteration in original)); *see also In re Alstom SA*, 406 F. Supp. 2d at 499 ("[T]he Complaint indicates only that the Audit Committee assists the Board in various oversight functions; it does not allege that the Audit Committee had the power to approve the

corporation's financial statements, nor does it allege that [the defendant] in this capacity signed any such documents.  Thus, his position as board member and Audit Committee member is insufficient to allege control person liability.").

Accordingly, the Court finds that Golden has not established that Defendants Yu Zhong, Zuohao Hu and Adam (Xin) He were control persons and has thus failed to state a claim under section 15 against them.

### 2.  *Yanjun Hu*

Next, Yanjun Hu argues that the control-person claim against him must fail because the TAC does not allege "whether and how he exerted actual control over Baosheng's management and policies, in particular, with respect to the IPO," or that he otherwise "had actual control over the IPO process and the Registration Statement."  CEO Br. at 24.  The Court agrees.

Golden primarily hangs its hat on the TAC's allegation that "Yanjun Hu admitted to taking control of [Baosheng] in the months preceding the IPO because the executive team had been detained or was in hiding."  Opp. at 46.  Even assuming, for the sake of argument, that he did, the TAC does not sufficiently establish that he was involved with preparing the Registration Statement or Prospectus.  It would take many speculative, inferential leaps to conclude, for example, that Hu took over Baosheng precisely at the time during which the filings were prepared and filed, or that he took active involvement in their preparation.  It is not even clear which duties Hu assumed when he allegedly took control, whenever that may have been, beyond liaising with local authorities or assuming a caretaker role during some undefined period.  Because the TAC does not "support . . . Plaintiffs['] contention that [he] was a control person during the [section 11 or 12(a)(2)] violations alleged in this action," or that he had "actual control over the transaction in question," *Ho*, 887 F. Supp. 2d at 579

(internal quotation marks and emphasis omitted) (citations omitted), Golden has not stated a claim under section 15 against Yanjun Hu.

### E. Golden's Section 11 Claim Against the Auditor Defendants

Golden brings a section 11 claim against the Auditor Defendants, alleging that the Consents, Audit Report, and Financial Statements contained materially misleading statements by omission. *See* TAC ¶¶ 81-94, 140-142. The Auditor Defendants dispute that these documents or any statements therein carry liability under section 11 and argue that section 11's three-year statute of repose bars Golden's claim against Friedman. *See* Auditors Br. at 9. The Court finds that Golden has failed to state a claim against the Auditor Defendants and thus does not reach the statute-of-repose issue.

#### 1. The Consents

First, the Court finds that the Consents are not actionable. Golden has not provided — nor is the Court aware of — any authority holding that the language of a consent alone can expose an auditor to section 11 liability. The lack of precedent for Golden's theory is unsurprising given the straightforward text of section 11, which delineates a limited universe of "persons liable." 15 U.S.C. § 77k(a). In relevant part, section 11 provides that a cause of action exists against an auditor, accountant, or similar expert "who has with his consent been named as having prepared or certified any part of the registration statement, or . . . any report or valuation which is used in connection with the registration statement, *with respect to the statement in such registration statement, report, or valuation.*" *Id.*. § 77k(a)(4) (emphasis added); *see New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 52 (2d Cir. 2023). This is appreciably narrower than the liability that attaches, without further qualification, to "every person who signed the registration statement" or "every underwriter." 15 U.S.C. § 77k(a)(1), (5). In other words, auditor liability under

section 11 "is limited to such statements as the registration statement names [the auditor] as having prepared or certified." *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 348 (S.D.N.Y. 2004).

In the instant case, the Consents plainly fall beyond the reach of section 11 because they are not "part of the registration statement" or a "report or valuation . . . used in connection with the registration statement" that Friedman was "named as having prepared or certified." 15 U.S.C. § 77k(a)(4). Because section 11's list of persons liable must "be strictly construed," *see Ho*, 887 F. Supp. 2d at 577 (citing *In re Lehman Bros.*, 650 F.3d at 181), the Court will not accept Golden's invitation to create a new extratextual category of auditor liability. *See also New Eng. Carpenters*, 122 F.4th at 52 ("[The auditor defendant] is thus responsible under Section 11 for any material inaccuracy in the [issuer's] registration statements that it certified, or in financial reports incorporated in those statements." (citing 15 U.S.C. § 77k(a)(4))); *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 416 n.140 (S.D.N.Y. 2013) ("Section 11 imposes liability on an auditor only for material misstatements or omissions in an audit report that is included in an SEC registration statement with the auditor's consent." (quoting *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 236 (S.D.N.Y. 2004))); *Amorosa v. Ernst & Young LLP*, 672 F. Supp. 2d 493, 511 (S.D.N.Y. 2009) ("[W]hile 'liability against the issuer of a security is virtually absolute, even for innocent misstatements,' accountant liability under Section 11 . . . is limited to 'those matters which purport to have been prepared or certified by them.'" (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 n.11, 382 (1983))), *aff'd sub nom. Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412 (2d Cir. 2011) (summary order).

Even if the Consents were actionable, they contain no statements or omissions that could reasonably be construed as materially misleading. As Golden acknowledges, the

Consents are "short and formulaic," Opp. at 53, and serve to satisfy a straightforward statutory requirement set forth in section 7 of the Securities Act, *see* 15 U.S.C. § 77g(a)(1) ("If any . . . person whose profession gives authority to a statement made by him[] is named as having prepared or certified any part of the registration statement, or is named as having prepared or certified a report or valuation for use in connection with the registration statement, the written consent of such person shall be filed with the registration statement.").  Consistent with that requirement, the Consents are limited to only two sentences consenting to (1) the incorporation of the Audit Report by reference into Baosheng's Registration Statement and (2) the reference to Friedman as an "Expert" in the Prospectus.  *See* Dkt. 142-4 at 2.  Because no more was required under section 7 and there is no dispute as to the existence or sincerity of Friedman's literal consent, the Court finds that there are no plausible allegations of anything false or misleading about the Consents' language.

### 2.  *The Audit Report*

Golden does not dispute that Friedman's Audit Report is clearly labeled as an "opinion" and consists of statements involving Friedman's subjective judgment.  *See* Registration Statement at F-2 (Audit Report containing two headings — "Opinion on the Financial Statements" and "Basis for Opinion" — and language such as "[w]e believe" and "[i]n our opinion").  Accordingly, the Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), which governs the availability of liability for statements of opinion under section 11, is controlling here.  *See Querub v. Hong Kong*, 649 F. App'x 55, 58 (2d Cir. 2016) (summary order) ("Audit reports, labeled 'opinions' and involving considerable subjective judgment, are statements of opinion subject to the *Omnicare* standard for Section 11 claims.").

"The standard for opinion liability presents 'no small task for an investor' seeking to plead that an opinion is misleading." *New Eng. Carpenters*, 122 F.4th at 42 (quoting *Omnicare*, 575 U.S. at 194). Applying *Omnicare*, the Second Circuit has identified three circumstances under which section 11 liability can extend to statements of opinion: (1) "when 'the speaker did not hold the belief she professed,'" (2) when "the statement of opinion contains embedded statements of fact that are untrue," or (3) when "the statement omits information whose omission conveys false facts about the speaker's basis for holding that view and makes the opinion statement misleading to a reasonable investor." *Id.* (first quoting *Omnicare*, 575 U.S. at 185-186; and then citing *Omnicare*, 575 U.S. at 186-88). Golden argues that the Audit Report is actionable based on the third theory regarding omissions. *See* Opp. at 60.

Under the omission-based *Omnicare* theory, an opinion is actionable if it "omits material facts about the [defendant's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement [of opinion] itself." *New Eng. Carpenters*, 122 F.4th at 42 (second alteration in original) (quoting *Omnicare*, 575 U.S. at 188). As previously identified, the TAC highlights various statements in the Audit Report that Plaintiffs contend were misleading, *see* TAC ¶ 81, because Friedman allegedly did not comply with the applicable professional standards when conducting its audit and omitted material information regarding the government investigation, *see id.* ¶ 83. The Auditor Defendants respond that Golden's omission theory is unavailing because the TAC fails to allege any facts demonstrating that Friedman failed to conduct a meaningful inquiry into Baosheng's operations or that Friedman had knowledge of the allegedly omitted facts. Auditors Br. at 15-21.

Citing to a host of PCAOB auditing standards, Golden alleges that Friedman either (A) failed to comply with professional standards and therefore failed to disclose its lack of compliance with those professional standards or (B) complied with professional standards and therefore should have uncovered facts about the suspension of Baosheng's operations and the detention of its executives, but failed to disclose those facts.  TAC ¶¶ 91-92; *see id.* ¶¶ 84-90. The Court is not convinced.

First, it is not enough for a plaintiff to surmise that an auditor must not have engaged in a meaningful inquiry because its opinions "turned out to be wrong."  *New Eng. Carpenters*, 122 F.4th at 47 (quoting *Omnicare*, 575 U.S. at 186).  Rather, a Plaintiff must allege "allege . . . facts that establish a lack of meaningful inquiry, other than the fact that the [opinion] turned out to be wrong."  *Id.*  Working backwards from the applicable professional standards, Golden may suspect that Friedman's inquiry was inadequate, but Golden has pleaded no facts regarding the nature, extent, scope, or substance of Friedman's inquiry. Without those facts, the TAC does not plausibly plead that Friedman failed to conduct a meaningful inquiry.  Such a conclusion would be no more than a guess based on hindsight. *See, e.g.*, *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 82 (S.D.N.Y. 2015) (rejecting section 11 claim based on *Omnicare* omission theory where plaintiff failed to allege "facts about the inquiry [the defendant] did or did not conduct" or "facts regarding *how* [the defendant] formulated its . . . opinion" (quoting *Omnicare*, 575 U.S. at 194)); *Key v. Horizon Bancorp, Inc.*, No. 23-cv-02961 (BMC), 2025 WL 1017552, at *3 (E.D.N.Y. Apr. 4, 2025) (finding that "plaintiffs [did] not properly plead an omission theory of liability" where they alleged "no facts [that] contradict[ed] a conclusion that defendants made a good faith investigation," even if "the investigators may have reached the wrong conclusion"); *see also Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*, 715 F. Supp. 3d 483, 495

(S.D.N.Y. 2024) ("A plaintiff may not plead a Securities Act claim 'with the benefit of 20/20 hindsight' . . . ." (quoting *Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*, No. 08-cv-07062 (PAC), 2010 WL 4642554, at *11 (S.D.N.Y. Nov. 17, 2010))), *aff'd*, No. 24-646, 2024 WL 4647131 (2d Cir. Nov. 1, 2024) (summary order).

Second, even if the Auditor Defendants conducted a meaningful inquiry, Golden has not pleaded that Friedman had knowledge of the allegedly omitted information. Absent any such allegations, Golden asks the Court to infer that if the Auditor Defendants had conducted a meaningful inquiry, it would have been impossible for the Auditor Defendants not to have uncovered the detention of Baosheng's management team, the suspension of its operations, or the risk of losing Sogou. *See* Opp. at 54-56. However, accepting this theory would require the Court to assume, for example, that there were no members of Baosheng's management who were not detained and could communicate with the auditors, or that the detentions and suspension were ongoing at the precise time Friedman was preparing its Audit Report, or that Baosheng's management was not actively concealing the investigation from the Auditor Defendants. The TAC contains no facts that would allow the Court to draw these inferences absent base speculation. *See, e.g.*, *Friedman v. Endo Int'l PLC*, No. 16-cv-03912 (JMF), 2018 WL 446189, at *5 (S.D.N.Y. Jan. 16, 2018) (finding that plaintiffs failed to state an *Omnicare*-based omission claim where they "never allege[d] that any of the [d]efendants knew of" the omitted information), *aff'd sub nom. Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494 (2d Cir. 2019) (summary order).

For these reasons, Golden has not stated a section 11 claim against the Auditor Defendants based on omissions in the Audit Report.

### 3. The Financial Statements

The TAC alleges that Baosheng's 2018 and 2019 year-end financial statements, which
Friedman certified, contained actionable statements for which the Auditor Defendants must be
held liable.  TAC ¶¶ 81-83.  Because Plaintiffs disclaimed at oral argument that they were
alleging that the pre-IPO financial statements were incorrect, *see* Oral Arg. Tr. at 59:11-60:4,
the Court need not address the Auditor Defendants' argument that "the TAC does not allege
facts showing that Baosheng's audited financial statements violated GAAP or any disclosure
requirements," Auditors Br. at 9; *see id.* at 22-24.

Given the parties briefing on *Omnicare*, however, the Court still notes its agreement
with the Auditor Defendants' argument that Baosheng's Financial Statements were not
embedded as facts in the Audit Report.  *See* Auditors Br. at 20-21.  To borrow an example
from *Omnicare*, if a CEO were to express the opinion that her company's "TVs have the
highest resolution available because [the company] use[s] a patented technology to which [its]
competitors do not have access," the fact that the "company uses a patented technology" is
embedded in the CEO's opinion.  575 U.S. at 185.  In contrast, Friedman's opinion that the
Financial Statements fairly presented Baosheng's "financial position . . . and the results of its
operations and its cash flows . . . in conformity with accounting principles generally accepted
in the United States of America," Registration Statement at F-2, contains no embedded
statements of fact that would incorporate the portions of the Registration Statement that
Golden asserts are misleading.  *See, e.g.*, *Special Situations Fund III QP, L.P. v. Marrone Bio
Innovations, Inc.*, 243 F. Supp. 3d 1109, 1119 (E.D. Cal. 2017) (rejecting argument "that
financial statements are embedded in audit opinions under *Omnicare*" where defendant's
"audit opinion provides an opinion on the accuracy of the financial statements" and "did not
use the facts of the financial statements to opine on something else"); *Johnson v. CBD Energy*

*Ltd.*, No. 15-cv-01668, 2016 WL 3654657, at *12 (S.D. Tex. July 6, 2016) ("The numbers in [the issuer]'s financial statements, on which [the auditor defendant] expressed an opinion, do not appear in the audit report and are not 'embedded' in a subordinate clause in any of [auditor defendant]'s sentences in the way the *Omnicare* Court set out."); *Hunt v. Bloom Energy Corp.*, No. 19-cv-02935, 2021 WL 4461171, at *15 (N.D. Cal. Sept. 29, 2021) ("[The Court rejects [p]laintiffs' attempt to cast any alleged errors in the financial statements as embedded statements of fact [in defendant's audit opinion].").

Accordingly, section 11 liability does not extend to the Auditor Defendants based on the portions of the Financial Statements that the TAC alleges were misleading.  Because Golden has also failed to allege that the Consents or Audit Report are actionable, Golden has failed to state a claim against the Auditor Defendants.[10]

## V.    Orient and Union's Breach of Contract Claim Against Baosheng

"To prevail on a claim for breach of contract under New York law, a plaintiff must show '(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages.'"  *Wiener v. AXA Equitable Life Ins.*, 113 F.4th 201, 214 (2d Cir. 2024) (quoting *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)). Here, the parties dispute only whether Plaintiffs have plausibly alleged a breach of the SPA. Orient and Union contend that Baosheng breached four provisions: section 3.1(*l*)(iii), "by failing to disclose the ongoing investigation," Opp. at 71; sections 3.1(i) and (j), by "fail[ing] to disclose the adverse material effects of the investigation," *id.* at 73; and section 3.1(x), "by omitting material information from its SEC disclosures," *id.* at 74.  The Court addresses each in turn and finds that Plaintiffs have sufficiently alleged a breach of all four provisions.

---

[10] The Court thus need not address the Auditor Defendants' argument that Golden's claim against Friedman is barred by section 11's statute of repose.

First, Section 3.1(*l*) warrants that Baosheng "has not been 'in violation of any statute, rule, ordinance or regulation of any governmental authority having proper jurisdiction over the Company or its Subsidiaries.'" TAC ¶ 100(c) (quoting SPA § 3.1(*l*)). Baosheng argues that Orient and Union have not alleged a breach of this warranty because they "fail to plead violation of a specific statute." Baosheng Br. at 22.

This argument is unavailing. Regardless of whether Baosheng violated any Chinese law or regulation, Plaintiffs have plausibly alleged that Baosheng was in violation of federal securities law prior to the SPA, which is sufficient to establish a breach of this kind of warranty. *See, e.g.*, *Prime Mover Cap. Partners, L.P. v. Elixir Gaming Techs., Inc.*, 793 F. Supp. 2d 651, 675-76 (S.D.N.Y. 2011) (finding that plaintiff stated claim for breach of contract provision warranting that defendant "was not and had not been 'in violation of any statute, rule or regulation of any governmental authority,'" *id.* at 675, because plaintiff "adequately . . . pleaded . . . that certain material statements . . . contained in documents filed with the SEC . . . prior to the SPA were false and violated the securities laws," *id.* at 676); *Gerszberg v. Iconix Brand Grp., Inc.*, No. 17-cv-08421 (KBF), 2018 WL 2108239, at *8 (S.D.N.Y. May 7, 2018) (finding that plaintiffs stated claim for breach of contract provision warranting that "defendants were not in violation of . . . any laws" where "plaintiffs sufficiently allege[d] that defendants were in violation of the [securities] law at the time of signing"). Accordingly, Plaintiffs have stated a claim against Baosheng for breach of Section 3.1(*l*).

Next, Section 3.1(i) warrants that "there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect," SPA § 3.1(i); *see* TAC ¶ 170, and Section 3.1(j) warrants that "there is no action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of the Company,

threatened against or affecting the Company, . . . before or by any court, arbitrator, governmental or administrative agency or regulatory authority" that "could, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect," SPA § 3.1(j); *see* TAC ¶ 100(b). "Material Adverse Effect" is somewhat recursively defined, in relevant part, as "a material adverse effect on the legality, validity or enforceability of any Transaction Document," such as the Registration Agreement, or "a material adverse effect on the results of operations, assets, business, or condition (financial or otherwise) of the Company and the Subsidiaries, taken as a whole." SPA § 3.1(b); *see id.* § 1.1, at 5 (defining "Transaction Documents").

Baosheng reasons that Plaintiffs have not established a breach of these warranties because they have not alleged facts "sufficient to infer that Baosheng had a reasonable expectation, at the time of signing the SPA, of a 'a Material Adverse Effect on the *results of* operations, assets, business, or condition (financial or otherwise) of the Company'" stemming from the investigation. Baosheng Br. at 24 (quoting SPA § 3.1(b)). As explained above, however, the Court has already determined, in the context of Item 303 and Item 5, that Plaintiffs have plausibly alleged that Baosheng was aware of the investigation and the resulting risk of losing Sogou, its biggest client, at the time of the IPO. Accordingly, the Court also finds that Plaintiffs have sufficiently pleaded the existence of an "event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect," SPA § 3.1(i), and an "investigation pending[,] . . . threated against[,] or affecting [Baosheng]" that "could, if there were an unfavorable decision, have or reasonably be expected to have a Material Adverse Effect," *id.* § 3.1(j). Plaintiffs have thus stated a claim for breach of Section 3.1(i) and Section 3.1(j).

Lastly, Section 3.1(x) warrants that Baosheng's public disclosure documents "d[id] not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading." SPA § 3.1(x). As to this provision, Baosheng's arguments are duplicative of those it already raised against Golden's securities claims. As already explained, the TAC plausibly alleges the omission of material facts in the Registration Statement and Prospectus that render them misleading, and Golden has thus alleged a breach of Section 3.1(x).

## CONCLUSION

For the foregoing reasons, Baosheng's motion to dismiss at Dkt. 140 is DENIED; the Underwriter Defendants' motion to dismiss at Dkt. 136 is DENIED; the Auditor Defendants' motion to dismiss at Dkt. 141 is GRANTED; and the Individual Defendants' motions to dismiss at Dkts. 137 and 146 are GRANTED in part and DENIED in part pursuant to Rule 12(b)(6), with the Court deferring ruling on the issue of personal jurisdiction pursuant to Rule 12(b)(2) pending rebriefing.

Accordingly, Golden's section 11 claims against the Auditor Defendants and Golden's section 15 claims against Defendants Yanjun Hu and the Independent Director Defendants are DISMISSED with prejudice.

The Individual Defendants shall submit supplemental briefing on the issue of personal jurisdiction no later than **September 19, 2025**, and Plaintiffs' response shall be due no later than **September 26, 2025**. The parties' submissions shall be filed as letter briefs not to exceed five pages and should focus on the appropriate post-*Fuld* legal standard to apply in the instant case.

The Clerk of Court is respectfully directed to terminate the pending motions at

Dkts. 136, 137, 140, 141, and 146.

Dated:  September 10, 2025
        New York, New York

                                SO ORDERED.


                                _Jennifer Rochon_
                                JENNIFER L. ROCHON
                                United States District Judge